# Exhibit 3

H
Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
UNITED STATES OF AMERICA, Plaintiff,
v.
Nabil SMAIRAT, Defendant.
**No. 05 CR 168.**

June 1, 2006.

John A. Meyer, Law Offices of John A. Meyer, Chicago, IL, for Defendant.

*MEMORANDUM DECISION*

LEFKOW, J.

*1 Defendant Nabil Smairat ("Smairat") is charged in an eight-count indictment with seven counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of money laundering, in violation of 18 U.S.C. § 1957. The indictment also includes a forfeiture allegation. Presently before the court are various pretrial motions of the United States of America (the "government") and Smairat. The court will address each motion in turn.

I. Motion by Nabil Smairat to Dismiss Counts One Through Seven of the Indictment as Duplicitous [FN1]

FN1. According to WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1981), "duplicity" means "doubleness of heart, thought, speech, or action ...." as in " "the simplicity and openness of their lives brought out for him the [duplicity] that lay at the bottom of ours-Mary Austin"), *id.* at 703."Duplicative" seems a better choice: "Marked by duplication," *i.e.,* "the action or process of duplicating or doubling...." *Id.* at 702.With apologies to William Safire but deference to the eminent authorities cited below, this court accedes to the use of "duplicitous" and "duplicity" to identify the issue whether more than one distinct offense have been improperly joined in a single count.

Smairat moves the court to enter an order dismissing counts one through seven of the indictment, which charge Smairat with wire fraud in violation of 18 U.S.C. § 1343, as duplicitous because each count alleges more than one scheme: a scheme to defraud the U.S. Department of Agriculture and a scheme to obtain money and property by means of false and fraudulent pretenses. The indictment alleges that Smairat, the owner of a grocery store, illegally paid his customers cash for their LINK (food stamp) benefits in an amount below the face value of the benefits. Specifically, counts one through seven allege that Smairat "... knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain money and property from the USDA by means of materially false and fraudulent pretenses, representations and promises...."

Duplicity is the joinder of two or more distinct offenses in the same count of an indictment. *United States v. Orzechowski,* 547 F.2d 978, 986 (7th Cir.1977). And Rule 8(a), Fed.R.Crim.P., requires that indictments charging multiple offenses state each offense in a separate count. In the context of bank fraud, 18 U.S.C. § 1344, the Seventh Circuit has explained that "a scheme to defraud and a scheme to obtain money by false or fraudulent pretenses are defined in the disjunctive, and thus are separate offenses." *United States v. LeDonne,* 21 F.3d 1418, 1425 (7th Cir.1994), *citing United States v. Doherty,* 969 F.2d 425, 427 (7th Cir.), *cert. denied,* 506 U.S. 1002, 113 S.Ct. 607, 121 L.Ed.2d 542 (1992). Similarly, the Tenth Circuit has held that "18 U.S.C. § 1341 identifies two interrelated but separate offenses: (1) engaging in a

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

scheme or artifice to defraud, or (2) engaging in a scheme to obtain money or property by false or fraudulent pretenses." *United States v. Haber,* 251 F.3d 881, 888 (10th Cir.2001), *citing United States v. Cronic,* 900 F.2d 1511, 1513 (10th Cir.1990). Recognizing that 18 U.S.C. § 1341, the mail fraud statute, and 18 U.S.C. § 1343, the wire fraud statute, contain the same two-part language, the Tenth Circuit explained that the separate offense analysis applies equally to both the mail fraud and the wire fraud statutes. *Haber,* 251 F.3d at 888 n. 4,*citing United States v. Trammell,* 133 F.3d 1343, 1354 n .2 (10th Cir.1998).

Nevertheless, "where a statute defines two or more ways in which an offense may be committed, all may be alleged in the conjunctive in one count in order to adequately apprise the defendant of the government's intention to charge him under either prong of the statute." *LeDonne,* 21 F.3d at 1427 (defendant charged in the conjunctive with violations of 18 U.S.C. § 1344(1) and (2)) (citation omitted). In this case, the indictment charges Smairat in the conjunctive with the two ways in which he allegedly committed the offense of wire fraud. Accordingly, that two schemes are alleged does not render counts one through seven fatally duplicitous.

***2** The primary problem raised by a duplicitous count in an indictment is that it may allow for an invalid, non-unanimous jury verdict on each separate offense. *United States v. Buchmeier,* 255 F.3d 415, 425 (7th Cir.2001). Duplicity also can result in "improper notice of the charges against [the defendant], prejudice in the shaping of evidentiary rulings, in sentencing, in limiting review on appeal, [and] in exposure to double jeopardy." *United States v. Marshall,* 75 F.3d 1097, 1111 (7th Cir.1996). Smairat, however, makes no argument that he would be prejudiced by the duplicitous counts in the indictment; rather, the indictment is clear and straightforward. Each of the wire fraud counts identifies a single wire communication executed in furtherance of Smairat's alleged schemes and gives Smairat adequate notice of the nature of the charges against him such that he is able to prepare a defense. Any danger of a non-unanimous jury verdict can be cured by instructing the jury that they must unanimously agree upon which of the different offenses alleged within § 1343 the defendant committed. *See United States v. Cherif,* 943 F.2d 692, 701 (7th Cir.1991) (Defendant could not complain on appeal that indictment for false statement was duplicitous, permitting a conviction even though the jury did not unanimously agree on what false statement he made, because the problem could easily have been cured by an instruction telling the jury that it could convict on the false statement count only if it unanimously agreed on the false statement he made.) Thus, the court denies Smairat's motion to strike counts one through seven of the indictment as duplicitous.

II. Motion by Nabil Smairat to Strike Surplusage from the Indictment

Smairat moves pursuant to Rule 7(d), Fed.R.Crim.P., to strike as surplusage all references to acts in furtherance of the alleged wire fraud scheme that occurred prior to February 17, 2000. 18 U.S.C. § 3282 requires that an indictment for a non-capital offense be brought within five years "after such offense shall have been committed."The indictment returned by the grand jury on February 17, 2005 alleges specific acts in furtherance of a scheme to defraud the United States Department of Agriculture's LINK program that occurred more than five years before the date of the return of the indictment. Smairat argues that the allegations in the indictment concerning acts that occurred between June 1, 1999 and February 17, 2000 are outside the statute of limitations and not chargeable as a continuing offense and, therefore, the inclusion of these allegations in the indictment is immaterial, irrelevant, and prejudicial.

Although the government is unable to indict Smairat separately on those acts that occurred prior February 17, 2000, Smairat fails to argue that those acts were not in furtherance of the alleged scheme

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

to defraud the LINK program. As recognized by the government, the alleged wires constituting the offenses are all within the statute of limitations. And the allegations relating to the acts in furtherance of the alleged scheme, even if they occurred prior to February 17, 2000, are relevant to establish a scheme to defraud and Smairat's intent. *See United States v. Tadros,* 310 F.3d 999, 1006 (7th Cir.2002); *United States v. Eckhardt,* 843 F.2d 989, 993-94 (7th Cir.1988). Moreover, Smairat has not identified how he is unfairly prejudiced by the inclusion of these allegations in the indictment. The court, therefore, denies Smairat's motion to strike.

III. Motion by Nabil Smairat to Suppress Evidence

*3 Smairat moves to suppress the evidence seized from his house on April 15, 2003. Smairat argues that the consent obtained by federal agents from Smairat's brother, Michil Smairat, and wife, Barbara Smairat, was unlawful, invalid, or otherwise insufficient. Both parties agree that an evidentiary hearing is necessary to determine whether the consent given by Michil Smairat to search the house of Nabil and Barbara Smairat was valid and whether Michil Smairat had actual or apparent authority to consent to a search of containers within the house.

The government argues, however, that no hearing is required to determine the voluntariness of Mrs. Smairat's consent because any alleged force used against Michil Smairat could not have tainted Mrs. Smairat's consent, as there are no allegations that Mrs. Smairat had knowledge of the alleged force used against Michil Smairat or that it affected her decision to consent. The government further contends that even if Michil Smairat's consent was involuntary or inadequate to justify search of containers within the Smairat's home, the search of these containers that occurred before Mrs. Smairat consented to the search may be justified under the inevitable discovery doctrine.

The " 'inevitable discovery' doctrine is a means for the government to avoid suppression of evidence obtained as the result of unlawful conduct by the police, ... and for the doctrine to apply the government must prove by a preponderance of the evidence that authorities '*would* have found the challenged evidence through lawful means." ' *United States v. Cherry,* 436 F.3d 769 at 771 (7th Cir.2006) (citations omitted) (emphasis in original). The government states that the agents had probable cause to believe that the financial and business records and $260,000 located in Smairat's home and in the containers were evidence of money laundering and food-stamp fraud, and the agents could have lawfully seized the containers even if Michil Smairat's consent was insufficient to allow them to open them. Absent from this statement is evidence supporting the government's assertion of probable cause. As a result, the court will require the government to prove by a preponderance of the evidence at an evidentiary hearing that the authorities would have found this evidence through lawful means.

Additionally, Mrs. Smairat avers in an unsworn declaration that upon her arrival home, she observed individuals wearing shirts or jackets bearing logos of "police," "DEA" and "FBI" outside the house. She also observed that these agents were carrying cardboard boxes out of the house and placing them in the cars parked in the vicinity. Upon parking her car, she was met by a DEA agent who escorted her into her house where she observed numerous agents in the process of removing boxes from the basement. After being informed that her husband was involved in importing illegal drugs from Canada, she was escorted to the basement where agents displayed clear plastic bags containing U.S. currency. She was escorted back upstairs where two agents informed her that they had been searching the house. The agents also informed her that they had the authority to conduct the search because Michil Smairat had authorized it. An agent also asked her about the existence of additional cash in the house and informed her that they were prepared to "tear the house apart." The agents then informed Mrs. Smairat that it would be in her interest to sign a consent to search form, which she did.

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*4 Although Smairat has not averred that any force or threats of force were used against Mrs. Smairat, these allegations raise a question as to whether Mrs. Smairat gave her consent voluntarily or whether her consent was tainted by the presence of the agents at her home and the allegedly unlawful search of the Smairat home that resulted from the consent of Michil Smairat. "The burden is on the government to prove, by a preponderance of the evidence, 'that someone who consents to a search does so freely and voluntarily." ' *United States v. Villegas,* 388 F.3d 317 at 325 (7th Cir.2004), *quoting United States v. Saadeh,* 61 F.3d 510, 518 (7th Cir.1995). If Michil Smairat's consent was invalid and if the agents then used this consent as leverage to persuade Mrs. Smairat to give her consent, it is also arguable that the evidence obtained following Mrs. Smairat's consent was the result of the exploitation of Michil Smairat's consent and the subsequent illegal search. *See, e.g., United States v. Gillespie,* 650 F.2d 127, 129 (7th Cir.1981) (holding that evidence initially obtained during illegal search of defendant's home must be suppressed when seized during later search to which defendant consented). Additionally, Mrs. Smairat may have given her consent to the search under the belief that there was no reason to withhold her consent since the search of her home by government agents was already underway. At the same time, Mrs. Smairat's consent may have been " 'so attenuated as to dissipate the taint" ' of the allegedly illegal action. *Segura v. United States,* 468 U.S. 796, 805, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984), *quoting Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939). Accordingly, the court also grants Smairat's motion to the extent that he seeks an evidentiary hearing to determine whether the consent given by Michil Smairat to search the house of Nabil and Barbara Smairat was valid, whether Michil Smairat had actual or apparent authority to consent to a search of containers within the house, and whether Barbara Smairat's consent was given voluntarily.

IV. Motion by Nabil Smairat for Early Return of Subpoenas

This motion is granted as unopposed.

V. Motion by Nabil Smairat to Dismiss Indictment Based on Loss of Evidence

Pursuant to Rule 12(b)(2), Fed.R.Crim.P., Smairat moves the court to dismiss the indictment or, in the alternative, to bar evidence of any documents, currency, tangible objects, or other items obtained as a result of the search of Smairat's residence because the government negligently or recklessly lost or destroyed many of the items removed from his home. In an unsworn declaration, Smairat avers that he maintained various records and receipts of Smart Choice from the period of June 1, 1998 through June or July 2002 in the basement of his home. As of April 15, 2003, all of these records and documents were complete and intact in his basement. On April 15, 2003, federal agents searched Smairat's home and removed 18 boxes of "MISC docu- ments."

*5 Following his indictment, Smairat reviewed the documents provided by the government and has found that the following items are missing or otherwise unaccounted for:

1. The daily and monthly documentation and records for Smart Choice for the period of 1/1/1999 to and including 3/31/2001;

2. The daily and monthly documentation and records for Smart Choice for the period of 5/16/2001 to and including 5/31/2001;

3. The daily and monthly documentation and records for Smart Choice for the period of 1/1/2002 to and including 1/31/2002;

4. Nearly all of the receipts from vendors who made deliveries to the store;

5. Nearly all of the receipts from vendors where

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

merchandise was picked up directly from the vendor;

6. Smairat's personal and business telephone books containing all of the business contacts for Smart Choice; and

7. Bound ledger journal containing disbursement and payment information for Smart Choice.

Smairat argues that the government's loss of these records violates the requirement of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, that the prosecution provide the defense with exculpatory information.

Smairat is not claiming, however, that the prosecution has intentionally suppressed material evidence that is favorable to him, as Smairat concedes that the Office of the United States Attorney has made its best efforts to have the various federal agencies produce all items and documents taken from Smairat's home. Rather, Smairat claims that the federal law enforcement agencies involved in the search and seizure from Smairat's home have refused or ignored repeated requests that the materials be produced, and, as a result, Smairat is not in the position to know whether these agencies have lost the materials or merely have failed to produce them.

When the failure of the government to preserve evidence is at issue, "due process requires that the defendant show: (1) bad faith on the part of the government; (2) that the exculpatory value of the evidence was apparent before the evidence was destroyed; and (3) that the evidence was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Watts,* 29 F.3d 287, 289-90 (7th Cir.1994), *citing Arizona v. Youngblood,* 488 U.S. 51, 57-58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Bad faith is determined by whether the government knew the exculpatory value of the evidence at the time it was lost or destroyed. *Jones v. McCaughtry,* 965 F.2d 473, 477 (7th Cir.1992). To show bad faith, the defendant "must prove 'official animus' or a 'conscious effort to suppress exculpatory evidence.'" ' *Id., citing United States v. Nesbit,* 852 F.2d 1502, 1520 (7th Cir.1988).

Smairat argues that bad faith should be imputed to the agencies involved in this matter because they removed every financial document from Smairat's home; Smairat was then charged with a financial crime but left defenseless when he was denied access to his own records; and the government agents "cherry-picked" the records that they believed were incriminating but were grossly negligent or reckless in failing to preserve the financial records. While the negligence of government agents in failing to preserve such evidence would not establish that the agents acted in bad faith, *see Youngblood,* 488 U.S. at 58, it is unclear at this time whether this evidence is missing or whether government agents have simply failed to turn over the requested evidence to the government. As such, the court grants Smairat's motion to the extent that he seeks an evidentiary hearing to determine whether government agents have acted in bad faith in failing to preserve the financial documents or in failing to disclose these documents to the government. The court notes that Smairat has a high hurdle to overcome in order to succeed on this motion because he must also demonstrate that these documents had exculpatory value and that this value was apparent to the agents before the documents were destroyed and that he is unable to obtain comparable evidence by other reasonably available means. At this point in time, Smairat has offered little more than speculation that documents were exculpatory, much less that the exculpatory nature of these documents was apparent.

V. Motion by Nabil Smairat to Dismiss and Strike Certain Forfeiture Allegations of the Indictment in Violation of the *Ex Post Facto* Clause of the United States Constitution

***6** With this motion, Smairat moves the court to dismiss or, in the alternative, strike the forfeiture allegations of the indictment arguing that certain

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

forfeiture allegations violate the *ex post facto* clause of the Constitution because the applicable forfeiture statute, 28 U.S.C. § 2461(c), took effect August 23, 2000, while the indictment seeks forfeiture of assets relating to allegations of wire fraud occurring as early as June 1, 1999.

It is well-established that the *ex post facto* clause does not bar the application of a newly-enacted statute to an offense that began before, but continued after, the enactment of the statute. *United States v. Vivit,* 214 F.3d 908, 917 (7th Cir.2000) ("a statute increasing the penalty for [an offense] beginning before the date of enactment but continuing afterwards does not offend the Constitution"), *quoting United States v. Baresh,* 790 F.2d 392, 404 (5th Cir.1986). Wire fraud, however, is not a continuing offense; it occurs on the day of the wire. *See United States v. Barger,* 178 F.3d 844, 847 (7th Cir.1999) (mail fraud); *United States v. Tadros,* 310 F.3d 999, 1006 (7th Cir.2002) ("Each mailing constitutes a separate offense"). And the government has not cited to any statute contradicting Smairat's assertion that until Congress enacted § 2461(c) and amended 18 U.S.C. § 981(a)(1)(C) as part of the Civil Asset Forfeiture Reform Act (CAFRA), no authority existed permitting the criminal forfeiture of proceeds of wire fraud.

Each of the offenses of wire fraud with which Smairat is charged occurred after § 2461(c) took effect. Thus, § 2461(c) applies to those offenses and, if Smairat is convicted, he will forfeit any and all right, title, and interest he may have in any property, real and personal, which constitutes and is derived from proceeds traceable to the offenses. The government, however, cannot seek to apply § 2461(c) to forfeit assets acquired prior to August 23, 2000. Wire fraud is not a "straddle offense," *see Barger,* 178 F.3d at 847-48, and accordingly, the imposition of § 2461(c) to conduct occurring prior to August 23, 2000 would violate the *ex post facto* clause of the Constitution, as it would increase the severity of the punishment for the crime since no such authority existed previously. As a result, assets acquired by Smairat prior to August 23, 2000 are not subject to criminal forfeiture. The court, however, denies Smairat's motion to strike the forfeiture allegations because the forfeiture count involves allegations of wire fraud that occurred after August 23, 2000.

VI. Smairat's Motion to Dismiss and Strike the Forfeiture Allegation, Motion by Nabil Smairat for Return of Property, Government's Motion for a Protective Order to Preserve Property for Criminal Forfeiture

On April 15, 2003, agents of the DEA, assisted by Special Agents of the IRS, seized $260,000 in U.S. currency from the basement of Smairat's residence. The property was seized after Smairat was arrested by Cincinnati DEA agents on the same day for conspiring to possess a listed chemical (pseudoephedrine) with knowledge and reasonable cause to believe that it would be used to manufacture a controlled substance (methamphetamine) in violation of 21 U.S.C. § 846. On February 17, 2005, Smairat was indicted for wire fraud.

*7 Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), the indictment seeks forfeiture of certain assets of Smairat upon his conviction, including funds in the amount of $2,000,000. The government avers that there is probable cause to believe that this property was the proceeds of Smairat's wire fraud violations. Additionally, the government states that the $260,000 are part of the $2,000,000 and traceable to Smairat's wire fraud violations. The government seeks an order allowing the government to maintain custody of the $260,000 to preserve it for criminal forfeiture. Smairat, by contrast, seeks a return of the $260,000. Additionally, Smairat moves the court to dismiss and strike the forfeiture allegation.

As a general matter, criminal forfeiture is permitted for the offense of wire fraud only when "special circumstances" are present, such as where fraud affected a financial institution. *See*18 U.S.C. §

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

982(a)(2)(A). In this case, the government seeks criminal forfeiture for wire fraud under 18 U.S.C. § 981. Section 981(a)(1)(c) provides for civil forfeiture of any real or personal property that "constitutes or is derived from proceeds traceable to" an offense constituting "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7).Section 1956(c)(7) defines "specified unlawful activity" as, among other things, "any act or activity constituting an offense listed in section 1961(1) [of Title 18]." Section 1961(1) is part of the RICO statute, which establishes, in part, that mail and wire fraud are offenses for purposes of RICO. Unlike § 982, § 981 does not require "special circumstances" for forfeiture. Thus, § 981 allows for civil forfeiture of the proceeds of mail and wire fraud. The issue before the court is whether § 2461(c), which was enacted as part of the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") and authorizes criminal forfeiture for any offense for which Congress has authorized civil forfeiture, allows for criminal forfeiture based on wire fraud in the absence of "special circumstances." FN2

> FN2. In his motion to dismiss and strike certain forfeiture allegations of the indictment in violation of the *ex post facto* clause of the constitution, Smairat seemingly concedes this issue, stating, "Criminal forfeiture of the proceeds of wire fraud, as charged in this case, was not permitted until Congress enacted 28[ ] U.S.C. [ ] § 2461(c) and amended 18[ ] U.S.C. [ ] § 981(a)(1)(C) as part of CAFRA, effective August 23, 2000."Motion to Dismiss at 3. The court recognizes that Smairat was not attempting to argue the merits of the present motion to dismiss and strike the forfeiture allegation, and, as a result, will consider the merits of the parties' arguments.

In interpreting § 2461(c), the court first looks to the language of the statute. *United States v. Henderson,* 376 F.3d 730, 732 (7th Cir.2004) (citations omitted)."If that language is plain, [the court's] only function is " 'to enforce it according to its terms." ' *Greenfield Mills, Inc. v. Macklin,* 361 F.3d 934 at 954 (7th Cir.2004), *quoting United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). "The court only looks beyond the express language of a statute where such language is ambiguous, or where a literal interpretation would lead to absurd results or thwart the goals of the statutory scheme." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer,* 49 F.3d 323 at 326-27 (7th Cir.1995), *citing United States v. One Parcel of Real Estate Commonly Known as 916 Douglas Ave., Elgin, Ill.,* 903 F.2d 490, 492 (7th Cir.1990), *cert. denied,* 498 U.S. 1126, 111 S.Ct. 1090, 112 L.Ed.2d 1194 (1991).

***8** Until the statute was amended, effective March 9, 2006, § 2461(c) stated:

> If a forfeiture of property is authorized in connection with a violation of an Act of Congress, and any person is charged in an indictment or information with such violation but no specific statutory provision is made for criminal forfeiture upon conviction, the Government may include the forfeiture in the indictment or information in accordance with the Federal Rules of Criminal Procedure, and upon conviction, the court shall order the forfeiture of the property in accordance with the procedures set forth in section 413 of the Controlled Substances Act [21 U.S.C. § 853], other than subsection (d) of that section.

The dispute between the parties requires a resolution as to the meaning of the phrase "but no specific statutory provision is made for criminal forfeiture upon conviction."Smairat argues that § 2461(c) does not authorize criminal forfeiture for mail or wire fraud because 18 U.S.C. § 982(a) is a "specific statutory provision" for criminal forfeiture with respect to wire fraud in violation of 18 U.S.C. § 1343 that limits criminal forfeiture to cases involving "special circumstances." Because the government has not alleged that any of the enumerated "special circumstances" are present, Smairat asserts that §

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

982(a) prohibits the use of § 2461(c) as a basis for criminal forfeiture for wire fraud. The government argues, however, that because there is no general criminal forfeiture provision for wire fraud, the combination of § 981 and § 2461(c) allows for criminal forfeiture for wire fraud.

Both the government's and Smairat's readings of § 2461(c) are plausible. Indeed, citing to the plain language of the statute, district courts have construed § 2461(c) both ways. *See United States v. Day,* 416 F.Supp.2d 79, 86 (D.D.C.2006) ("By its terms, therefore, Section 2461(c) does *not* authorize criminal forfeiture of mail and wire fraud proceeds.") (emphasis in original), *citing United States v. Croce,* 345 F.Supp.2d 492, 496 (E.D.Pa.2004) ("18 U.S.C. § 982(a)(2)(A) is a specific statutory provision made for criminal forfeiture upon conviction of mail fraud, ... so § 2461(c) does not authorize us to order criminal forfeiture of mail fraud proceeds.") (internal citation omitted); *United States v. Grass,* No. 02-146, 2002 U.S. Dist. LEXIS 26045, at *15-17 (M.D.Pa. Dec. 17, 2002) (same regarding wire fraud); *cf. United States v. Thompson,* No. 02 CR 116, 2002 WL 31667859, at *2 (N.D.N.Y. Nov.26, 2002) (applying similar reasoning regarding narcotics conspiracy and possession with intent to distribute marijuana).*But see United States v. Schlesinger,* 396 F.Supp.2d 267, 275 (E.D.N.Y.2005) ( [U]nder the plain terms of [§ 2461(c) ], criminal forfeiture for mail and wire fraud is permitted."); [FN3] *United States v. Lebed,* No. 05-361-02, 2005 WL 2495843 (E.D.Pa. Oct.7, 2005) (holding that " § 2461(c) allows for criminal forfeiture in mail and wire fraud cases in which the fraud does not affect a financial institution"); *United States v. Wittig,* No. 04-40142-01-02, 2006 WL 13158, at *2 (D.Kan. Jan.3, 2006) (allowing criminal forfeiture of property pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)).[FN4]

FN3. The court notes that while Smairat did not cite to or otherwise reference *Schlesinger,* Smairat quoted heavily from this opinion in his motion to dismiss and strike the forfeiture allegation of the indictment. In fact, the entire argument portion of his motion is essentially a word-for-word recitation of the court's analysis in *Schlesinger,* that is, until the court reached a conclusion contrary to the argument that Smairat is asserting. At a minimum, this suggests to the court that Smairat was aware of contrary authority but failed to bring this authority to the court's attention. The court recognizes that there is no controlling precedent and that no court within this circuit has addressed the precise issue raised in these motions. Nevertheless, the court has a strong preference that attorneys, who must be mindful of their duty of candor, disclose adverse authority.

FN4. The Ninth Circuit also found that § 2461(c) authorizes criminal forfeiture of the proceeds of mail or wire fraud crimes. *See United States v. Rutledge,* 437 F.3d 917, 921 (9th Cir.2006). Recently, however, the Ninth Circuit withdrew its opinion because the appeal had been rendered moot by a plea agreement that was reached before the court filed its opinion. *United States v. Rutledge,* --- F.3d ----, 2006 WL 1277883 (9th Cir. May 11, 2006).

***9** This court reads § 2461(c) as allowing criminal forfeiture where a statute provides for civil forfeiture but does not specifically provide for criminal forfeiture upon conviction. Because there is no specific criminal forfeiture provision for wire fraud in the absence of "special circumstances," § 2461(c) allows for criminal forfeiture of the proceeds of wire fraud. As explained by the court in *Schlesinger,* this construction of the statute makes § 2461(c) a "broad 'gap filler' that applies whenever civil forfeiture is permitted. In sum, when there is no provision for criminal forfeiture, the government may

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

use a civil forfeiture provision if it includes such allegation in the indictment." 396 F.Supp.2d at 276. If, however, a statute includes a specific criminal forfeiture provision, that provision, and not the civil forfeiture provision, will apply. *Id.*

In rejecting Smairat's proffered construction of § 2461(c), the court again finds *Schlesinger* instructive. In that case, the defendants offered the same reading of § 2461(c) as that of Smairat: that the "specific statutory provision" prohibits the use of § 2461(c) as a basis for criminal forfeiture for mail and wire fraud because § 982(a) is a "specific statutory provision" for criminal forfeiture with respect to mail and wire fraud in matters involving "special circumstances." 396 F.Supp.2d at 274. The court in *Schlesinger* recognized this "restrictive reading of the statute" as being plausible but not the only permissible construction of the statute. *Id.* at 275.Instead, as the court explained,

[r]eading the statute the way the Defendants propose adds qualifying language that is simply not in the statute. The Defendants interpret the section to mean that the government can *only* include the charges *if* there is no existing criminal forfeiture provision. This interpretation wrongfully replaces the word "but" with "only if."

The word "but" is used in the statute as a conjunction. The definition of "but" is "except for the fact" or "unless." *See Merriam-Webster's Third New International Dictionary Unabridged* (2002). "But" is not synonymous with "only if." Using the definition "unless" and rearranging the phrasing of the statute, it reads: "the Government may include the forfeiture in the indictment ... if forfeiture of the property is authorized ... [unless a] specific statutory provision is made for criminal forfeiture upon conviction...."

*Id.*(emphasis in original). Thus, Smairat's construction of § 2461(c) is contrary to the plain language of the statute.

Additionally, even if the language of § 2461(c) was ambiguous, which the court believes it is not, the legislative history of § 2461(a) supports the court's reading of the statute. *See id.* at 276-77 ("It appears that in enacting more stringent due process protection in the civil forfeiture realm, Congress inserted § 2461(c) to allow the government to seek forfeiture through an indictment rather than commencing a separate civil action against a criminal defendant for forfeiture."); *Lebed,* 2005 WL 2495842, at *8-9 (explaining that a goal of CAFRA was to "expand[ ] the reach of federal criminal forfeiture, such as to crimes that frequently generate criminal proceeds"); *Thompson,* 2002 WL 31667859, at *3 (in enacting § 2461(c), "Congress was merely filling a gap in the current law by providing that where a criminal forfeiture provision existed, but no mechanism for enforcement of that forfeiture was found in the statute, the provisions of 21 U.S.C. § 853 would fill the gap.").

***10** A recent amendment to § 2461(c), effective March 9, 2006, further bolsters the court's reading of the statute. The amended statute reads as fol- lows:

If a person is charged in a criminal case with a violation of an Act of Congress *for which the civil or criminal forfeiture of property is authorized,* the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to the Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code. The procedures in section 413 of the Controlled Substances Act (21 U.S.C. 853) apply to all stages of a criminal forfeiture proceeding, except that subsection (d) of such section applies only in cases in which the defendant is convicted of a violation of such Act.

28 U.S.C. § 2461(c) (Mar. 9, 2006) (emphasis added). In eliminating the "but no specific statutory provision" language of the earlier version and au-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

thorizing criminal forfeiture of property whenever a person is charged with violating a statute that authorizes "civil or criminal forfeiture of property," Congress has eliminated any ambiguity in the previous statute. With this amendment, Congress has demonstrated its intent to "Encourag[e the] use of Criminal Forfeiture as An Alternative to Civil Forfeiture" and to establish "Uniform Procedures for Criminal Forfeiture." *See*Pub.L. 106-185, § 16 (April 25, 2000), Pub.L. 109-177, § 410 (Dec. 8, 2005). Thus, under § 2461(c), the government may seek criminal forfeiture of the proceeds of wire fraud pursuant to § 981. Smairat's motion to dismiss and strike the forfeiture allegation of the indictment is denied.

Having determined that the government may seek criminal forfeiture of the proceeds of the alleged wire fraud, the court now must decide whether to grant the government's motion for a protective order to preserve property for criminal forfeiture or to return the $260,000 that were seized on April 15, 2003 to Smairat. This decision requires the court to resolve whether § 2461(c) authorizes pretrial restraint of putative forfeitable property.

Before the court reaches that issue, however, the government must demonstrate that there is probable cause to believe that the $260,000 were the proceeds of Smairat's alleged wire fraud. The court agrees with Smairat that, at this point in time, the government has not proffered anything more than an assertion that the $260,000 are part of the $2,000,000 forfeiture amount sought in the indictment. Thus, the court will grant Smairat's request for an evidentiary hearing on this issue and defer ruling on the present motions until after the hear- ing.

## CONCLUSION

For the reasons stated above, the court denies the Motion by Nabil Smairat to Dismiss Counts One Through Seven of the Indictment as Duplicitous [# 16], denies the Motion by Nabil Smairat to Strike Surplusage from the Indictment [# 17], and denies the Motion by Nabil Smairat to Dismiss and Strike Certain Forfeiture Allegations of the Indictment in Violation of the *Ex Post Facto* Clause of the United States Constitution [# 34]. The court grants the Motion by Nabil Smairat for Early Return of Subpoenas [# 20]. Pending an evidentiary hearing, the court reserves ruling on the Motion by Nabil Smairat to Suppress Evidence [# 18], Motion by Nabil Smairat to Dismiss Indictment Based on Loss of Evidence [# 29], and Smairat's Motion to Dismiss and Strike the Forfeiture Allegation [# 31], the Motion by Nabil Smairat for Return of Property [# 30], and Government's Motion for a Protective Order to Preserve Property for Criminal Forfeiture [# 48].

N.D.Ill.,2006.
U.S. v. Smairat
Slip Copy, 2006 WL 1554412 (N.D.Ill.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Exhibit 4

**H**
Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
UNITED STATES OF AMERICA
v.
Abdul Karim ALHALABI
**No. 03 CR 971-1.**

April 8, 2005.

John A. Meyer, Law Offices of John A. Meyer, Timothy P. O'Connor, Catherine L Crisham, Winston & Strawn LLP, Chicago, IL, for Defendant.

Ricardo Meza, United States Attorney's Office, Chicago, IL, for Plaintiff.

*MEMORANDUM OPINION AND ORDER*

KENNELLY, J.

*1 Abdul Karim Alhalabi was convicted by a jury of three wire fraud charges and three food stamp trafficking charges. He has moved for an order arresting judgment on the grounds that the indictment failed to charge an offense; for a judgment of acquittal; or for a new trial.

1. Whether the indictment charged an offense

The Court rejects Alhalabi's argument that the wire fraud charges (Counts 1, 2, and 3) failed to charge an offense. These counts' charging paragraphs alleged that Alhalabi, for the purpose of executing a scheme to defraud, knowingly caused food stamp benefits to be transmitted for payment and redemption by wire communication in interstate commerce, specifically, certain identified electronic funds transfers. *See, e.g.,* Indictment, Count 1 ¶ 11. These allegations met the requirements of the wire fraud statute. 18 U.S.C. § 1343. Alhalabi's argument that the identified electronics funds transfers were not truly payments or redemptions of food stamp benefits is an argument about the sufficiency of the evidence, not the adequacy of the indictment.

Alhalabi's argument regarding the food stamp charges has some surface appeal but also fails. Counts 4, 5, and 6 alleged that Alhalabi had violated 7 U.S.C. § 2024(b) & (c). These are two distinct offenses, and for this reason the charges were arguably duplicitous. *See, e.g., United States v. Buchmeier,* 255 F.3d 415, 421 (7th Cir.2001) (duplicity consists of the joining of two charges in a single count). But Alhalabi did not argue before trial, and does not argue now, that these particular charges were duplicitous. In any event, any potential prejudice from the duplicitousness of these charges was cured by the jury instructions, which effectively limited the jury to consideration of a charge under § 2024(b).*See* Instructions Given to the Jury at 26 (requiring the government to prove that Alhalabi "knowingly acquired Link card benefits in a manner contrary to law").*See Buchmeier,* 255 F.3d at 425 (duplicitous indictment cured by jury instructions that required jury to convict defendant of a single offense); *United States v. Cherif,* 943 F.2d 692, 701 (7th Cir.1991).

Section 2024(b) prohibits the knowing use, transfer, acquisition, alteration, or possession of "coupons, authorization cards, or access devices in any manner not authorized by this chapter or the regulations issued pursuant to this chapter."An "access device" is a "card, plate, code, account number, or other means of access that can be used, along or in conjunction with another access device, to obtain payments, allotments, benefits, money, goods, or other things of value, or that can be used to initiate a transfer of funds" under the Food Stamp Act. 7 U.S.C. § 2012(t).

Counts 4, 5, and 6 each alleged that Alhalabi "did knowingly acquire, transfer, and possess United States Department of Agriculture Electronic Trans-

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

fer Card benefits, namely LINK benefits," in that he caused payments to be made to his company's bank account, knowing the LINK benefits to have been received, transferred, and used in an unauthorized manner. *See, e.g.,* Indictment, Count 4 ¶ 2. Alhalabi contends that payments into a bank account are not "coupons, authorization cards, or access devices" and that these Counts thus fail to charge an offense.

***2** The Court again concludes that Alhalabi's argument is an argument about the sufficiency of the evidence, not the sufficiency of the indictment. An indictment charges an offense if it alleges the elements of the offense, *see, e.g., United States v. Sandoval,* 347 F.3d 627, 633 (7th Cir.2003); whether the proof measures up is a separate matter. The indictment's allegation that Alhalabi knowingly acquired, transferred, and possessed electronic transfer card benefits, though perhaps not as precise as one might want to see in an indictment, was sufficient to state an offense under § 2024(b), as Alhalabi's acquisition, transfer, and possession of electronic transfer card benefits may be said to be an unauthorized use, acquisition, transfer, and possession of an "access device"-i.e., a LINK card. It may also be said to be an unauthorized use, acquisition, transfer, and possession of a "coupon," defined in the Food Stamp Act as including both "authorization card[s]" and "access device[s], including ... electronic benefit transfer card[s]."7 U.S.C. § 2012(d).

2. Whether the evidence was sufficient

In deciding a motion for judgment of acquittal, the Court must view the evidence in the light most favorable to the government, *see, e.g., United States v. Arocho,* 305 F.3d 627, 639 (7th Cir.2002), and may grant the motion only if no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *See, e.g., United States v. Griffin,* 310 F.3d 1017, 1022 (7th Cir.2002). The evidence was sufficient to permit the jury to convict Alhalabi of each of the charges.

Alhalabi's primary argument for a judgment of acquittal on the wire fraud charges is a reprise of an argument that the Court rejected during the course of the trial, specifically, that the government failed to prove the particular wire communications alleged in Counts 1 through 3. These Counts each identified an electronic funds transfer from Austin, Texas to Firstar Bank in Chicago for deposit into Holyland Foods' account. *See, e.g.,* Indictment, Count 1 ¶ 11. Alhalabi contends that the evidence shows that the only wire communications transmitted from Austin were automated clearing house files that were sent not to Firstar Bank in Chicago but rather to National City Bank in Kalamazoo, Michigan, which stripped out entries for retailers with accounts at that Bank and then forwarded the files by wire to a Federal Reserve Bank, which in turn forwarded the transmission to the various banks where funds were to be deposited, including Firstar. According to Alhalabi, there was no wire transfer from Austin to Chicago; the wire sent by National City was a different wire communication than the one sent from Austin; and the wire from Austin was not itself an electronic funds transfer but rather was a request to make such a transfer.

As the government argues, however, the evidence was sufficient to show that Alhalabi caused Transactive Corporation to send a wire from Austin directing the making of an electronic funds transfer into Holyland's account in Chicago. It is of no consequence that the wire communication did not go directly from Austin to Chicago. *See United States v. Van Cauwenberghe,* 827 F.2d 424, 430 (9th Cir.1987). The wire communication, considered as a whole, began in Austin and ended at Firstar Bank, and any arguable variance resulting from the fact that there were intermediate steps in no way prejudiced Alhalabi. *See, e.g., United States v. Martino,* 648 F.2d 367, 398 (5th Cir.1981). In addition, the fact that Transactive's wire communication was not itself a transfer of funds, but rather a direction to make a transfer, is likewise immaterial. This is not a case in which there is a danger that the jury convicted Alhalabi on some different charge that the

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

grand jury returned or a set of material allegations different from the one that the grand jury considered.

*3 The Court also rejects Alhalabi's remaining arguments. First, there was sufficient evidence that Alhalabi participated in a scheme to defraud as late as October 1998, even after he purportedly sold the store (a claim which, we might add, the jury was not required to accept). Among other things, there was evidence that Alhalabi continued to participate in the operation of the store through October 1998. The jury reasonably could conclude from this that he continued to participate during that period in the scheme he had begun to conduct some time earlier. Whether Alhalabi was the person who actually swiped the cards of the recipients who traded benefits for cash on the referenced dates is beside the point.

Second, there was sufficient evidence to show that fraudulent LINK card transactions took place at Holyland on October 7 and 8, 1998, as alleged in Counts 1, 2, 4, and 5. The government presented the testimony of witnesses whose LINK cards were used on those dates. Though Alhalabi had ample ammunition with which to attack their credibility, the jury was entitled to believe their testimony.

Third, there was sufficient evidence that fraudulent LINK card transactions took place on October 9, 1998, as alleged in Counts 3 and 6. Although the cards of the testifying recipients may not have been used on that date, other evidence, including among other things the huge disparity between Holyland's food purchases and its LINK card transactions, and the arguable falsity of the explanations given by Alhalabi when interviewed by law enforcement, was sufficient to permit the jury reasonably to infer that unauthorized transactions had taken place on that date as they did on earlier dates.

Finally, the evidence was sufficient to show that the electronic funds transfers into Holyland's bank account constituted LINK benefits and/or electronic benefit transfer food stamp benefits. The wire communications, as described earlier, involved directions from Transactive Corporation to transfer funds into Holyland's account, and funds were in fact transferred to Holyland's account pursuant to those directions. The amounts of the transfers consisted of the amounts of LINK card / food stamp benefits that had been redeemed at Holyland. Alhalabi seems to suggest that the problem is that the funds transferred were not themselves food stamp benefits. That is a distinction without a difference. Section 2024(b) covers both recipients who present coupons or LINK cards in return for cash and retailers and others who give cash in return for coupons or LINK cards without authorization.

3. Whether a new trial should be ordered

Alhalabi's request for a new trial is based on two issues: the Court's denial of his motion to strike surplusage and the allegation that the indictment was constructively amended by the evidence at trial. The Court has previously addressed the surplusage issue and need not repeat that discussion here; it will suffice to say that Alhalabi's arguments do not persuade the Court that its earlier ruling was erroneous.

*4 Alhalabi's constructive amendment argument is likewise without merit. It was not error to allow the government to present evidence of unauthorized LINK card transactions in addition to those specifically alleged; that evidence was relevant and admissible to prove the scheme to defraud alleged in Counts 1, 2, and 3. This evidence did not impermissibly broaden the basis for a conviction on any of the charges. The Court has previously (in this ruling and during the trial) dealt with Alhalabi's other points on the issue of constructive amendment and reaffirms those rulings.[FN1]

FN1. The Court notes that contrary to Alhalabi's contention, the jury was not instructed that it could convict him on Counts 4 through 6 if it was proved that he "knowingly redeemed food stamp benefits

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

in exchange for cash through the use of an access device."Rather, the instructions, as noted above, required the jury to find that Alhalabi had "knowingly acquired Link card benefits in a manner contrary to law," which was consistent with the allegations of Counts 4 through 6, not a constructive amendment of those charges.

Conclusion

For the reasons stated above, the Court denies defendant's motion in arrest of judgment, for a judgment or acquittal, or for a new trial [docket # 90-1, 90-2, & 90-3]. Sentencing will proceed as scheduled on April 19, 2005 at 1:30 p.m.

N.D.Ill.,2005.
U.S. v. Alhalabi
Not Reported in F.Supp.2d, 2005 WL 819727 (N.D.Ill.)

END OF DOCUMENT

© 2009 Thomson Reuters/West. No Claim to Orig. US Gov. Works.