**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 08 CR 846** |
| **vs.** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **JON BURGE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

On October 16, 2008, Jon Burge ("Burge"), a commander in the Chicago Police

Department ("CPD") during the 1980s and early 1990s,[1] was indicted based on allegedly false

interrogatory answers he submitted in *Hobley* v. *Jon Burge*, *et al.*, No. 03 C 3678, a civil rights

case filed in this court. The two sets of interrogatories at issue concerned Burge's participation

in and knowledge of an alleged pattern and practice of physical abuse and torture of Area Two

detainees. Counts I and III charge Burge with obstructing justice in violation of 18 U.S.C. §

1512(c)(2) by signing false answers to the first and second sets of interrogatories propounded in

*Hobley.* Count II charges Burge with perjury in violation of 15 U.S.C. § 1621(1). Burge now

moves for a change of venue pursuant to Fed. R. Crim. P. 21(a) [#54]. For the reasons discussed

below, Burge's motion is denied.

---

[1] Burge supervised detectives at the Area Two and Area Three commands, as well as the Bomb & Arson Squad.

# BACKGROUND[2]

The Chicago press began reporting on allegations of systematic physical abuse and torture during Burge's tenure with the CPD in the late 1980s. After Andrew Wilson ("Wilson") moved to suppress his confession in his criminal case and filed a civil rights suit in 1986 alleging that Burge had tortured and physically abused him in order to coerce him into confessing to the murders of two Chicago police officers,[3] many other suspects detained and interrogated at the Area Two and Three commands moved to suppress their confessions, appealed their convictions, sought post-conviction relief, and filed civil rights suits on the same basis. The proceedings in these cases have spanned the past two decades, and the Chicago press has reported on key developments.[4] *E.g.*, Jacquelyn Heard, *2 Officers Cleared of Torturing Suspect: Jury Rejects Cop Killer's Charges*, CHI. TRIB., Mar. 21, 1989 (Vol. 2, at 7); John Conroy, *The Shocking Truth: After insisting for years that Andrew Wilson was never tortured by police, why is the city*

---

[2] Unless otherwise indicated, the facts in this section are derived from the three volumes of exhibits and one DVD attached to Burge's motion for a change of venue. Volume 1 contains a list of 1,326 search results generated by LexisNexis of all articles containing the words "Jon Burge" from 1986 to 2009. Volume 2 consists primarily of newspaper and internet articles and dated from 1989 to 2009, almost all of which were published in the CHICAGO TRIBUNE and the CHICAGO SUN-TIMES (referred to in the text as "the TRIBUNE" and "the SUN-TIMES"). Volume 3 consists of 12 articles dated from January1990 to May 2007 published in the CHICAGO READER (referred to in the text as "the READER"). The DVD has a portion of the United States Attorney's press conference on October 21, 2008. Because Burge does not include the full text of the articles listed in Volume 1, the court derives the facts in this section solely from the articles in Volumes 2 and 3, as well as the DVD. Citations to "Vol." refer to these exhibits.

[3] The facts of Wilson's case have been more fully set forth in the court's Memorandum Opinion and Order of April 23, 2009 [Dkt. No. 31].

[4] The first exposé on the allegations of the systematic use of torture was John Conroy's *House of Screams*, published in the READER on January 26, 1990. Since then, the READER has published over ten features on the subject. Of the twelve included in Volume 3 by Burge, ten have been written by John Conroy. Of the articles submitted by Burge on this motion, Conroy's have been the most critical of Burge, the police officers under his command, as well as the CPD, the states attorney's office and the state judiciary.

*now insisting that he was?*, CHI. READER, Jan. 10, 1997, at 1 (Vol. 3); Ken Armstrong & Steve

Mills, *Death Row Conviction in Cop Death Overturned: Illinois Justices Cite Prosecutors'*

*Errors*, CHI. TRIB., Jan. 28, 2000 (Vol. 2, at 102-103); Steve Mills, *Ex-cop's Sister Accuses*

*Burge: Former Police Official Bragged About Torturing Suspects*, CHI. TRIB., Apr. 1, 2004 at 8

(Vol. 2, at 116-17); Natasha Korecki, *Burge, 8 Others Take Fifth on Police Torture*, CHI. SUN-

TIMES, July 13, 2004 (Vol. 2, at 124); Michael Higgins & Jeff Coen, *Court Orders Daley to talk:*

*Federal Judge's Ruling Clears Way for Deposition in Cop Torture Case*, CHI. TRIB., Feb. 23,

2007 (Vol. 2, at 212-13); Eric Herman, *Judge: Give Inmate New Hearing Due to Cop Torture*,

CHI. SUN-TIMES, Aug. 15. 2008 (Vol. 2, at 248).

 As a result of Wilson's allegations, the CPD's Office of Professional Standards ("OPS")

began investigating the conduct of Burge and the other officers under his command.  On

November 8, 1991, Burge was suspended from the CPD pending the resolution of the charges

filed with the Police Board.  The OPS began hearings on February 10, 1992.[5]  They ended five

weeks later, on March 20, 1992.  In the interim, the Chicago press reported on the evidence

introduced against Burge, his defense and his supporters.  *E.g.*, Charles Nicodemus, *Cop Killer*

*Shows Scars to Bolster Brutality Case*, CHI. SUN-TIMES, Feb. 11, 1992 (Vol. 2, at 32); Sharman

Stein, *Burge Defense Rips Testimony: Convicted Cop-Killer's Story of Police Torture*

*Challenged*, CHI. TRIB., Feb. 12. 1992 (Vol. 2, at 33); Charles Nicodemus, *Doctor's Account*

*Bolsters Wilson Torture Charge*, CHI. SUN-TIMES, Feb. 14, 1992 (Vol. 2, at 37); Charles

---

[5] In February 1992, as the OPS was preparing for hearings, an OPS study from October 1990 was
made public pursuant to a ruling of this court.  It charged that systematic abuse of suspects during the
1970s and 1980s had been condoned by CPD commanders.  *E.g.*, Charles Nicodemus, *Report Cites 12
Years of S. Side Cop Brutality*, CHI. SUN-TIMES, Feb. 8, 1992 (Vol. 2, at 26); Robert Blau & David
Jackson, *Brutality: A Festering Police Issue*, CHI. TRIB., Feb. 9, 1992 (Vol. 2, at 27-28).

Nicodemus, *Convict Says Burge Held Plastic Around Head to Get Confession*, CHI. SUN-TIMES, Feb. 21, 1992 (Vol. 2, at 39); Janita Poe & Sharman Stein, *Burge Supporters Come Out in Force*, CHI. TRIB., Feb. 26, 1992 (Vol. 2, at 40-41); Sharman Stein, *Burge Says No Torture Occurred*, CHI. TRIB., Mar. 3, 1992, at 1, 7 (Vol. 2, at 54); Scott Fornek, *Doctor Rebuts Convict's Torture Claims*, CHI. SUN-TIMES, Mar. 8, 1992 (Vol. 2, at 57). On February 11, 1993, the OPS issued its decision, firing Burge and finding that he physically abused Wilson, allowed other officers to do the same and denied him medical treatment.[6] (For citations, see Apr. 23, 2009, Mem. Op. and Order at 8 (Dkt. No. 31)). The Chicago press reported on the public's divided reactions, as well as Burge's unsuccessful effort to have the OPS ruling overturned. *E.g.*, Larry Weintraub & Tim Gerber, *Some Hail Ruling, Others Assail 'Travesty,'* CHI. SUN-TIMES, Feb. 11, 1993 (Vol. 2, at 79); Andrew Fegelman, *Cop Dismissed in Beating Wants Ruling Overturned*, CHI. TRIB., Jan. 12, 1994 (Vol. 2, at 84). In June and July of 1993, the SUN-TIMES and the READER publicized the release of THE END OF THE NIGHTSTICK, a one-hour film on police brutality in Chicago, produced by the Community TV Network. The film focused on Burge and grass-roots efforts to have him fired from the police force. Vol. 2, at 75-76, 90. The READER noted that the film was not even-handed, *id.* at 75, and the SUN-TIMES stated that "its grasp of political history, press bias and cop psychology is limited." *Id.* at 76. THE END OF THE NIGHTSTICK was screened at least two times in Chicago and broadcast at least once on PBS.[7] *Id.* at 90.

In 1999, the Chicago press began reporting on efforts to have the capital convictions of ten death row inmates who had allegedly been physically coerced into confessing by Burge or

---

[6] Burge appealed the OPS's ruling but it was upheld on administrative review by the Circuit Court of Cook County in February 1994.

[7] Burge presents no evidence of how many people saw the film.

officers under his command overturned.[8]  *E.g.*, Charles Nicodemus, *Cop Links 10 Capital Cases*, CHI. SUN-TIMES, Feb. 26, 1999, at 6 (Vol. 2, at 91-92); *The Failure of the Death Penalty in Illinois*, CHI. TRIB., Nov. 17, 1999 (Vol. 2, at 100, 267-269); John Conroy, *Pure Torture*, CHI. READER, Dec. 3, 1999, at 1 (Vol. 3).  In 2001, State's Attorney Richard Devine was reported as beginning to negotiate deals with some of those inmates to reduce their sentences in exchange for abandoning their claims that they were coerced into confessing.  *E.g.*, Steve Mills, *Devine Offers Death Row Deal: Inmates Who Drop Cop Torture Claims May Gain Freedom*, CHI. TRIB., Sep. 27, 2001 (Vol. 2, at 106); John Conroy, *A Hell of a Deal*, CHI. READER, Oct. 12, 2001, at 1 (Vol. 3); John Conroy, *Annals of Police Torture: What Price Freedom?*, CHI. READER, Mar. 2, 2001, at 1 (Vol. 3).

In April 2002, the Chicago press reported that Judge Paul Beibel of the Circuit Court of Cook County appointed a special prosecutor, Edward J. Egan, and his assistant, Robert Boyle, to investigate the allegations against Burge and those working under his command and to determine whether charges should be brought against them.  The special prosecutor investigated the involvement of not only Jon Burge but also of former police superintendent Richard Brzeczek, Mayor Richard Daley and former State's Attorney Richard Devine.[9]  In November 2005, the

---

[8] Former Illinois Governor George Ryan issued a moratorium on death penalty executions in Illinois in 2000.  In January 2003, he pardoned Madison Hobley, Aaron Patterson, Stanley Howard and Leroy Orange, four death row inmates who alleged they had been tortured into making confessions by Burge and those under his command.  He also commuted the sentences of all inmates awaiting execution in Illinois to terms of life imprisonment or less.  On January 16, 2003, Ryan appeared on the OPRAH WINFREY SHOW to discuss his decision.  Hobley, Patterson, Howard and Orange sought to use Ryan's pardon as proof of their innocence in their civil rights cases.  In response, Burge's attorneys argued that Ryan should be made testify about his decision.  *See* Frank Main, *Cop Accused of Torture Wants Ryan to Testify*, CHI. SUN-TIMES (Online ed.), Jan. 11, 2006 (Vol. 2, at 145); *Lawyers Seek to Quiz Ryan on Pardons*, CHI. TRIB. (Online ed.), Apr. 29, 2006 (Vol. 2, at 153).

[9] Daley served as State's Attorney of Cook County from 1980 to 1989.  During that time Devine
(continued...)

TRIBUNE reported that the special prosecutor's investigation was drawing to a close. (Vol. 2, at 141). The special prosecutor's report was widely anticipated in the following months amidst attempts to block its publication. *E.g.*, Michael Higgins & Steve Mills, *Police Torture Inquiry Nears End*, CHI. TRIB. (Online ed.), Apr. 27, 2006 (Vol. 2, at 151-52); Jeff Coen, *Judge: Police Torture Report Should Be Released*, CHI. TRIB. (Online ed.), May 19, 2009 (Vol. 2, at 157-58); Mike Robinson, *Chicago Police Torture Report Delayed Pending High Court Appeal*, CHI. TRIB. ONLINE EDITION, June 2, 2006 (Vol. 2, at 161-62); Michael Miner, *Why Name Names?: If and when the report on Jon Burge torture investigation is made public, what might happen next?*, CHI. READER, May 26, 2006 (Vol. 2, at 163); John Conroy, *The Police Torture Scandal: A Who's Who*, CHI. READER, June 16, 2006, at 1 (Vol. 3). The special prosecutors' report was released in July 2006. It concluded that although many claims of torture were credible, the statute of limitations barred prosecution of the wrongdoers. The Chicago press published these findings and publicized the political fallout. *E.g.*, Frank Main, *Brzeczek Says he's scapegoat: Lashes Out at Mayor*, CHI. SUN-TIMES, July 20, 2006 (Vol. 2, at 184); Frank Spielman, *Daley: Cops Responsible for Torture*, CHI. SUN-TIMES, July 22, 2006 (Vol. 2, at 182); Mickey Ciokajilo & Dan Mihalopoulos, *'I Would Not Allow Anything Like This': Daley Says He Was Not Aware of Cop Torture*, CHI. TRIB., July 22, 2006 (Vol. 2, at 190); Charles Sheehan, *Gutierrez Assails Daley Over Cop Torture Scandal*, CHI. TRIB., July 23, 2006 (Vol. 2, at 191); Mickey Ciokajlo, *Alderman Seek to Revoke Burge's Pension*, CHI. TRIB. (Online ed.), July 26, 2006 (Vol. 2, at

---

[9](...continued)
was First Assistant State's Attorney. Devine later served as the state's attorney, from 1996 to 2008.

203); Michael Miner, *Grading the Special Prosecutor's Report: Incomplete*, CHI. READER, July 28, 2006 (Vol. 2, at 195-196).

In September 2007, the SUN-TIMES and the TRIBUNE reported that several Chicago alderman were calling for a federal indictment of Burge. *See* Monique Garcia, *Burge Indictment Sought: Alderman Urge Fitzgerald to Look into Federal Charges*, CHI. TRIB., Sep. 21, 2007 (Vol. 2, at 232); Fran Spielman, *5 Alderman Urge Feds to Prosecute Burge, Cronies: Fitzgerald Asked to Dig into Torture Allegations*, CHI. SUN-TIMES, Sep. 21, 2007 (Vol. 2, at 233). In December of the same year, the two papers publicized the City of Chicago's decision to simultaneously settle the Hobley, Howard, Orange and Patterson cases. *E.g.*, Fran Spielman & Frank Main, *$20 Million Settlement in Cop Torture Case: End of a 'Nightmare'*, CHI. SUN-TIMES, Dec. 8, 2007 (Vol. 2, at 234-35); Gary Washburn & Jeff Coen, *City to Settle Burge Case: 4 Alleged Victims to Get Share of up to $19.8 Million Under Tentative Plan*, CHI. TRIB., Dec. 8, 2007, at 1 (Vol. 2, at 239-40).

The SUN-TIMES and the TRIBUNE reported the federal indictment and arrest of Burge in this case on October 21 and 22, 2008. *See*, Steve Mills & Jeff Coen, *Feds Catch up with Burge: Notorious Ex-Chicago Commander Charged with Lying About Torture*, CHI. TRIB., Oct. 22, 2008 (Vol. 2, at 249-51); Natasha Korecki, Frank Main, & Carol Marin, *Feds Call Jon Burge One Bad Cop: Former Police Commander Arrested in Torture Cases and It's Just the Beginning*, CHI. SUN-TIMES (Online ed.), Oct. 22, 2008, at 1 (Vol. 2, at 252-53). On October 27, 2008, the TRIBUNE reported that Burge entered a plea of not guilty. (Vol. 2, at 256). Following the indictment, the SUN-TIMES and the READER published the opinions of two Burge supporters. *See* Annie Sweeney, *Slain Cop's Mom Defends Burge: 'I probably would have done it myself'*,

CHI. SUN-TIMES (Online ed.), Oct. 21, 2008 (Vol. 2, at 255); Jamie Fahey, *Letters: Reconsider the Victims*, CHI. READER, Oct. 30, 2008 (Vol. 2, at 258). On December 5, 2008, the TRIBUNE reported on the Fraternal Order of Police's decision to pay for Burge's defense in this case. *See* David Heinzmann & Steve Mills, *Police Union Will Pay for Burge Defense: Lawyer Bill for Federal Case Could Reach $1 Million*, Dec. 5, 2008 (Vol. 2, at 259). Three days later, the SUN-TIMES ran an editorial piece criticizing that decision. *Union Ignoring Facts in Defense of Burge*, CHI. SUN-TIMES, Dec. 8, 2008 (Vol. 2, at 260). The TRIBUNE published an opinion piece on the importance of reopening the torture allegations on December 28, 2008. Jonathan Jackson (as spokesman for the Rainbow-PUSH Coalition), *Burge Arrest Reopens Torture Allegations*, CHI. TRIB., Oct. 25, 2008 (Vol. 2, at 261).

In February 2009, the TRIBUNE reported that federal prosecutors were investigating CPD detectives who had worked with Burge, and the SUN-TIMES and the QUAD-CITY TIMES reported that Illinois Attorney General Lisa Madigan was being criticized by Chicago aldermen regarding her office's decision to send supervision of five of the 25 pending cases against Burge back to the state's attorney office. *E.g.*, Steve Mills & Jeff Coen, *Police Torture Inquiry Widens Around Burge: Federal Probe Now Includes Detectives, Sources Indicate*, CHI. TRIB., Feb. 4, 2009 (Vol. 2, at 262); *Chicago Alderman Wants AG to Prosecute*, QUAD-CITY TIMES (Online ed.), Feb. 25, 2009 (Vol. 2, at 264). On March 17, 2009, the TRIBUNE reported that the City of Chicago offered $2.7 million in a wrongful conviction which involved detectives who had worked under Burge. Hal Dardick, *Chicago Offering $2.7 Million in Wrongful-Conviction Case*, CHI. TRIB., Mar. 17, 2009 (Vol. 2, at 265). A month later, the SUN-TIMES and the TRIBUNE reported that an attorney for Cortez Brown, a former death row inmate seeking a new trial on the basis that he

was physically coerced into confessing to the murders of two men in 1990, was seeking the testimony of Burge and another detective under his command. *See* Rummana Hussain, *Lawyer Wants Burge on Stand in Cortez Case: Farrakhan, Pfleger Join Alderman Ed Smith in Showing Support for Ex-Death Row Inmate Who Claims He Was Tortured*, CHI. SUN-TIMES (Online ed.), Apr. 14, 2009 (Vol. 2, at 270); Matthew Walberg, *Jon Burge Case: Attorneys for Convicted Killer Seeking Retrial Want Retired Police Cmdr. Jon Burge and Former Detective to Testify: Convicted Killer Seeks Retrial, Says Confession Coerced*, CHI. TRIB. (Online ed.), Apr. 15, 2009 (Vol. 2, at 271). The most recent article submitted by Burge was published on the TRIBUNE's website on April 25, 2009. *Jon Burge Trial Ruling: Judge to Allow Testimony of Convicted Cop Killer Who Died in 2007*, CHI. TRIB. (Online ed.), Apr. 25, 2009 (Vol. 2, at 272). It reported this court's April 23, 2009 decision to admit the testimony of Wilson at trial. *Id.*

## LEGAL STANDARD

Federal Rule of Criminal Procedure 21 provides for transfer for trial, in pertinent part,

> (a) For prejudice. Upon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

Fed. R. Crim. P. 21(a). It is within the court's discretion to grant or deny a change of venue motion. *United States* v. *Garza*, 664 F.2d 135, 139-40 (7th Cir. 1981). "The burden is on the defendant to show a reasonable likelihood of prejudice, and the common judicial attitude is that relief should be granted only in exceptional cases." 2 Charles Alan Wright, *et al.*, FED. PRAC. & PROC. CRIM. § 343 (3d ed. 2009); *see also United States* v. *McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998) ("'[T]he defendant bears the burden of establishing that prejudice should be presumed.'") (quoting *Stafford* v. *Saffle*, 34 F.3d 1557, 1566 (10th Cir. 1994)).

# ANALYSIS

Burge argues that it is impossible for him to receive a fair trial in this district because the pretrial publicity in this case has been pervasive and prejudicial. "Extensive pretrial publicity does not, in itself, render a trial unfair and violate a defendant's right to due process." *Willard* v. *Pearson*, 823 F.2d 1141, 1146 (7th Cir. 1987). While "[d]ue process requires that the accused receive a trial by an impartial jury free from outside influences," *Sheppard* v. *Maxwell*, 384 U.S. 333, 362, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966), the Supreme Court has explained that the constitutional guarantee of an impartial jury does not require that jurors be blind to all publicity:

> It is not required . . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin* v. *Dowd*, 366 U.S. 717, 722-23, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961). Because "[t]he ultimate question is whether it is possible to select a fair and impartial jury, . . . in most situations the voir dire examination adequately supplies the facts upon which to base that determination." *United States* v. *Nettles*, 476 F.3d 508, 513 (7th Cir. 2007) (internal citations and quotation marks omitted). It is thus appropriate and preferable for the court "to assess the impact of the pretrial publicity through an extensive voir dire of the prospective jurors." *United States* v. *Peters*, 791 F.2d 1270, 1295 (7th Cir. 1986) (superseded on other grounds as stated in *United States* v. *Guerrero*, 894 F.2d 261, 267 (7th Cir. 1990)). It is only "[i]n rare cases where

pervasive and inflammatory pretrial publicity utterly corrupts the trial atmosphere [that] a court

may presume trial publicity prejudiced the accused." *Willard*, 823 F.2d at1146  (internal

citations omitted); *see also McVeigh*, 153 F.3d at 1181 ("[T]he claim of presumed prejudice is

rarely invoked and only in extreme situations.") (internal citations and quotation marks omitted).

"[M]ore often trials are deemed fair in spite of widespread publicity." *United States* v. *Garza*,

664 F.2d 135, 138 n. 1 (7th Cir. 1981).

The Supreme Court developed the presumed prejudice standard in three cases: *Rideau* v.

*Louisiana*, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963), *Estes* v. *Texas*, 381 U.S. 532,

85 S. Ct. 1628, 14 L. Ed. 2d 543 (1965), and *Sheppard* v. *Maxwell*, 384 U.S. 333, 86 S. Ct. 1507,

16 L. Ed. 2d 600 (1966).  The Court summarized those cases as follows in *Murphy* v. *Florida*:

> In *Rideau* the defendant had "confessed" under police interrogation to the murder
> of which he stood convicted.  A 20-minute film of his confession was broadcast
> three times by a television station in the community where the crime and the trial
> took place.  In reversing, the Court did not examine the voir dire for evidence of
> actual prejudice because it considered the trial under review "but a hollow
> formality" – the real trial had occurred when tens of thousands of people, in a
> community of 150,000, had seen and heard the defendant admit his guilt before
> the cameras.
>
> The trial in *Estes* had been conducted in a circus atmosphere, due in large
> part to the intrusions of the press, which was allowed to sit within the bar of the
> court and to overrun it with television equipment. Similarly, *Sheppard* arose from
> a trial infected not only by a background of extremely inflammatory publicity but
> also by a courthouse given over to accommodate the public appetite for carnival.

421 U.S. at 799.  Accordingly, the Seventh Circuit has explained that courts may presume

prejudice "in cases surrounded by a 'carnival atmosphere,' where 'pervasive and inflammatory

pretrial publicity' makes juror bias inevitable."  *Nettles*, 476 F.3d at 513 (quoting *Peters*, 791

F.2d at 1296).

The following four factors have been derived from these principal cases: (1) whether the publicity is recent, widespread and highly damaging to the defendant; (2) whether the government was responsible for the publication of the objectionable material, or if it emanated from independent sources; (3) the inconvenience to the government and the administration of justice; and (4) whether a substantially better panel can be sworn at another time or place. Wright, 2 Fed. Prac. & Proc. Crim. § 343.

## A. Whether the publicity is recent, widespread and highly damaging to the defendant

The articles submitted by Burge, taken primarily from the TRIBUNE and the SUN-TIMES, fail to show that pretrial publicity in this case has been highly damaging. The publicity at issue has been predominantly factual and descriptive.[10] Most of the articles state that the acts of torture were *alleged* and several describe the actions and opinions of his supporters. Publicity of this sort is not sufficiently inflammatory to satisfy the presumed prejudice standard. *See, e.g.*, *Murphy*, 421 U.S. at 802 (no presumption of prejudice or actual prejudice where news articles concerning petitioner were "largely factual in nature"); *Garza*, 664 F.2d at 138 n.1 (no presumption of prejudice where newspaper clippings furnished were "largely factual and descriptive, rather than inflammatory"). Furthermore, the focus of many of the articles

---

[10] The articles most accusatory of Burge were those in the READER. The READER is published only once a week, distributed primarily within the City of Chicago (and, consequently, only in part of the area from which jurors in this district are pooled), and has approximately one-fifth of the weekday circulation of the TRIBUNE and one-third the weekday circulation of the SUN-TIMES. *See* Audience & Circulation, Tribune Media Group, http://www.ctmgadvertise.com/audcirc/ct.html (last visited July 27, 2009); Press Release, Sun-Times News Group, Chicago Sun-Times Reports Positive Circulation Performance, Significantly Outpacing the Industry (Apr. 27, 2009), http://www.thesuntimesnewsgroup.com/releasedetail.cfm?ReleaseID=379971 (last visited July 27, 2009); About the Reader, http://www1.chicagoreader.com/readerinc/aboutR.htm (last visited July 27, 2009). Articles from the TRIBUNE and the SUN-TIMES that were critical of Burge were clearly designated as editorial, commentary and opinion.

submitted is not on Burge or his culpability but on the involvement of other public figures implicated in the allegations, including Mayor Richard M. Daley and former State's Attorney Richard Devine, as well as the actions of those involved in the political fallout, such as Governor George Ryan. The attention of potential jurors may well have shifted away from Burge due to the involvement of other public figures in the scandal and the many other highly-publicized events which have occurred since the indictment, including the election of President Barack Obama, a United States senator from Illinois and Chicago resident, and the indictment and impeachment of former Illinois Governor Rod Blagojevich.

Moreover, the time lag between the last period of extensive publicity and the trial date weighs strongly against presuming prejudice. The bulk of the publicity submitted by Burge is not recent. The articles submitted show that Burge became the subject of press interest in this district during the late 1980s and early 1990s, when Wilson filed his civil rights suit in this district and the OPS launched its investigation. While Burge has since received publicity, it has, as the government contends, been intermittent. Burge has submitted scant evidence of press coverage for extended periods, from 1993 to 1999 and 2002 to 2004. The periods during which Burge received the most intensive and extensive press were before 1993, when the OPS ordered Burge's separation from CPD, and in 2006, when the special prosecutors released their report.[11] Because the trial in this case will not occur until January 2010, more than three years will have passed since the last period of extensive publicity regarding Burge, and more than one year will

_____

[11] Because the periods of most extensive publicity were in the early 1990s and mid-2000s, younger members of the potential jury pool or those who have recently moved to the Chicago may be unaware of the controversy surrounding Burge.

have passed since the less extensive coverage surrounding the October 21, 2008 unsealing of the indictment.[12]

Recognizing that the passage of time tends to mitigate against juror bias, courts considering similar delays prior to trial have declined to presume prejudice. *See Murphy*, 421 U.S. at 802 (no presumption of prejudice or actual prejudice where "news articles concerning petitioner had appeared almost entirely during the period between December 1967 and January 1969, the latter date being seven months before the jury in this case was selected"); *Peters*, 791 F.2d at 1297 (no presumption of prejudice where articles were dated almost a year before the trial began); *Garza*, 664 F.2d at 138 n.1 (no presumption of prejudice where articles were largely factual and descriptive and three months had passed between the bulk of the publicity and the trial); *United States* v. *Finley*, 705 F. Supp. 1297, 1309 (N.D. Ill. 1988) (Rovner, J.) (because "passage of time is likely to erase any prejudice which the articles may have created," no presumption of prejudice where articles pointed out by defendant appeared, for the most part, more than three years prior to the trial date).

That jurors may remember Burge at the date of the trial or even associate him, as he claims, with "police torture" is not determinative. Mem. in Supp. at 4. "The relevant question is not whether the community remembered the case, but whether the jurors at [the] trial [will have] such fixed opinions that they [cannot] judge impartially the guilt of the defendant." *Patton* v. *Yount*, 467 U.S. 1025, 1035, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984) (period between first and second trials during which there was practically no publicity "clearly rebuts any presumption of

---

[12] Burge has submitted a total of 15 articles published since his indictment and arrest, ten of which concern this case. Two voice support for Burge; two clearly designated as commentary and editorial are more critical; and the rest are predominantly factual.

partiality or prejudice that existed at time of initial trial").  *Murphy* is also instructive on this

point.  The defendant in *Murphy* had first received publicity in 1964, after he participated in the

theft of the Star of India sapphire[13] from a museum in New York.  His flamboyant lifestyle made

him a continuing subject of the press, which referred to him as "Murph the Surf."  Murphy was

arrested in January 1968 for armed robbery of a home in Dade County, Florida.  Defendant was

thereafter indicted in another state case, for murder in Broward County, Florida, and federally,

for conspiracy to transport stolen goods across state lines.  Prior to August 1970, when the

defendant was tried for armed robbery in Dade County, the press extensively covered each of the

three criminal proceedings which entailed conflicting findings as to Murphy's mental

competency by the two courts in Florida and ultimately resulted in his conviction for murder in

Broward County and a plea of guilty in the federal case.  Nevertheless, the Supreme Court

declined outright to presume prejudice from pretrial publicity in his armed robbery case, stating:

---

[13] The description on the website for the American Museum of Natural History, where the Star of India sapphire is on permanent display, reads:

> The Star of India, at 563 carats, is the largest and most famous star sapphire in the world. Formed some 2 billion years ago, it was discovered, allegedly more than 300 years ago, in Sri Lanka, where excellent sapphires are still to be found in deposits of sand and gravel left by ancient rivers.  Industrialist and financier J. P. Morgan, a founding patron of this institution, presented the sapphire to the Museum in 1900.  Today, the Star of India is one of the most renowned objects in all of the Museum's collections.

> \* \* \*

> In 1964 the Star of India was the object of an infamous burglary, carried out by Jack Murphy, known as Murph the Surf, and two other men.  The gem was recovered several months later.

American Museum of Natural History, Star of India, http://www.amnh.org/exhibitions/expeditions/treasure_fossil/Treasures/Star_of_India/star.html (last visited July 27, 2009)

> The proceedings in [the cases where it had presumed prejudice] were entirely
> lacking in the solemnity and sobriety to which a defendant is entitled in a system
> that subscribes to any notion of fairness and rejects the verdict of a mob. They
> cannot be made to stand for the proposition that juror exposure to information
> about a state defendant's prior convictions or to news accounts of the crime with
> which he is charged alone presumptively deprives the defendant of due process.

*Murphy* v. *Florida*, 421 U.S. 794, 799, 95 S. Ct, 2031, 44 L. Ed. 2d 589 (1975).

The nature of the pretrial publicity described in *Murphy* is similar to that at issue here. As in this case, the defendant in *Murphy* had been notorious for many years prior to the indictment at issue and the pretrial publicity of which he complained involved information inadmissable at trial. Moreover, both cases involved a significant time lag between the periods of extensive publicity and the date of trial. Accordingly, as in *Murphy*, the court finds that the articles submitted by Burge fail to show that the pretrial publicity in this case has been "pervasive and inflammatory," *i.e.,* sufficiently recent, widespread and highly damaging, to warrant a presumption that juror bias is inevitable.

> **B.**      **Whether the government was responsible for the publication of the
> objectionable material**

Although the vast majority of the pretrial publicity to which Burge objects was the result of journalistic endeavors, Burge also objects to United States Attorney Patrick Fitzgerald's comments during his October 21, 2008 press conference addressing the indictment in this case.[14] During the conference, Fitzgerald explained that Burge was being prosecuted for making false statements in *Hobley* regarding his knowledge of and participation in the physical abuse and torture of suspects because the statute of limitations barred charging Burge with actual acts of torture and physical abuse. He added,

---

[14] Burge presents no evidence of how many people viewed this press conference.

If people commit multiple crimes and you can't prosecute them for one, there's nothing wrong with prosecuting him for another. If Al Capone went down for taxes, that was better than him going down for nothing.

Vol. 2, at 249-51. Misquoting these comments as "'If Al Capone went down for taxes it's better than [Burge] going down for nothing,'" Mem. at 12 (alterations by Burge), Burge asserts that Fitzgerald compared him to Al Capone and, consequently, materially prejudiced his rights to a fair trial. The video makes clear, however, that Fitzgerald compared only the strategy used to prosecute Al Capone to that used in this case.[15] Fitzgerald's other statements, which Burge makes no mention, concerned his belief, based on evidence gathered during his officer's investigation, that Burge had participated in and was aware of the torture and physical abuse of suspects being interrogated under his command. Such statements are insufficient to create a presumption of prejudice.[16] *See Finley*, 705 F. Supp. at 1309 ("[T]he fact that government officials may have been responsible for the pretrial publicity does not eliminate the necessity of showing prejudice.") (citing *Mayola* v. *Alabama*, 623 F.2d 992, 1001 (5th Cir. 1980)). Accordingly, Burge's reliance on prejudice deriving from the prosecutor's press conference in this case is unavailing.

### C. The inconvenience to the government and the administration of justice

The government argues, and the court agrees, that a change of venue would be inconvenient and contrary to the administration of justice. All of the witnesses necessary to

---

[15]The comment was inartfully phrased, suggesting that Burge might be convicted for "nothing." Mr. Fitzgerald probably meant ". . . that was better than him not going down at all."

[16] The material at issue here is also clearly distinguishable from that at issue in *Rideau*, the case from which this consideration derives. As mentioned above, the material at issue in *Rideau* was the defendant's confession to a kidnaping, robbery and murder in a small community in Louisiana which was broadcast for three consecutive days on a local television network with the cooperation and participation of the local law enforcement officers. *Rideau*, 373 U.S. at 723-24.

prove the government's case are likely to be located within the Northern District of Illinois, where the alleged torture and physical abuse took place. Given the court's familiarity with this case and the Seventh Circuit's admonition in *Peters* that it is appropriate and preferable for the court to determine juror prejudice during *voir dire*, it would also be inefficient and inappropriate to change venue at this time. Finally, this forum has a strong interest in this case, not only because the intended effects of the crimes with which Burge is charged were directed at the justice system in the county where this court sits, but also because the public has had a long-standing interest in the allegations of police torture and physical abuse underlying the case.

**D.      Whether a substantially better panel can be sworn at another time or place**

The government contends that changing venue in this case would not increase the chance of impaneling a substantially better jury. A defendant is "more likely to receive a fair trial in a metropolitan area . . . . where his case [i]s just one story among many, than in a small town, where the case would likely be the biggest story in town." *Willard*, 823 F.2d at 1147 (affirming denial of habeas corpus petition where defendant, who received extensive publicity in connection with the murder of an eccentric millionaire, was tried in Indianapolis, Indiana); *see also United States* v. *Chapman*, 515 F.2d 1274, 1288 (D.C. Cir. 1975) ("[A] venue change is more, rather than less, effective if it is to a metropolitan community because a big case in a small town quickly becomes a *cause celebre* and the focus of substantially more publicity.") (internal citations omitted). Chicago is the third largest metropolitan area in the United States, with a population of 9,157,540.[17] The jury pool in the Northern District of Illinois consists of eight

---

[17] United States Census Bureau, Ranking Tables for Metropolitan Areas (2000 Census), at 1, http://www.census.gov/population/www/cen2000/briefs/phc-t3/tables/tab03.pdf.

counties.[18]  Accordingly, the court has one of the largest segments of the United States population from which to impanel a jury.[19]  Furthermore, as discussed above, the trial date is set for January 2010, more than a year after the indictment was publicized.  In consideration of these facts, the court finds that a substantially better panel could not be sworn at another time or place.[20]

In summary, Burge has failed to show that pretrial publicity in this case warrants the application of the rarely applied presumed prejudice standard.  The last time the Supreme Court found the presumed prejudice standard met was over thirty years ago in *Sheppard*,[21] and Burge provides no Seventh Circuit decision, nor is the court aware of any, where the court found the presumed prejudice standard to be met.  The cases on which Burge relies in asking this court to apply the presumed prejudice standard are not binding.  Most are not recent or do not involve the application of the presumed prejudice standard and need not be addressed.  The others are

---

[18]  United States District Court, Northern District of Illinois, *Plan for the Random Selection of Jurors* ¶ 3 (2006), http://www.ilnd.uscourts.gov/press/ILNDJuryPlan.pdf.

[19] As the government notes, judges in this district have successfully impaneled impartial juries in several other cases involving prominent defendants, such as former Governors George Ryan, Dan Walker, and Otto Kerner, as well as Cicero Mayor Betty Lorene-Maltese, and Congressman Mel Reynolds.

[20] Burge suggests that the venue be changed to the Northern District of Indiana, Hammond Division.  Reply at 3.  The jury pool for the Hammond Division consists of two counties.  United States District Court, Northern District of Indiana, *Amended Jury Selection Plan* ¶ 1 (2005), http://www.innd.uscourts.gov/generalorders/juryplan2005.pdf.  The Census Bureau does not report the population of the metropolitan area surrounding Hammond; its 2008 population estimate for the city of Hammond is 76,732.  United States Census Bureau, http://factfinder.census.gov.  Given that the jury pool in the Hammond Division is substantially smaller than that in the Eastern Division of Northern District of Illinois and the likelihood that, because of their proximity to Chicago news media outlets, northwestern Indianans have also been exposed to some of the publicity surrounding Burge, the court cannot accept Burge's suggestion that a substantially better jury could be impaneled in the Hammond Division.

[21] *See McVeigh*, 153 F.3d at 1182 ("Indeed, despite the proliferation of the news media and its technology, the Supreme Court has not found a single case of presumed prejudice in this country since the watershed case of *Sheppard*.").

distinguishable.[22]  Having considered the evidence submitted by Burge and the relevant legal

authorities, the court cannot conclude that the pretrial publicity of which Burge complains is so

---

[22] In *Nevers* v. *Killinger*, 990 F. Supp. 844 (E.D. Mich. 1997), the court granted a petition for *habeas corpus* finding that the trial court should have presumed prejudice and changed venue where extensive pretrial publicity surrounded the trial of a Detroit police officer for murder of a black man.  The district court distinguished *Murphy* on the basis that there was no significant time gap between the pretrial publicity and the trial.  *Id*. at 862.  Moreover, on appeal, the Sixth Circuit ruled that the district court erred in applying both the presumed and actual prejudice standards and overturned the district court's ruling on those bases.  *Nevers* v. *Killinger*, 169 F.3d 352, 364-68 (6th Cir. 1999) (*Nevers* was later superseded by *Williams* v. *Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed 2d 389 (2000), on grounds not relevant here).  Thus, *Nevers* is factually distinguishable from this case and the ruling on which Burge relies is no longer good law.

In *United States* v. *Saya*, 980 F. Supp. 1157 (D. Haw. 1997), the court granted Saya's motion for a change of venue (which the government initially suggested but subsequently opposed) after his and his co-defendants' first trial ended in a hung jury.  The court granted the motion based in large part on its previous decision to grant the government's motion for trial by an anonymous jury, which had been strenuously opposed by the defendants.  Finding that "[e]xtensive publicity concerning the Defendants, coupled with the sensitive issues of an anonymous jury[ ] aggravates the concern whether the Defendant will receive a fair trial," the district court granted a change of venue to the mainland.  *Id.* at 1158.  After Saya's case was severed from his co-defendants' in the Eastern District of Washington, Saya requested his case be sent back to Hawaii because the publicity had abated.  *United States* v. *Saya*, 247 F.3d 929, 933 (9th Cir. 2001).  Saya was convicted by a jury in Honolulu in December 1998, and his conviction was upheld by the Ninth Circuit on appeal.  *Id*. at 933, 939.  *Saya* is distinguishable not only because the defendant was actually retried in Hawaii after a sufficient time lag, but also because the unusual due process and procedural concerns stemming from the anonymous jury and previous mistrial are not present in this case.

Lastly, Burge relies on *United States* v. *McVeigh*, 918 F. Supp. 1467 (W.D. Okla. 1996), where the Western District of Oklahoma granted a change of venue to Colorado after the defendants conspired to detonate a bomb at a federal building in Oklahoma City, killing 168, injuring hundreds of others and destroying or damaging several buildings.  After the bombing, the defendants were the subject of extensive, national pretrial publicity. The parties agreed that the case could not proceed to trial in Oklahoma City, but the government suggested that venue be changed to the Northern District of Oklahoma. The court found that trying the case anywhere in the state of Oklahoma would jeopardize the defendants' due process rights because of the extensive evidence of prejudice among Oklahomans, which had resulted from "the repetition of emotionally intense stories of loss and grief and the valiant efforts to overcome the consequences of the event." *Id*. at 1472.  In granting the change of venue to Denver, the court also relied on evidence of the lingering emotional burdens of the bombing, which had been "intensified by the repeated and heavy emphasis on the innocence of the victims and the impact of their loss on their families." *Id.* at 1472-73.  *McVeigh* is distinguishable because the pretrial publicity there was clearly more intensive and extensive than that at issue here and because the venue was able to be changed to a larger metropolitan area with a larger jury pool.  Furthermore, the press's characterization of the victims in this case is extremely different.  The men who have alleged being tortured and physically abused by Burge and officers under his command are repeatedly referred to in the articles submitted as cop-killers, convicts, and death row inmates.  Accordingly, the court declines to follow the non-binding ruling in *McVeigh.*

pervasive and inflammatory that it has utterly corrupted the trial atmosphere and created a carnival-like atmosphere. And, given the one-year time lag between the periods of publicity in this case and the trial, the population and size of the jury pool in this district, and the opportunity to re-examine the issue of juror bias at *voir dire*, the court will deny Burge's motion for a change of venue.

## CONCLUSION AND ORDER

Burge's motion for a change of venue due to prejudicial pretrial publicity [#54] is denied without prejudice to renewal at trial should pretrial publicity for the case demonstrate cause under the principles set out in this Opinion.

Dated: July 29, 2009           Enter: _____

                                    JOAN HUMPHREY LEFKOW
                                  United States District Judge