```
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )
 4            Plaintiff,              )
                                      )
 5        vs.                         )  No. 08 CR 846
                                      )
 6   JON BURGE,                       )  Chicago, Illinois
                                      )  June 15, 2010
 7            Defendant.              )  9:00 A.M.

 8                         VOLUME 10A
                TRANSCRIPT OF PROCEEDINGS - Trial
 9      BEFORE THE HONORABLE JOAN HUMPHREY LEFKOW, and a jury

10   APPEARANCES:

11   For the Government:   HON. PATRICK J. FITZGERALD
                           219 South Dearborn Street
12                         Chicago, Illinois  60604
                           BY:  MR. M. DAVID WEISMAN
13                              MS. APRIL PERRY

14                         DEPARTMENT OF JUSTICE
                            CIVIL RIGHTS DIVISION
15                          CRIMINAL SECTION
                           601 D Street NW
16                         Room 5339
                           Washington, DC  22314
17                         BY:  MS. ELIZABETH L. BIFFL

18   For the Defendant:    MR. RICHARD MICHAEL BEUKE
                           53 West Jackson Boulevard
19                         Suite 1410
                           Chicago, Illinois   60604
20

21                   PAMELA S. WARREN, CSR, RPR
                        Official Court Reporter
22            219 South Dearborn Street, Room 1928
                      Chicago, Illinois   60604
23                        (312) 294-8907

24

25
```

1    APPEARANCES:  (Continued)

2

3                              MR. WILLIAM GEORGE GAMBONEY, JR.
                               216 South Marion Street
                               Oak Park, Illinois  60302

4

5                              MR. MARC WILLIAM MARTIN
                               53 West Jackson Boulevard
                               Suite 1410
6                              Chicago, Illinois   60604

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings had in open court outside of the presence and

2     hearing of the jury:)

3               THE CLERK:  08 CR 846, USA versus Jon Burge.

4               MR. WEISMAN:  Good morning, your Honor.  David

5     Weisman, April Perry, and Betsy Biffl for the United States.

6               MR. MARTIN:  Good morning, Judge.  Marc Martin, Rick

7     Beuke, and Bill Gamboney for Mr. Burge, who is present.

8               THE COURT:  All right.  As I recall, our agenda this

9     morning is just this one motion concerning Fred Hill.  Are

10    there other things that you need to raise?

11              MR. BEUKE:  Well, Judge, I think the other -- the

12    other detectives and State's Attorney.

13              THE COURT:  Oh, right.

14              Well, I had the hearing yesterday regarding this

15    former assistant State's Attorney Nealis and conclude that his

16    position is virtually identical to, you know, others who have

17    been involved in this, including, in particular, Mr. Hyman.  So

18    I have allowed the motion on the same basis.

19              MR. WEISMAN:  All right.

20              MR. BEUKE:  I suppose, Judge, we would ask you to

21    consider the admission of his prior testimony similar to we

22    have asked you regarding McKenna and Hyman, and I know there

23    was one other.

24              MR. MARTIN:  Hill.

25              MR. BEUKE:  We'd ask you to consider that in the same

1  vein as those other people who you have given Fifth Amendment

2  protection to because now they are unavailable for us to call.

3  We had them all under subpoena, your Honor.

4         THE COURT:  Right, right.  And I --

5         MR. WEISMAN:  Judge --

6         THE COURT:  Go ahead.

7         MR. WEISMAN:  As I say, I don't know if Nealis has

8  prior testimony.

9         MR. MARTIN:  Yes, he testified before the police

10 board.

11        MR. WEISMAN:  Oh, okay.

12        THE COURT:  Okay.  Well, I -- you know, I haven't seen

13 the testimony, but if it is in the same category as the others,

14 then, you know, I would use the same reasoning to not admit

15 it.  But if there is some basis to distinguish it, then --

16        MR. MARTIN:  It will -- obviously we're learning this

17 this morning, but we'll get together this testimony -- I don't

18 think it was that long -- and present it to the Court.

19        THE COURT:  Okay.  And then the motion to admit prior

20 testimony of Fred Hill.

21        Without going into all the details, I'll put a brief

22 written ruling on the docket.  But the essential factor here is

23 the demonstration of the trustworthiness, and, you know, I know

24 you're not confident that I am treating these on an even-handed

25 basis, Mr. Martin, but it seems to me that this is, you know,

1    really in the same category as the others.

2           The trustworthiness element is not satisfied in regard

3    to Mr. Hill's prior testimony because, as I previously ruled in

4    regard to O'Hara and Yucaitis, officers who worked under

5    Burge's command at Area 2 had a strong motive to deny that they

6    or Mr. Burge had tortured or abused Wilson or that they knew of

7    such conduct by other officers.

8           Mr. Hill was one of the main detectives assigned to

9    Wilson's case and conducted the line-up of Wilson, which took

10   place at Area 1 after Area 2 officers had obtained a

11   confession.  Furthermore, although Mr. Hill was not named as a

12   defendant in Wilson's second civil rights trial and claimed

13   that he did not arrive at Area 2 until after the confession had

14   been obtained, the transcript of his testimony from that case

15   reveals that Wilson alleged that Hill was present and assisted

16   Burge in electrocuting him in order to obtain a confession.

17   Thus Hill was similarly motivated to deny Wilson's allegations

18   in order to secure Wilson's successful criminal prosecution and

19   to prevent Wilson's conviction from being overturned, as well

20   as to avoid his own and his fellow officers's possible criminal

21   prosecution or the payment of civil damages.

22          So the motion is denied.

23          MR. WEISMAN:  Thank you, your Honor.

24          MR. MARTIN:  Your Honor, just for scheduling

25   purposes.  We spoke yesterday about Carolyn Hill who I had

1   indicated we had scheduled to come in today.  And I had a

2   contact with the person that would be bringing her to court

3   last night.  And it is because of medical appointments, it is

4   better for her to come next Monday, so I informed the

5   government of that.

6         THE COURT:  All right.

7         Okay.  Are we ready?

8      (Discussion off the record.)

9         MR. MARTIN:  One other issue, your Honor.

10         THE COURT:  Okay.

11         MR. MARTIN:  I noticed that this case was the entire

12  front page of the Sun-Times this morning, and we'd ask that the

13  jurors be questioned.

14         MR. WEISMAN:  Judge, can I ask one other procedural

15  matter?  Is it this Court's practice to give instructions prior

16  to our closing argument?

17         THE COURT:  I usually do it after.  I can do it either

18  way.

19         MR. WEISMAN:  It is -- we're flexible.  I just -- I

20  thought I had seen this Court give instructions prior to

21  arguments in the past.

22         THE COURT:  I don't think I have.

23         MR. WEISMAN:  Okay.  All right.  So your plan is to do

24  it after arguments?

25         THE COURT:  Yes.

Mu'min - direct by Biffl

1        MR. WEISMAN:  Okay.

2        THE COURT:  All right.  Bring them in.

3    (Proceedings had in open court in the presence and hearing

4  of the jury:)

5        THE COURT:  Before you sit down, would you stand to be

6  sworn.

7        Before you start, let's have a sidebar here quickly.

8    (Sidebar proceedings had in open court outside of the

9  hearing of the jury:)

10       THE COURT:  My timing is a little off.  I didn't do

11  the inquiry of the jury.  So can we do -- should I do it now?

12       MR. MARTIN:  As long as we can do it today, your

13  Honor, that's fine.

14       THE COURT:  All right.  Fine.

15    (Proceedings had in open court in the presence and hearing

16  of the jury:)

17       THE COURT:  You made proceed, Ms. Biffl.

18       MS. BIFFL:  Thank you.

19    (Witness sworn.)

20     SHADEED MU'MIN, GOVERNMENT'S WITNESS, DULY SWORN

21              DIRECT EXAMINATION

22  BY MS. BIFFL:

23  Q.  Good morning, sir.  Would you state your name and spell it,

24  please?

25  A.  Yes, I would.  My name is Shadeed Mu'min.  S-h-a-d-e-e-d,

Mu'min - direct by Biffl

1  M-u apostrophe m-i-n.

2  Q.  How old are you, sir?

3  A.  66.

4  Q.  And in what state do you currently live?

5  A.  Ohio.

6  Q.  Are you current employed?

7  A.  No.

8  Q.  Do you do any kind of volunteer work?

9  A.  Yes.

10  Q.  Where is that?

11  A.  At the Old Food Pantry.

12  Q.  At a food pantry?

13  A.  Yes.

14  Q.  And how many days a week do you do that?

15  A.  Four.

16  Q.  For how long have you been doing that?

17  A.  Approximately two years.

18  Q.  I want to talk a little bit about your background.  Were

19  you ever in the military?

20  A.  Yes.

21  Q.  When was that?

22  A.  In '62.

23  Q.  Okay.  And did you have some involvement first when you

24  were in high school?

25  A.  Yes.

Mu'min - direct by Biffl

1    Q.  What that was?

2    A.  Reserve.  I was in the Reserve.

3    Q.  Okay.  And then after high school, did you go into the

4    Navy?

5    A.  I went on active duty in the Navy.

6    Q.  Where were you stationed?

7    A.  In Great Lakes, Illinois.

8    Q.  And anywhere else?

9    A.  Philadelphia.

10   Q.  Okay.  And were you ever in Virginia?

11   A.  Yes.

12   Q.  Okay.  Now at what point did you get out of the Navy?

13   A.  '65, if I am not mistaken.

14   Q.  Were you honorably discharged?

15   A.  Yes.

16   Q.  What did you do after the military?

17   A.  I have got a job, and I got married.

18   Q.  Do you remember where you were working?

19   A.  I think it was National Cannery.

20   Q.  Now at some point did you change your name?

21   A.  Yes.

22   Q.  What was your name when you were younger?

23   A.  George H. Ramsey.

24   Q.  And why did you change it?

25        MR. BEUKE:  I'm going to object.  If we could put a

Mu'min - direct by Biffl

1    foundation as to when this would have gone.

2              MS. BIFFL:  It just goes to the use of more than one

3    name, Judge.

4    BY MS. BIFFL:

5    Q.  When did you change your name?

6    A.  In '85 or '82, I think, one of them years.

7    Q.  And for what reason did you change your name?

8    A.  I changed it for religion purpose, so I would -- it would

9    seem if I have some knowledge of my culture, that's what seemed

10   fair.

11             MR. BEUKE:  I'm sorry, Judge, I didn't hear that.

12   BY MS. BIFFL:

13   Q.  Could you repeat that, please?

14   A.  It shows I have some knowledge of my culture, why I changed

15   my name, that I belong to the Islamic faith.

16   Q.  Now have you been to prison before?

17   A.  Yes, I have.

18   Q.  Okay.  In February 1972 were you convicted of armed

19   robbery?

20   A.  Yes.

21   Q.  Were you sentenced to 10 to 25 years on that?

22   A.  Yes.

23   Q.  In February of 1977 were you convicted of robbery?

24   A.  Yes.

25   Q.  Were you sentenced to 10 to 25 years on that?

2207
Mu'min - direct by Biffl

1   A.  Yes.

2   Q.  In November of 1987 were you convicted of attempted murder

3   and attempted armed robbery?

4   A.  Yes.

5   Q.  And were you sentenced to 15 years?

6   A.  Yes.

7   Q.  In April of 1988 were you convicted of armed robbery?

8   A.  Yes.

9   Q.  And were you sentenced to eight years?

10  A.  Yes.

11  Q.  And in November of 2000 were you convicted of second degree

12  recklessly endangering safety and possession -- excuse me --

13  felon in possession of a firearm?

14  A.  Yes.

15  Q.  And were you sentenced to a total of five years prison

16  followed by five years probation on those two counts?

17  A.  Yes.

18  Q.  And are you still currently on probation for that?

19  A.  Yes, I am.

20  Q.  When do you finish your probation?

21  A.  July 3rd.

22  Q.  So just a few weeks, right?

23  A.  Yes.

24  Q.  Okay.  Now one of the convictions I just mentioned was from

25  November of 1987, and I want to direct your attention to the

Mu'min - direct by Biffl

1    arrest for that.

2            Now do you remember when you were arrested for that?

3    A.  Not exactly.

4    Q.  Okay.  Was it -- let me ask this.  The offense for which

5    you were convicted, did that occur in July of 1985?

6    A.  Yes.

7    Q.  Okay.  Did you get arrested the night that it happened?

8    A.  Yes, I did.

9    Q.  In July of '85 --

10   A.  Yes.

11   Q.  -- the night of the robbery?

12   A.  Yes.  To the best of my knowledge, yes.

13   Q.  Okay.  Well, do you remember in October of 1985 getting

14   arrested -- getting pulled over --

15           MR. BEUKE:  Objection, Judge.  It is asked and

16   answered.  He said he got arrested that night.

17           MS. BIFFL:  And now I'm asking about three months

18   later.

19           THE COURT:  I see.  All right then.  Overruled.

20   BY MS. BIFFL:

21   Q.  In October of 1985 did you get pulled over?

22   A.  Yes.

23   Q.  And did you get arrested that night?

24   A.  Yes.

25   Q.  And what were you questioned about that night?

Mu'min - direct by Biffl

1    A.  A robbery that had taken place.

2    Q.  All right.  And when had that robbery taken place?

3    A.  In '85.

4    Q.  Okay.  Do you remember when in '85?

5    A.  Yeah, it had been July.

6    Q.  So were you arrested twice for that offense in July or did

7    you not get arrested until October?

8           MR. BEUKE:  Objection, Judge, leading, suggestive.

9           MS. BIFFL:  It wasn't leading, Judge.  I'm asking one

10   or the other.

11          THE COURT:  Well, try again.

12          MS. BIFFL:  Okay.

13   BY MS. BIFFL:

14   Q.  All right.  When you were arrested in October, you said you

15   were questioned about a July robbery, correct?

16   A.  Yes.

17   Q.  Had you already been arrested on that charge?

18   A.  No.

19   Q.  Do you know -- were there some other people who were

20   involved in that July robbery?

21   A.  Yes.

22   Q.  How many?

23   A.  Three.

24   Q.  Do you know whether any of them had been arrested in

25   July --

Mu'min - direct by Biffl

1    A.   I'm not sure on that.

2    Q.   Was there -- what gender were those other three people?

3    A.   Could you repeat that?

4    Q.   Sure.  Were they boys or girls, the other people involved?

5    A.   One of them was a young lady, and the rest of them was men,

6    young men.

7    Q.   Okay.  Was the young lady arrested -- do you know when she

8    was -- if she was arrested on this?

9    A.   To the best of my knowledge she was arrested that night

10   that it happened.

11   Q.   Okay.  What about the two young men?

12   A.   No.

13   Q.   Okay.  So in October when you were arrested were you taken

14   to a police station?

15   A.   Yes.

16   Q.   In what city was this?

17   A.   Chicago.

18   Q.   Do you remember which district it was or on what street the

19   police station was?

20   A.   I'm not sure.

21   Q.   Okay.  Did you at some point that night end up at Area 2?

22   A.   Yes.

23   Q.   Was that the first police station you went to?

24   A.   No.

25   Q.   Okay.  So you went to -- what happened at the first station

1   you went to?

2   A.  I guess normal routine.  They booked me in there.

3   Q.  All right.  And then how did you get to Area 2?

4   A.  I was informed after I was there a while that I would be

5   picked up --

6   Q.  Okay.

7   A.  -- and --

8   Q.  And so did someone pick you up there and take you?

9   A.  Yes, I was picked up in a paddy wagon.

10  Q.  When you got to Area 2, where were you taken?

11  A.  Upstairs to the detective division.

12  Q.  And were you put -- where were you put?  Were you in a room

13  or out in the big larger area?

14  A.  I was put in a room.

15  Q.  Was anybody else in the room with you?

16  A.  No.

17  Q.  Who is it that took you up to this room on the second

18  floor?

19  A.  It was two officers --

20  Q.  Were they the ones --

21  A.  -- uniformed that brought me from there and took me up

22  there.

23  Q.  Okay.  When they put you in that room, did they leave you

24  handcuffed or unhandcuffed?

25  A.  They took the cuffs off.

Mu'min - direct by Biffl                    2212

1   Q.  And then they left you, is that right?

2   A.  Yes.

3   Q.  Okay.  So you were in that room unhandcuffed you said, is

4   that right?

5   A.  That's correct.

6   Q.  Did they leave the door open or closed?

7   A.  To the best of my knowledge the door was closed.

8   Q.  At some point did an officer come in and talk to you?

9   A.  Yes.

10  Q.  And do you know who that was?

11  A.  At the time it was Lieutenant Burge.

12  Q.  Now had you ever met him before?

13  A.  No.

14  Q.  How did you know his name?

15  A.  He introduced himself to me.

16  Q.  Do you remember what he said?

17  A.  To the best of my knowledge he asked me did I have anything

18  that I want to tell him.

19  Q.  What did you say to that?

20  A.  I told him no.

21  Q.  What did he say to that?

22  A.  I was lying.

23  Q.  And how did you respond?

24  A.  I told him I still don't know what you are talking about.

25  Q.  And for how long did that exchange go on?

Mu'min - direct by Biffl

1    A.  A few minutes.

2    Q.  And then did Lieutenant Burge do anything?

3    A.  He became a little angry and pushed me into the wall.  Told

4    me to turn around, and he put the cuffs on.

5    Q.  Now when you say he put the cuffs on you, did he put the

6    cuff on just one hand or on both?

7    A.  No, he put them on both my hands.

8    Q.  Okay.  And were you cuffed in front of you or behind you?

9    A.  At the time I was cuffed in front of me.

10   Q.  And did he say anything when he put the cuffs on?

11   A.  He told me I would talk before I left there, tell him what

12   he wanted to know to the best of my knowledge.

13   Q.  And then did he remain in the room or did he leave?

14   A.  No, he left out for a minute or for a while after he placed

15   the cuff firmly on me.

16   Q.  When you say firmly on me, can you describe what you mean?

17   A.  Tight when he was practically cutting my circulation off.

18   Q.  For how long was he gone?

19   A.  Possibly 20 minutes or half an hour.

20   Q.  And then did Lieutenant Burge return to the room?

21   A.  Yes, he did.

22   Q.  And tell us what happened when he returned?

23   A.  He asked me again was I willing to tell him what he wanted

24   to know.

25   Q.  What did you say?

Mu'min - direct by Biffl

1   A.   I said I don't know what he is talking about.

2   Q.   Then what happened?

3   A.   He become annoyed and tightened the cuffs up even more so.

4   Q.   And were you still handcuffed, both hands in front of you?

5   A.   Yes.

6   Q.   Did you say anything to him about the cuffs being tight?

7   A.   Not to my knowledge.

8   Q.   And how long did he remain in the room that time?

9   A.   Not long.

10  Q.   Did he leave again?

11  A.   Yeah.

12  Q.   And can you approximate how long he was gone that time?

13  A.   It may have been a half hour, 20 minutes, to the best of my

14  knowledge.

15  Q.   While he was gone, were you -- how did the cuffs feel on

16  you?

17  A.   They was tightening up, and my wrists was swelling up.

18  Q.   Okay.  Did Lieutenant Burge return to the room again?

19  A.   Yes, he did.

20  Q.   What happened when he did?

21  A.   He asked me was I ready to talk.

22  Q.   What did you say?

23  A.   I told him I still -- I still repeated myself that I didn't

24  know what he was talking about.

25  Q.   All right.  And then what happened?

 1   A.  He took them off in front of me, and then he cuffed me one

 2   hand, take me -- hooked me to the wall.  I was sitting on a

 3   bench where there was a bar, and he took the cuffs off both

 4   hands and put them on one and handcuffed me to the wall.

 5   Q.  Okay.  Did he say anything when he did that?

 6   A.  To the best of my knowledge he repeated again I would tell

 7   him what he wanted to know before I left there.

 8   Q.  Did he leave the room again?

 9   A.  Yes, he did.

10   Q.  For how long was he gone that time?

11   A.  I'm not sure.

12   Q.  Okay.  Did he return at some point?

13   A.  Yes, he did.

14   Q.  Was anyone with him?

15   A.  Not to my knowledge.

16   Q.  Okay.  What happened then?

17   A.  He took me out of there, out of the room that I was being

18   confined in.

19   Q.  And where did he take you?

20   A.  He took me to out into -- into his office.

21   Q.  When you say he took you out through the detective

22   division, can you describe for us what it was -- what area you

23   walked through to get to his office?

24   A.  It was an open area, something like the courtroom, but it

25   had desks sitting around and a lot of officers sitting around.

Mu'min - direct by Biffl                                    2216

1   Q.  I'm going to show you what's marked for identification as

2   Government's 8E.

3        I'd ask you to look at that photograph and ask if the

4   area outside that door resembles the area that you walked

5   through.

6   A.  Yes.

7        MS. BIFFL:  Your Honor, at this time I would request

8   to use 8E as a demonstrative.

9        THE COURT:  Any objection?

10       MR. BEUKE:  No objection, Judge.

11       THE COURT:  All right.

12       MS. BIFFL:  I'll publish.

13  BY MS. BIFFL:

14  Q.  Okay.  So, Mr. Mu'min, you said the area outside this room

15  door resembles the one you walked through.

16  A.  Yes.

17  Q.  Do you recall how many desks there were in the area that

18  you walked through?

19  A.  No, I do not.

20  Q.  Were they set up to be used -- were there people working at

21  those desks?

22  A.  To the best of my knowledge there wasn't, no.

23       MR. BEUKE:  I'm sorry, Judge, I didn't hear that

24  answer.

25  BY MS. BIFFL:

Mu'min - direct by Biffl

1   Q.  Would you repeat what you said.

2   A.  To the best of my knowledge there wasn't.

3           THE COURT:  Was or wasn't?

4           THE WITNESS:  Wasn't.

5           THE COURT:  Was not, okay.

6   BY MS. BIFFL:

7   Q.  Were the desks, did they have anything on the top of them

8   or were they just empty desks?

9   A.  They had, you know, typewriters sitting on top of them

10  where people worked.

11  Q.  All right.  Okay.

12          How far or how long did it take you to walk from the

13  interview room where you had been to Lieutenant Burge's office?

14  A.  Not long, maybe about ten seconds or fifteen seconds,

15  something like that.

16  Q.  Okay.  What happened when you got into his office?

17  A.  I was set -- set down.  I was told to sit down.

18  Q.  Go ahead.

19  A.  I was sat in front of his desk.

20  Q.  So you sat in front of his desk.

21  A.  His desk.

22  Q.  There was a desk in the room?

23  A.  Yes, it was.

24  Q.  All right.  Was there a chair behind the desk?

25  A.  Yes, it was.

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 22 of 191 PageID #:5821
Mu'min - direct by Biffl
2218

1  Q.  And did you sit -- the chair you sat in, where was it in

2  relation to the desk?

3  A.  In the front of the desk which he sat in.

4  Q.  And when you were sitting -- let's say that where you're

5  sitting now is where you were sitting in his office, where was

6  the door to the office?

7  A.  To the best of my knowledge it was to my right.

8  Q.  Was it immediately to your right or a little bit behind or

9  a little bit in front?

10  A.  Slightly like, say, he -- I'm sitting -- it would be over

11  this area.

12  Q.  Okay.  So a little in front of you or a little behind you?

13  A.  A little bit behind me.

14  Q.  Okay.  When you sat down in the chair, were you still

15  handcuffed?

16  A.  Yes.

17  Q.  Were the cuffs in front of you or behind you at that point?

18  A.  They were in front of me.

19  Q.  And what happened in that room?

20  A.  I was asked where was my son at at that time when I was

21  sitting there.

22  Q.  Where my son was?

23  A.  Where my son was at.

24  Q.  And what did you say?

25  A.  Told him I didn't know.

Mu'min - direct by Biffl

1   Q.  And then what happened?

2   A.  He told me I was lying.

3   Q.  Okay.  And then did he do anything?

4   A.  He told me to call my wife.

5   Q.  And did you do that?

6   A.  I did that.

7   Q.  From his office?

8   A.  Yes.

9   Q.  Okay.  And tell us about that.  Why did you call -- did he

10  tell you why you should call your wife?

11  A.  If I -- see if she knew where my son was at, did she see

12  him.

13  Q.  And so did you do that?

14  A.  Yes.

15  Q.  And how long did the phone call last?

16  A.  Not long.  Probably 10 or 15 seconds, something like that,

17  maybe.

18  Q.  And was Lieutenant Burge standing there the whole time?

19  A.  Yes, he was.

20  Q.  What happened when the phone call ended?

21  A.  He had a small tape recorder, something -- that's what it

22  was, and he played it back to me what I said, I said on the

23  phone.

24      It is a device that he plugged in so he could listen

25  to and record the phone call.

Mu'min - direct by Biffl

1   Q.  So he recorded the phone call?

2   A.  Yes.

3   Q.  And then he played it back?

4   A.  Yes.

5   Q.  When he played it back, did it have both your end of the

6   conversation and your wife's end?

7   A.  Yes, it did.

8   Q.  Okay.  What did he say after he played it back?

9   A.  He told me I was lying.  She probably lying.

10  Q.  He said your wife as lying?

11  A.  Probably lying.

12  Q.  Then what happened?

13  A.  He told me I would still tell him what he wanted to know

14  before I left out of there.

15  Q.  Did --

16  A.  And he was sitting behind the desk.  And he opened the

17  drawer.  And in that drawer he pulled out, to the best of my

18  knowledge, a .44 Magnum.

19  Q.  And what did he do with that .44 Magnum?

20  A.  He laid it on the desk at first.  Told me I blow your

21  brains out if you don't tell me what I want to know.

22  Q.  When he laid it on you, was a barrel pointing toward you or

23  pointing in a different direction?

24  A.  Not at first.  He took -- he picked it up after it laid

25  there for a while and took all the bullets out except one.

Mu'min - direct by Biffl

 1   Q.  And then what did he do?

 2   A.  He placed it to my head and spin it and snapped it three

 3   times.

 4   Q.  Okay.  Now let's break this down a little bit.

 5       You were still sitting in the chair in front of the

 6   desk.

 7   A.  Yes.

 8   Q.  Is that right?

 9   A.  Yes.

10   Q.  Was he still behind the desk?

11   A.  Yes.

12   Q.  Do you recall what this gun looked like as far as its size?

13   A.  It was a big long barrel, something about like that.

14   Q.  Okay.  And you have gestured with your hands --

15   A.  Yes.

16   Q.  -- about eight inches?

17   A.  About inches, I am not -- I don't know how long.  It was a

18   big one.

19   Q.  So you said that he took all the bullets out and put one

20   in. Is that right?

21   A.  Except one.

22   Q.  He took all but one out.

23   A.  All but one out.

24   Q.  Okay.  And then I believe you said he spun the cylinder.

25   A.  Yes.

Mu'min - direct by Biffl

```
 1   Q.  Okay.  And then what did he do?

 2   A.  Placed it to my head.

 3   Q.  Did he do that from behind the desk or did he come around?

 4   A.  He did that from behind the desk.

 5   Q.  And when you said he put it to your head, was it touching

 6   you?

 7   A.  Yes, it was.

 8   Q.  Okay.  And could you show us by pointing to your head where

 9   he touched it to?

10         MS. BIFFL:  All right.  For the record he is gesturing

11   to the middle of his forehead.

12   BY MS. BIFFL:

13   Q.  And what did he do when he put the gun to your forehead?

14   A.  He spunned the cylinder and clicked it.

15         He clicked it.

16   Q.  How many times did he do that?

17   A.  Three.

18   Q.  Did he spin it each time --

19   A.  Yes.

20   Q.  -- in between?

21         I'm sorry.  You --

22   A.  Yes.  Yes.

23   Q.  You just have to wait for me to finish my question because

24   the court reporter can't take us both down at once.  Okay?

25         All right.  So he spun it in between and clicked it
```

Mu'min - direct by Biffl

```
 1   three times.

 2   A.  Yes.

 3   Q.  What were you doing at this point?

 4   A.  Looking.

 5   Q.  Looking at what?

 6   A.  Looking at him.

 7   Q.  Did you say anything?

 8   A.  No.

 9   Q.  Now up until this point in his office, was there anyone

10   else in the office?

11   A.  To the best of my knowledge there was an associate standing

12   in the doorway.  He wasn't directly in the office but he was

13   standing in the doorway.

14   Q.  Okay.  And did you say an associate?

15   A.  Yes.

16   Q.  Okay.  I just wasn't sure of the word you used.

17           Was it another police officer or was it a civilian?

18   A.  It was another police officer.

19   Q.  Do you know when he had arrived at the doorway?

20   A.  Like shortly after he had taken me to his office.

21   Q.  After Lieutenant Burge had had the gun to your head and

22   pulled it -- the trigger three times, what did he do?

23           Did he say anything to you?

24   A.  I think he said, to the best of my knowledge, he said to me

25   that I would talk.  I want to play hard.  So he told me you
```

1    want to play hard.  And he became angry at that point and

2    rushed out behind the desk with a typewriter cover, typewriter

3    cover, and attempted to force it down into my face.

4    Q.  And when you say he became angry, can you describe for us

5    what about him makes you say that?

6    A.  His face real red and like he -- his whole contour change.

7    Q.  What was his tone of voice?

8    A.  Aggressive, real aggressive.  Like I could tear your head

9    off, like someone.

10   Q.  Now you say that he grabbed a typewriter cover.  Can you

11   describe to us what it looked like?

12   A.  It was a vinyl cover that goes over a typewriter.

13   Q.  Do you remember what color?

14   A.  To the best of my knowledge it was grayish.

15   Q.  And was it something that you could see through or no?

16   A.  No.

17   Q.  Now you said that he tried to force it over your face.  Can

18   you describe for us -- and if you need to use your hands to

19   demonstrate -- can you describe what you mean by that?

20           What did he do?

21   A.  He took it and came out and pushed it down over my face and

22   was trying to push it over the back of my head.  But he was

23   holding his hand in front of it so I could hardly breathe.

24           And he kind of held it that I did get short of

25   breathing.

Mu'min - direct by Biffl

1  Q.  You did get short of breathing?

2  A.  Yes, I did.

3  Q.  Okay.  And for the record you have used your hand to show

4  it being pressed first over the top part of your face and then

5  over your mouth and nose, is that right?

6  A.  That's correct.

7  Q.  Now while he was doing that, did you -- did you feel hands

8  on you?

9  A.  After the second attempt to do that -- well, I stood up

10  mostly, did it the second time, I stood up with the chair and I

11  was handcuffed to the chair.

12  Q.  Okay.  Let me stop you.  Had your handcuffs been changed at

13  some point?

14  A.  Yes.

15  Q.  When did that happen?

16  A.  After I wouldn't -- after the gun didn't do no good.

17        After he had pointed a gun.

18  Q.  All right.  And who changed your cuffs?

19  A.  He did.

20  Q.  What did he do?  That -- you were handcuffed in the front,

21  right?

22  A.  Right.  He took them off and put them behind me.

23  Handcuffed behind.

24  Q.  All right.  And now you said a second ago handcuffed to the

25  chair.  So can you describe, were you handcuffed directly

Mu'min - direct by Biffl

```
 1    behind your back or around the back the chair or --
 2    A.  Around the back of the chair.
 3    Q.  What kind of chair was it?
 4    A.  The kind of chair like I'm sitting in now
 5    Q.  Did it move?
 6    A.  Yeah, swivel back.
 7    Q.  Swivel back?
 8             So now you have described that when he put this
 9    typewriter cover in your face, did you struggle at all?
10    A.  Yes, I struggled the second time he attempted to do it
11    again, but I got up.  And there was an associate that was
12    standing in the door.  He asked him to come forward to hold me
13    down.
14    Q.  Okay.  Do you remember what he said to that person?
15    A.  He said it is fun time.
16    Q.  All right.  And did he say anything about holding you down?
17    A.  He said hold him down so I can get him -- get it over the
18    face, that's what he told the associate that was standing
19    there.
20    Q.  Did you see whether that person from the doorway came in?
21    A.  I felt him come in because he had his hand on my shoulder.
22    Q.  Okay.
23    A.  On my shoulder pushing me down so I couldn't get up from
24    the chair.
25    Q.  All right.  And for the record you have just demonstrated
```

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 31 of 191 PageID #:5830
2227
Mu'min - direct by Biffl

1   with both of your hands pushing on your shoulders, is that

2   right?

3   A.  Yes.

4   Q.  While you felt those hands on your shoulders, what was

5   Lieutenant Burge doing?

6   A.  Pushing the typewriter down and smothering me, and I went

7   to hollering.

8   Q.  Why were you hollering?

9   A.  At that point I had became afraid that I was going to die.

10  Q.  You mentioned a minute ago that you had become short of

11  breath.  At some point were you able to breathe when he had

12  this typewriter cover --

13  A.  When I passed out, he blew, right in my face, so I would

14  come back to.

15  Q.  So you passed out?

16  A.  Yes.

17  Q.  And then when you say he blew air in your face, are you

18  referring to Lieutenant Burge or --

19  A.  Yes, Lieutenant --

20  Q.  -- or to the associate?

21  A.  -- Burge.

22  Q.  And can you tell us what you mean by blowing in your face?

23  A.  Get close to somebody.  It is like almost -- like mouth to

24  mouth except that you blowing into my nostrils so I went --

25  Q.  Okay.  Was he actually -- were his lips touching you or was

1    he just blowing --

2    A.  He just -- his lips wasn't touching me, but I could feel

3    the air.

4    Q.  Okay.  How many times did the defendant, Lieutenant Burge,

5    put the typewriter cover over your face?

6    A.  Three.

7    Q.  How many times did you lose consciousness?

8    A.  Two.

9    Q.  The third time he put the cover over your face, was he

10   doing what you have already described as far as holding it

11   against you?

12   A.  Yes.

13   Q.  And were you having trouble breathing?

14   A.  Yes.  That's when I went to hollering.

15   Q.  Okay.  And then did you tell him anything?

16   A.  I told him I had -- I -- just don't do it no more, I would

17   tell him what he want to know.

18   Q.  When you told him that, what did he do?

19   A.  He kind of released it.

20   Q.  Did he then question you about the robbery at that point?

21   A.  Yes, he did.

22   Q.  Did he take a statement from you?

23   A.  Not to my knowledge he didn't.

24   Q.  Okay.  Did he tell you anything about a statement?

25   A.  He informed me that I would sign a statement.  And if I

Mu'min - direct by Biffl

```
 1    said anything to anybody what had happened, they wouldn't
 2    believe me.
 3    Q.  And did he tell you who would be taking a statement or when
 4    that would happen?
 5    A.  I don't recall.
 6    Q.  Okay.  Did you remain in his office or did he take you out?
 7    A.  I remained in there a few minutes.
 8    Q.  And then where did you go?
 9    A.  Then he took me back to the room that he was holding me in.
10    Q.  Did you see him again that night?
11    A.  No.
12    Q.  How long did you remain in that interview room until
13    someone else came to see you?
14    A.  Overnight.
15    Q.  And the next day do you recall who came to see you?
16    A.  An officer by the name of Paladino.
17    Q.  And when Officer Paladino came to see you, what happened?
18    A.  To the best of my knowledge he informed me that a district
19    attorney, DA, would be coming in for me, with a statement for
20    me to sign.
21    Q.  And did another person come in to see you with Paladino?
22    A.  Later on.
23    Q.  Okay.  Do you know that person's name?
24    A.  It was state attorney.  I think this is -- DA.  It was a
25    DA.
```

Mu'min - direct by Biffl

1   Q.  Do you remember how many times that attorney came in to the

2   room?

3   A.  To the best of my knowledge once.

4   Q.  All right.  Is it possible he came in more than once?

5   A.  It is possible.

6   Q.  One of the times that he came in, did they have a statement

7   for you to sign?

8   A.  Yes.

9   Q.  And did the attorney read that statement to you?

10  A.  He attempted to, and I stopped him.  I told him it wasn't

11  necessary for all that, I would sign it.

12  Q.  And did you sign it?

13  A.  Yes, I did.

14  Q.  Did you tell Paladino or that attorney what had happened to

15  you in Lieutenant Burge's office?

16  A.  No, I did not.

17  Q.  Why not?

18  A.  I was afraid to.

19  Q.  Did you see Lieutenant Burge any more after you signed the

20  statement?

21  A.  It could have been the next day to the best my knowledge.

22  Q.  All right.  And where did you see him?

23  A.  He came by and told me, good boy.

24  Q.  Did he say anything else other than good boy?

25  A.  I don't recall.

```
                    Mu'min - cross by Beuke
```

 1   Q.  All right.  Just a couple last questions.  Was this -- you

 2   mentioned that this arrest was in Chicago.  Was this the first

 3   time you had been arrested in Chicago?

 4   A.  Yes.

 5   Q.  Where were you living at the time?

 6   A.  I was living in Milwaukee.

 7   Q.  Had you ever met Lieutenant Burge before?

 8   A.  No.

 9   Q.  Had you ever heard of him?

10   A.  No.

11   Q.  One other question about your background.  Had you ever

12   been affiliated with any gang?

13   A.  No.

14   Q.  All right.  And, finally, did you ever file any sort of

15   civil lawsuit in connection with this incident that we have

16   just talked about?

17   A.  No.

18        MS. BIFFL:  Thank you.  I don't have anything further,

19   your Honor.

20                        CROSS EXAMINATION

21   BY MR. BEUKE:

22   Q.  Mr. Mu'min, you have testified and been interviewed about

23   this incident a number of times, haven't you?

24   A.  Yes.

25   Q.  Okay.  You have been -- you have given statements to the

1  FBI, haven't you?

2  A.  To the best my knowledge I have.

3  Q.  You have given video statements to people from the People's

4  Law Office, haven't you?

5  A.  Yes.

6  Q.  You have given statements in front of the representative

7  from the Chicago Police Department, Office of Professional

8  Standards, haven't you?

9  A.  Yes.

10  Q.  And you also had a number of conversations with the

11  prosecutors in this case, haven't you?

12  A.  Repeat that, sir?

13  Q.  You have had a number of conversations with the prosecutors

14  in this case, haven't you?

15          Ms. Biffl and her partners.

16  A.  Yes.

17  Q.  You have been interviewed by them on a number of occasions,

18  correct, prior to testifying here?

19  A.  Yes.

20  Q.  You have gone over your testimony with Ms. Biffl numerous

21  times, haven't you?

22  A.  Yes.

23  Q.  How many?

24  A.  I'm not sure, sir.

25  Q.  More than five?

Mu'min - cross by Beuke

1   A.  I'm not sure.

2   Q.  Travel from Ohio to come here and speak with her?

3   A.  Yes.

4   Q.  More than five times?

5   A.  I'm not sure, sir.

6   Q.  Well, prior to testifying here today, when was the last

7   time you spoke with Ms. Biffl and her partners?

8   A.  Repeat that.

9   Q.  Prior to testifying here today, when did you last speak

10  with Ms. Biffl and her partners?

11  A.  Today.

12  Q.  Pardon?

13  A.  Today.

14  Q.  How about yesterday?

15  A.  Yes.

16  Q.  How about over the weekend?

17  A.  Yes.

18  Q.  How about last week?

19  A.  Yes.

20  Q.  How about two weeks ago?

21  A.  That's possible.

22  Q.  You have gone through your statement with her more than

23  five times, haven't you?

24  A.  I didn't keep track, sir.

25  Q.  Well, every time you traveled from Ohio, you came here at

1    their expense, correct?

2         They paid you for your travel expenses, right?

3    A.  This is my first time here.

4    Q.  Well, all of the other conversations that you had with the

5    prosecutors concerning preparation for your testimony here

6    today, was that all done on the phone?

7    A.  No.

8    Q.  You were here before today, weren't you?

9    A.  No.

10   Q.  Well, when you talked to Ms. Biffl yesterday, where were

11   you and where was she?

12   A.  Sir, maybe I misunderstood the question, but I talked to

13   them -- when I say first time here, I mean my coming to

14   Chicago, that's what I mean by that statement.

15   Q.  Okay.  I'm just -- you prepared your testimony with

16   Ms. Biffl a number of times over the last month in preparation

17   for your appearance here today, is that fair to say?

18   A.  That could be correct, sir.

19   Q.  Okay.  And the conversations that you have had with

20   Ms. Biffl, were they in Chicago or did you speak with her over

21   on the phone?

22   A.  I had a few conversations here with her.

23   Q.  She gave you -- in Chicago, correct?

24   A.  Yes.

25   Q.  Yeah.  So you have been to Chicago before and spoke with

Mu'min - cross by Beuke

1    the prosecutors about your testimony.

2            MS. BIFFL:  Objection, Judge.  Asked and answered.  It

3    is getting confusing.

4            MR. BEUKE:  I'll say.

5            THE COURT:  Are you ready to move on or do you want a

6    ruling on it?

7            MR. BEUKE:  Well, I'll move on.

8            THE COURT:  Okay.

9    BY MR. BEUKE:

10   Q.  Here, did Ms. Biffl give you transcripts of your prior

11   testimony, Mr. Mu'min, and ask you to read them to see what you

12   have testified to in the past?  Yes or no.

13   A.  She allowed me to look them over.

14   Q.  Okay.  There were several transcripts that you got,

15   correct?

16   A.  That's correct.

17   Q.  Okay.  Just so it is clear for the ladies and gentlemen,

18   that robbery, attempt murder that you were convicted of in

19   1987, that was a robbery that -- an attempt murder that

20   occurred in July of 1985, correct?

21   A.  To the best of my knowledge, yes.

22   Q.  And you did that robbery, attempt murder, didn't you?  You

23   were involved in that case, correct?

24   A.  Yes.

25   Q.  Okay.  You drove a car in that case, correct?

Mu'min - cross by Beuke

1    A.   Yes.

2    Q.   You drove your son and a person by the name of Rio Harper

3    to a Brown's Chicken on 116th and --

4              MS. BIFFL:  Objection to going into --

5    BY MR. BEUKE:

6    Q.   -- and Western, didn't you?

7              MS. BIFFL:  -- the facts of the case.

8              THE COURT:  All right.  Sustained.

9    BY MR. BEUKE:

10   Q.   Well, the statement that you ultimately gave in that case,

11   you read a handwritten statement, didn't you?

12   A.   No, I did not read it.

13   Q.   Well, let me show you what I will ask to be marked as --

14        (Brief interruption.)

15   BY MR. BEUKE:

16   Q.   Mr. Mu'min, I'm going to show you what I am going to mark

17   as Defendant's Number 51 and ask you to take a look at this

18   two-page document.

19            Tell the ladies and gentlemen of the jury if you

20   recognize that and if you do, what you recognize that to be.

21   A.   I recognize this.  It is a statement.

22   Q.   What is it?

23   A.   It is a statement taken.

24   Q.   A statement.  Does it -- at the top does it say statement

25   of Shadeed Mu'min?

Mu'min - cross by Beuke

1    A.  That's correct.

2    Q.  Does it have a date and a time?

3    A.  Yes.

4    Q.  October 31st, 1985, 12:50 P.M., correct?

5    A.  Correct.

6    Q.  Underneath -- your signature appears in the middle of page

7    1, doesn't it?

8    A.  That's correct.

9    Q.  And that's underneath what's commonly referred to as the

10   Miranda warnings, correct?

11   A.  Yes.

12   Q.  Your signature appears at the bottom of the page also,

13   correct?

14   A.  That's correct.

15   Q.  And on page 2 -- could you turn to page 2?

16        Your signature appears on page 2, correct?

17   A.  Correct.

18   Q.  And do you recall Detective Paladino signing that document?

19   A.  Yes.

20   Q.  Do you recall assistant State's Attorney Wilbur Crooks

21   being involved in this investigation?

22   A.  Correct.

23   Q.  You remember him, don't you?

24   A.  Yes.

25   Q.  Okay.  Well, we'll get back to that.

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 42 of 191 PageID #:5841
2238
Mu'min - cross by Beuke

1          Those signatures on that document, you put them

2    there, correct?

3    A.   That's correct.

4          MS. BIFFL:   Objection to the form of the question as

5    far as whose signature was put there.

6          MR. BEUKE:   Oh, I'm sorry, Judge.   Let me clear that

7    up.

8    BY MR. BEUKE:

9    Q.   Where it says -- where the signature Shadeed Mu'min appears

10   underneath the Miranda warnings, you signed there, correct?

11   A.   That's correct.

12   Q.   At the bottom of page 1 where Shadeed Mu'min's signature

13   is, you signed there also, didn't you?

14   A.   Yes.

15   Q.   On the back of page 2, at the end of the statement, Shadeed

16   Mu'min's signature appears there, and that's where you signed,

17   correct?

18   A.   That's correct.

19   Q.   And after you signed assistant State's Attorney Wilbur

20   Crooks signed, didn't he?

21   A.   Correct.

22   Q.   And Detective Paladino signed, didn't he?

23   A.   Correct.

24   Q.   And that document that you signed, that was read to you by

25   assistant State's Attorney Crooks that afternoon at 12:50,

Mu'min - cross by Beuke

1   wasn't it?

2   A.  Correct.

3   Q.  And he read you each and every line in that document,

4   didn't he?

5   A.  Correct.

6   Q.  Okay.  And he asked you if everything in that document was

7   true and correct and he asked you if you would sign it,

8   correct?

9   A.  Correct.

10  Q.  And you did it.  Correct?

11  A.  Yes.

12  Q.  Okay.  Just to back up a little bit.  Ms. Biffl asked you

13  about do you recall that -- excuse me -- that -- being arrested

14  in July of 1985.  You indicated that that's when you were

15  arrested originally, correct?

16  A.  Yes, I did.

17  Q.  And in July of 1985 when you were arrested, it was for this

18  robbery, correct?

19  A.  Yes.

20  Q.  You were arrested after Rio Harper and your son drove away

21  from the Brown's Chicken --

22          MS. BIFFL:  Objection -- I'll withdraw.

23  BY THE WITNESS:

24  A.  No.

25  BY MR. BEUKE:

Mu'min - cross by Beuke

1  Q.  Where were you arrested in July of '85 when you were

2  arrested for this robbery?

3  A.  I'm not sure.

4  Q.  Was it in Chicago?

5  A.  To the best of my knowledge in Chicago.

6  Q.  Were you brought to a place after you were arrested in July

7  for this armed robbery?

8  A.  Excuse me.  That's incorrect.  When I was arrested I was

9  not arrested directly for this case, I was --

10  Q.  Well --

11  A.  -- arrested for carrying a concealed weapon --

12  Q.  Oh.

13  A.  -- when I was stopped.

14  Q.  Okay.  The arrest in July of '85 is what I am talking

15  about, Mr. Mu'min, that you told Ms. Perry -- or Ms. Biffl.

16        Where were you arrested in July of '85?

17  A.  That was incorrect where I was arrested.

18  Q.  Oh, you got that wrong?

19  A.  Yes, I did.

20  Q.  Oh, okay.  In spite of preparing your testimony with

21  Ms. Biffl on five or six occasions, you got that wrong, right?

22  A.  Yes.

23  Q.  Okay.  Just so we're clear, Mr. Mu'min, in -- you were

24  arrested on October 30th of 1985, correct?

25  A.  That's correct now, sir.

Mu'min - cross by Beuke                           2241

1   Q.  You told Ms. Biffl that you recall after the robbery a

2   young girl that you drove over to the Brown's Chicken at 116th

3   and Western, she had been arrested that day, that was your

4   testimony, correct?

5   A.  That's correct.

6   Q.  You knew that, correct?

7   A.  I had heard it.

8   Q.  Well, you drove her there, correct?

9   A.  That's correct.

10  Q.  And you drove your son and Rio Harper there, correct?

11  A.  That's correct.

12  Q.  And you knew they were going to commit a robbery, correct?

13  A.  To the best of my knowledge, yes.

14  Q.  They had a gun, correct?

15          MS. BIFFL:  Objection to going into the facts, your

16  Honor.

17          MR. BEUKE:  Well, this is important, Judge, because --

18          MS. BIFFL:  Not relevant.

19          THE COURT:  What's the relevance?

20          MR. BEUKE:  Pardon?

21          THE COURT:  What point of proof does it go to?

22          MR. WEISMAN:  Judge, could we have a sidebar, please?

23          THE COURT:  Yes.

24      (Sidebar proceedings had in open court outside of the

25  hearing of the jury:)

Mu'min - cross by Beuke

1        THE COURT:  This is the first robbery, right, I mean

2    -- or the one that -- I mean, the one for which he was

3    convicted and --

4        MR. BEUKE:  Yes.

5        THE COURT:  -- now overturned.

6        MR. BEUKE:  Yes, your Honor.

7        THE COURT:  Okay.

8        MR. BEUKE:  He was -- none of his convictions were

9    ever overturned, they are all convictions.

10        MS. BIFFL:  No, that's not true.  Two counts of this

11    one were.

12        THE COURT:  Well --

13        MS. BIFFL:  Yes.

14        THE COURT:  -- not the one at issue in this case.

15        MR. BEUKE:  Right.

16        Judge, with respect to his several statements, he has

17    said in prior testimony that he did not commit this robbery.

18    You know, so I think it is directly relevant and impeaching

19    based on what Ms. Biffl has elicited on direct that the -- he

20    is now admitting, and it is contrary to statements he has made

21    on other occasions.  That's why the facts that he told to

22    assistant State's Attorney Crooks and Paladino I think are

23    important.

24        MS. BIFFL:  Judge, if he was denying it, they would

25    say that the facts had to come in.  Now he is admitting it, and

Mu'min - cross by Beuke

 1    they are saying the facts have to come in.

 2              MR. BEUKE:  Well, either way it is impeaching, Judge.

 3              MS. BIFFL:  It is not relevant.

 4              They can ask him --

 5              THE COURT:  He has admitted the robbery, right?  And

 6    so you --

 7              MR. BEUKE:  Well, but he is denying the robbery --

 8              THE COURT:  On previous occasions?

 9              MR. BEUKE:  -- on previous occasions.

10              THE COURT:  So you can confront him with that without

11    getting into details about what the robbery was all about.  He

12    has already admitted the robbery.

13              MR. BEUKE:  Well, but --

14              THE COURT:  He --

15              MR. BEUKE:  -- Judge, one of the -- I think what's

16    also at issue is we're going to have evidence concerning the

17    interrogation, and the questions that are posed to him are

18    going to come in by other witnesses that he was aware of the

19    fact, and the interrogators were aware of the fact that this

20    Carol Tyree had been arrested the day of the robbery, just like

21    he said that, she had given a statement.  Her statement was

22    that he was the driver, his son was the passenger.  His son was

23    the shooter.

24              THE COURT:  Right.

25              MR. BEUKE:  All of that information.  He's saying he

1   was tortured to give this statement.  Our theory is he was

2   confronted with all of the evidence that the police officers

3   had at the time, and then he chose to give a statement and

4   cooperate.  And the allegations of torture are nonsense.

5        MS. BIFFL:  Okay.  That can all be established without

6   going into the facts.  He has already acknowledged, yes, the

7   girl was arrested the night of, and so they can go into so you

8   don't know what she had told them or you knew she had given the

9   statement whatever.  They can confront him with the fact that

10  he denied it in the past.

11       But to say that they are going to bring in somebody to

12  say, yes, he gave the statement when he has just said, yes, I

13  gave the statement and I was guilty --

14       THE COURT:  Right, yeah.

15       MR. BEUKE:  But, Judge, it goes to his state of mind.

16       THE COURT:  I made the ruling over and over again not

17  to get in the underlying facts of these crimes because they are

18  prejudicial and they are not really relevant.

19       So you can interrogate him with regard to his

20  credibility and impeach him on the prior statements, but you

21  don't -- I won't let you lead him through every incident that

22  led up to this robbery.

23       MR. BEUKE:  Well, Judge, can I be allowed to speak

24  with him about -- I mean, he has testified about conversations

25  he had with Lieutenant Burge in the office.  I believe, you

Mu'min - cross by Beuke

```
1    know, it is contrary to -- we'll have evidence that he was

2    questioned about information that the officers knew at the

3    time.  I mean, one is the young lady had been arrested.  The

4    other one is that his car had been identified.  You know, the

5    detective -- the officer who arrested him in the 7th District

6    is going to testify to that, that this -- he was actually

7    sitting in his car because it had been identified as being

8    involved in the armed robbery, attempt murder.

9              So I mean those --

10             THE COURT:  But now we're talking about the arrest

11   with the alleged torture.

12             MR. BEUKE:  Right.

13             THE COURT:  Okay.

14             MR. BEUKE:  Right.  That's in October of '85.

15             MS. BIFFL:  And, your Honor, these arresting officers

16   he is talking about, they took them off the witness list over

17   the weekend.  So if they are now putting them back on -- I

18   don't know what they are doing.

19             MR. BEUKE:  Well --

20             MS. BIFFL:  They told us they weren't coming and --

21             MR. BEUKE:  Well, I don't know if we took -- we took

22   who off the witness list?

23             MS. BIFFL:  Meyer and Bunch.

24             MR. BEUKE:  No.  Well, I didn't.  You know, I

25   apologize, but I didn't know what he was going to testify to.
```

 1    I don't know why they --

 2              MS. BIFFL:  That's for another day.

 3              MR. WEISMAN:  Judge, the other problem is we read a

 4    stipulation in yesterday in which the defendant admits that

 5    he -- after he gave him food for thought he was ready to

 6    cooperate.

 7              So for them to bring in people now to say, that's not

 8    why he was going to cooperate, I'm not sure how that works when

 9    the defendant's own admission is contrary to that.

10              MR. BEUKE:  Well, the stipulation was that Mr. Burge

11    had testified on a previous occasion that he had a conversation

12    with him, and his conversation was that he gave him food for

13    thought.  He told him about the fact that the young lady had

14    been identified, that she had identified him.  All of that is

15    in evidence.  So I don't know why I shouldn't be able to go --

16              THE COURT:  Okay.  So you want to bring --

17              MR. BEUKE:  That's --

18              THE COURT:  -- out certain statements were given, that

19    they had certain statements.

20              MR. BEUKE:  Yeah, they put that in.

21              THE COURT:  Prior to.

22              MR. BEUKE:  Yeah.  I mean, they've elicited that

23    through the stipulation.  It is already in evidence.

24              MR. WEISMAN:  No, no, no.  The stipulation does not

25    say that.  In fact, the stipulation was that a motion to

1    suppress where Lieutenant Burge then was trying to keep -- the

2    issue was keeping the statement out, and Lieutenant Burge was

3    very specific that he was not trying to elicit a statement.

4    And what he said was, I gave him food for thought.  And after I

5    was then giving him food for thought he was ready to --

6              THE COURT:  There is a dispute as to what the food for

7    thought was?

8              MR. BEUKE:  Yeah.  Right.

9              THE COURT:  Well --

10             MR. WEISMAN:  He said we're ready to cooperate.

11             MR. BEUKE:  No.

12             MR. WEISMAN:  The issue then --

13             THE COURT:  Wait, wait.

14             MR. BEUKE:  That wasn't the motion because I thought

15   the stipulation contained specific things that the detective

16   or --

17             THE COURT:  No, I don't think --

18             MR. BEUKE:  -- Lieutenant Burge had told him during

19   the course of that --

20             THE COURT:  Maybe we should take a little recess --

21             MR. BEUKE:  All right.

22             THE COURT:  -- and get this straightened out.

23        (Proceedings had in open court in the presence and hearing

24   of the jury:)

25             THE COURT:  All right.  We'll take a 15-minute recess.

Mu'min -

```
 1          (Proceedings had in open court outside of the presence and
 2    hearing of the jury:)
 3          THE COURT:  Mr. Mu'min, would you step down and leave
 4    the courtroom, please?
 5          (Witness temporarily excused.)
 6          THE COURT:  So as I understand this issue, the defense
 7    wants to inquire of the witness about what Mr. Burge told --
 8    said to Mu'min concerning the underlying facts of the crime.
 9    Is that right?  That according to his theory led Mu'min to
10    confess.
11          MR. WEISMAN:  With that we have no --
12          MR. BEUKE:  Yes, Judge.
13          MR. WEISMAN:  Judge, we have no -- I mean, the
14    stipulation says that Burge did tell him facts that the police
15    knew at the time.  That wasn't the line of questioning.
16          They are offering two things here.  One, they are
17    saying, we want to get into the underlying details of the
18    statement itself, which is just a backdoor way of getting into
19    the underlying facts of the conviction.
20          MR. BEUKE:  That's not true, Judge.
21          MR. WEISMAN:  And second --
22          THE COURT:  Wait, wait, wait.
23          MR. WEISMAN:  Then he says that it is relevant because
24    we're going to bring in a State's Attorney and a detective --
25    apparently a State's Attorney only to say this is how the
```

1      interrogation went, we gave him this information.

2          But it is clear from the stipulation that after

3  Mr. Burge had this food for thought conversation, he was then

4  ready to cooperate.

5          So for them to bring in a State's Attorney to say, no,

6  he wasn't ready to cooperate, then we had to give him the

7  information to make him cooperative, is impeaching their

8  own -- the defendant's own words.

9          MR. BEUKE:  Judge, here's the part of the stipulation

10  that I am referring to.  Page 2.

11          "Question:  What did you tell him at that time of the

12  evening?

13          "Answer:  I had a conversation of maybe five minutes

14  duration at the outside.  I told him the reason why he was

15  there.  Told him the evidence that we had against him.  Told

16  him that certain statements had been made by the co-defendant

17  in the case implicating him being one of the offenders, various

18  idle chatter."

19          So I mean he was told about the fact that a

20  co-defendant had been arrested and the fact that a co-defendant

21  had in fact implicated him as being a participant from the

22  armed robbery attempt murder.  That's --

23          MS. BIFFL:  And if that's what the question was

24  limited to, that would be fine.  But that's not what's going to

25  happen.

 1          MR. WEISMAN:  Correct.

 2          MS. BIFFL:  So if Mr. Beuke --

 3          THE COURT:  Wait.  Let Mr. Beuke finish, and then you

 4   can respond.

 5          MS. BIFFL:  I'm sorry, I thought he was.

 6          MR. BEUKE:  Well, I mean, that is the issue, Judge.

 7   What he is --

 8          THE COURT:  So you want to say -- you want to

 9   have -- you want to confront him with actual statements that

10   Burge made to him.

11          MR. BEUKE:  I mean, they have brought it all in.  They

12   have gone into four different conversations that he had with

13   Burge.

14          THE COURT:  Okay.

15          MR. BEUKE:  They have put in in their case the fact

16   that Burge has made a statement indicating that he had a

17   conversation with him.  And part of the conversation included

18   confronting him with the facts that Lieutenant Burge knew at

19   the time of the conversation.

20          It is important for us, Judge, because, again, our

21   theory is that his statement was given based on he knew and had

22   knowledge of the fact that others that he was involved in -- in

23   the crime had implicated him.

24          THE COURT:  All right.  And then the next stage would

25   be if he denies that these were said to him, can you prove it

1    up?  Which I guess you cannot do, is that right?

2          MR. BEUKE:  No, I think we can, Judge.  But I think

3    he's already admitted it.  Ms. Biffl brought out on direct that

4    he knew about her.  He was told about the fact that I think the

5    young lady was in custody.  He was told about the fact -- I

6    don't know, you know, relative to the car, relative, you know,

7    additional information.  But, you know, they have gone into the

8    conversation with Burge.  They have opened up the door.  I

9    think I have got to be allowed to cross examine on that point

10   as to what, you know, Burge told him.  They brought all this

11   out.

12         MS. BIFFL:  Judge, we brought out --

13         THE COURT:  That is not impeaching I guess.

14         MS. PERRY:  We have no objection to them bringing that

15   out.  That is not what the questions were that led to the

16   objection.  So if he is going to stay away from the underlying

17   details of the offense, we have no problem here.

18         MR. BEUKE:  Well, that --

19         MS. PERRY:  It is only if he continues to go and, by

20   the way, as Mr. Beuke knows, Brown's Chicken in this, you know,

21   city is just a pretty incendiary phrase.  So the more he throws

22   around Brown's Chicken, Brown's Chicken, it is making it seem

23   like it is something it's not.

24         He is talking about what happened at the Brown's

25   Chicken, who was driving, all of that type of thing.  Those are

1    the underlying details of the offense.  That's the only thing

2    we have a problem with at this moment at least.

3           MS. BIFFL:  And, Judge, when we -- I elicited from him

4    that he knew that one of the co-defendants had been arrested,

5    that wasn't through Burge.  He said -- I said were any of your

6    co-defendants arrested that night?  Were they male or female?

7    And he said the young lady was.

8           That information didn't come from Burge, he knew it.

9    And he just said on cross, I had heard she had been arrested.

10          MR. BEUKE:  Well, but --

11          MS. BIFFL:  If he wants --

12          THE COURT:  Well, he can inquire about where he heard.

13          MS. BIFFL:  And that's fine.  But he went into, and

14   she told you that you drove them there and that they had a gun

15   and that they were going to do this and that.  None of that

16   should be coming in.

17          In the stipulation Mr. Beuke read to you the part, and

18   those general phrases we're fine with.  But then later on page

19   9 onto 10 of the stipulation, Burge said, yes, he indicated he

20   wanted to cooperate.

21          So it is not -- I'm not sure why they feel they need

22   to get into the facts.  But Mr. Mu'min has not denied any of

23   this.  He is saying that he -- that the statement, that he

24   signed it.  He says that he did it.  There is no reason to go

25   into the facts.

1        MR. BEUKE:  Judge, it is important because the sub-

2   -- well, I know, I don't want to go into the substance of the

3   statement.  But what he ultimately tells Mr. Crooks and

4   Detective Paladino is exactly consistent with what happened

5   here.  I mean, he has denied his involvement in the offense in

6   the past, you know, at prior -- in prior proceedings.  And

7   that, obviously I think we all concede, is a basis of

8   impeachment.

9        But now that he is admitting it here, and really he's

10  admitting it kind of for the first time that I did in fact do

11  this crime, now the fact that at this admission 25 years later,

12  the facts of what actually happened and the fact that the facts

13  that actually happened are absolutely consistent with what he

14  told the prosecutors 25 years ago, is impeaching also.

15       THE COURT:  Well --

16       MS. BIFFL:  Judge, they can ask if he has ever denied

17  doing it.  But to say that that opens the door to the facts,

18  that just doesn't even make sense.  It is not relevant.

19       THE COURT:  Well, I'm just trying to think of a way

20  that the defense can bring out --

21       MR. BEUKE:  Judge, do you want to look at the

22  handwritten statement?  It is not very long.  I mean, it is

23  not -- I mean, if that gives your Honor some universe to --

24       THE COURT:  Well --

25       MR. BEUKE:  -- make suggestions about --

1          THE COURT:  I'll take a look at it.

2          MR. WEISMAN:  Judge, can I offer an analogy.  This

3  is -- this is like a co- -- you have a defendant up on a drug

4  charge.  The government presents a cooperating witness.  And

5  that cooperating witness is charged in a whole separate case

6  with felon in possession.

7          When that cooperating witness was first arrested by

8  the Chicago Police Department, he denied it was his job.  When

9  he is interviewed by ATF, he denies it was his gun.  He then

10 pleads guilty to the charge of possessing the firearm.  And he

11 wants to cooperate in a separate drug case.

12         A defense attorney could say to the witness, you did

13 not -- you have been admitted to this gun today, you pled

14 guilty, but in fact you lied to the Chicago Police Department

15 about it when you were arrested, isn't that true, false

16 statement?  Yes, that's true.

17         You lied to the ATF when you said you didn't have

18 anything to do with that gun?  False statement can be impeached

19 on.

20         But that doesn't give that defense attorney to then go

21 into all the details of that underlying conviction.  The

22 impeachment is absolutely fine.  Mr. Mu'min has said in the

23 past -- well, apparently their version is he has denied this in

24 the past.  Well, if he's denied it in the past, if he engaged

25 in the criminal conduct, and now he's admitting it, that's

1   proper impeachment.  But that does not open the door to this

2   whole dump of the facts underlying it.

3           We are all stumped as to how these underlying facts of

4   the offense he's now admitted to in front of the jury, it helps

5   the defense in that regard.  How those underlying facts now

6   become relevant, it escapes us.

7           MR. BEUKE:  Judge, I have to apologize, I missed

8   Mr. Weisman's brilliant argument.  And if you could maybe give

9   me --

10          MR. MARTIN:  I heard it, and I can respond.

11          Your Honor, this is not a drug case or a possession

12  case.  This is a case where Mr. Burge is charged with lying

13  about what happened during interrogations.  The facts of this

14  particular case are part and parcel.  They are the whole body

15  of evidence.  They are the complete story of the interrogation

16  which he is charged with.

17          This defendant is on trial for lying about using

18  improper methods and torture during interrogations.  In this

19  case it just happens to be that the facts of Mr. Mu'min's crime

20  are part and parcel of what he was confronted with both by

21  Mr. Burge as well as by Detective Paladino and State's Attorney

22  Crooks.

23          THE COURT:  Well --

24          MR. WEISMAN:  And the government recognizes that

25  overlap, but it still escapes how all the details of what he

1    did now become relevant.  I agree that my analogy is not a

2    perfect fit, but it is -- it is illustrative of what is -- why

3    this is innately wrong.

4        And for them to now try to do something which allows a

5    dump of facts in that normally wouldn't be at all relevant, I

6    think raises why this is a problem.

7        MR. MARTIN:  Because Mr. Mu'min testified he confessed

8    because he was tortured.  We're allowed to present the other

9    side of that.  We're allowed to present a defense.  He

10   confessed because he was confronted with particular evidence

11   and he knew he was guilty, and his confession was true.

12       MS. PERRY:  And we have agreed with that.

13       MR. MARTIN:  That's all we're trying to do.

14       THE COURT:  It is a question of -- I mean, I think it

15   is relevant.  The question is does the prejudice outweigh

16   the -- you know, the benefit to --

17       MS. PERRY:  Judge, I think there is a middle ground

18   here, which is what was told to him during the interrogation is

19   totally fair game.  Or what he knew before the interrogation,

20   which I think they have already asked about, that someone had

21   been arrested who was a potential co-defendant, that person

22   could have talked to the police.  He didn't know one way or the

23   other.  That's totally fair game.

24       The only thing we objected to was Mr. Beuke going down

25   the road of what actually happened during the offense.

1       THE COURT:  Well, right.  I mean, I thought that's

2  what we were talking about.

3       MS. PERRY:  Right.

4       THE COURT:  What was told to him during the

5  investigation -- I mean during the interrogation.

6       MR. WEISMAN:  Right.  And so then we would ask, I

7  guess, for an offer of proof as to the basis that Mr. Beuke

8  would be able to ask questions that were inherently

9  prejudicial, which as we foresaw he started to read from the

10  statement, were you told X, were you told Y?

11       MR. BEUKE:  I didn't read from the statement.

12       MS. BIFFL:  Well, and Judge --

13       MR. WEISMAN:  And so if there is an offer of proof as

14  to what he was told -- I mean, the stipulation is, I think, a

15  fair basis.  If he was asked -- if he was told those things,

16  he's fair to inquire into that.

17       THE COURT:  Right.  But you're talking about other,

18  other information.  Where does that come from?

19       MR. WEISMAN:  Correct.

20       THE COURT:  All right.  That's -- I see that.

21       MR. BEUKE:  Judge --

22       THE COURT:  So where does it come from?

23       MR. BEUKE:  Judge, Mr. Weisman numerous times during

24  our weeks together has mentioned or used the word inherently

25  prejudicial when evidence attempts to come in through the

Mu'min -

1   defense.  I mean, that's what our evidence hopefully is, it is

2   prejudicial --

3           THE COURT:  Okay.  Let's see --

4           MR. BEUKE:  -- to their theory of the case.

5           THE COURT:  -- if we can focus here so we can get back

6   to work with the jury.

7           MR. BEUKE:  Now --

8           THE COURT:  You are -- you may talk about what Burge

9   said to Mu'min during the interrogation if you have a good

10  faith evidentiary basis for those statements; that is, you

11  can't just read from his post hoc statement that he signed and

12  say you were told this during interrogation.  Do you see what I

13  am saying?

14          I mean, what's your proof that these statements were

15  made --

16          MR. BEUKE:  Well --

17          THE COURT:  -- to Mu'min during the interrogation?

18          MR. BEUKE:  Initially, I mean, we already have the

19  testimony elicited on direct that he was aware of the fact that

20  the young lady had been arrested that day, okay, the day of the

21  robbery.

22          We have the stipulated testimony that the government

23  has offered into evidence concerning the fact that Mr. Burge on

24  a prior occasion has testified that he confronted Mr. Mu'min

25  with additional evidence about the facts that a co-defendant

had in fact implicated him in the crime and had made certain

statements relative to his participation in the crime.

That I think gives us, you know -- including

Mr. Mu'min's testified already in front of this jury about a

number of conversations that he had with -- including Mr. Burge

making a phone call to his wife, the phone calling being

recorded, the fact that he was attempting to elicit information

relative to the whereabouts of his son which --

THE COURT:  So the co-defendant is the --

MR. BEUKE:  -- is the --

THE COURT:  -- young woman who was arrested?

MR. BEUKE:  It is the young woman.  Her name is Carol

Tyree, Judge.

THE COURT:  Okay.

MR. BEUKE:  But with respect to his son, that

information -- Mr. Burge, it is already in evidence through

their direct, that he's asking him about his son.

THE COURT:  Right.

MR. BEUKE:  The fact that his son is in fact one of

the people who was -- participated in the armed robbery with

Mr. Mu'min is corroborative of that.

THE COURT:  Okay.

MR. BEUKE:  You know, the fact that he, to Mr. Burge,

says, I don't know where my son is or my son didn't have

anything to do with, that in fact I think -- I should be able

1    to confront him about that.

2           The truth is is that your son did participate in this

3    robbery with you.  The truth is is that your son did go into

4    that chicken store on that date.

5           MS. BIFFL:  Well, and, see, that's what --

6           MR. BEUKE:  They brought all this out.

7           THE COURT:  Okay.  The whereabouts of the son was

8    raised with Burge during the interro- -- I mean, with Mu'min

9    during the interrogation.  So you can ask him if he was

10   involved.  I mean, he was in fact involved, wasn't he, right?

11   You don't have to go into the details about what his

12   involvement was.  So you can go that far.

13          And then that the co-defendant had given a statement

14   or then implicated, that was in Mr. Burge's -- in the

15   stipulation.  So you can identify who the co-defendant was and

16   that he has admitted she had already been arrested.

17          MR. BEUKE:  Well, I mean, how about, Judge, the fact

18   that the son was one of the participants with him in the

19   crime?

20          THE COURT:  That's what I said --

21          MR. BEUKE:  Oh, okay.

22          THE COURT:  -- you can ask him that without saying

23   exactly what the son's involvement was.  You know, and if he

24   denies it, then maybe you can follow up with it, but you don't

25   lead with it.

 1          MR. BEUKE:  But --

 2          THE COURT:  See, you have to have a basis in what that

 3  conversation with Mu'min was in the interrogation room, and it

 4  doesn't come from the statement.

 5          MR. BEUKE:  Well, Judge, I mean, they have -- they

 6  have put in these food for thought, you know, statements of

 7  Mr. Burge.  Now I don't know specifically, because it wasn't

 8  explored at that particular hearing, what food for thought

 9  actually meant.  Nobody really went into any details.  But, you

10  know, I think --

11          THE COURT:  Well, if you have a witness who can come

12  in and testify about what was said --

13          MR. BEUKE:  All right.

14          THE COURT:  -- during that conversation.  But,

15  obviously, that's going to be a difficult thing to do.

16          MR. BEUKE:  Okay.

17          THE COURT:  I don't know.

18          MR. BEUKE:  Judge -- well, I'd like to ask the Court

19  this also.  I mean, I think one of the, one of the convictions

20  of Mr. Mu'min is a -- Ms. Biffl referred to it as a conviction

21  from 1988.  That conviction was based on an armed robbery in

22  Milwaukee that occurred on July 20th, five days before this

23  armed robbery, and was a robbery of a Payless shoe store.

24          I don't want to go into any of the facts of that

25  robbery, anything about that, but I believe it has significant

1   relevance in terms of my cross examination of Mr. Mu'min.  He

2   does file a -- well, he objects to the State of Wisconsin

3   attempting to extradite him back to Wisconsin while he's in

4   custody on this case.

5        He is arrested in Chicago while he's out on bond on

6   this case.  And after he's taken into custody, they ask him if

7   he will sign a waiver to be shipped back to Wisconsin for the

8   purpose of that charge, he refuses.  He hires Mr. Doherty, who

9   was his lawyer, as well as Mr. Doherty's partner, Mr. Echeles,

10  and they contest extradition in front of Judge Fitzgerald.

11       At that extradition hearing, he testifies that he was

12  not in the State of Wisconsin, which is the ultimate issue on

13  one of those hearings, on the date that this offense allegedly

14  occurred.  He testified that he was living in Chicago.

15       Now he has testified on direct from -- in response to

16  Ms. Biffl's questions that he was living, I believe, in the

17  State of Wisconsin in July of 1985.  So it is contrary to his

18  testimony at the extradition hearing.  And he subsequently goes

19  up to Wisconsin, and as she's elicited, he does plead guilty to

20  his involvement in that offense.

21       THE COURT:  Okay.  So you want to get in that the

22  offense with -- for which he was convicted in 1988 occurred

23  five days before this arrest?

24       MR. BEUKE:  This arrest.  And he basically --

25       THE COURT:  And you want to get in that he lied today

1    about where he lived at the time he was arrested?

2         MR. BEUKE:  Well, Judge, he committed perjury in front

3    of the Chief Judge at that extradition hearing when he

4    testified that he lived in Illinois, in Chicago, on the date of

5    that offense.

6         I mean, I --

7         THE COURT:  But that's kind of a --

8         MR. BEUKE:  -- I don't have to say you committed

9    perjury, I -- but I certainly would like to confront him about

10    the fact that he was attempting to preclude himself being

11    brought back to Wisconsin.  And as part of what he did, he lied

12    during the course of that hearing under oath that he was not

13    living in Wisconsin and was not in Wisconsin on that date.

14         THE COURT:  This is kind of a prior bad act problem, I

15    guess.

16         MS. PERRY:  Judge, it is an untruthful statement,

17    apparently, under oath.  We agree that they can inquire as to

18    whether he has testified one time that he --

19      (Discussion off the record.)

20         MS. BIFFL:  I'm sorry.

21         MS. PERRY:  Judge, the appropriate question and answer

22    was, you testified today that you lived in Wisconsin at the

23    time.  Isn't it true you have testified falsely or you

24    testified under oath previously that you lived in Wisconsin?

25    End of story.

1          We don't need to get into an extradition.  The fact

2     that he was apparently asserting his rights to require the

3     state to go through the proper maneuvers in order to extradite

4     him --

5          THE COURT:  Well, do we have a transcript of his

6     testimony?

7          MR. WEISMAN:  That's the only thing we'd ask for, your

8     Honor, is an offer of proof.

9          MR. BEUKE:  Judge --

10          THE COURT:  Do you have a transcript of the testimony

11     where he said he didn't live in Wisconsin?

12          MR. BEUKE:  Yes, Judge.

13          MS. BIFFL:  Well, apparently -- no, they have cross

14     examination from the Police Board Hearing.

15          MR. BEUKE:  Well, he was confronted at the Police

16     Board Hearing, Judge, with his testimony at this extradition

17     hearing.  It says:  "Do you remember your extradition hearing

18     from Milwaukee and you were under oath at that time before the

19     Chief Judge of the criminal courts, Judge Richard Fitzgerald,

20     April 16th of 1987.  Do you remember testifying at that time?

21          "Answer:  No.

22          "Question:  Your attorney was Julius Echeles?

23          "Answer:  I don't remember testifying to that.

24          "Question:  And do you remember this question?

25     Question:  Were you working on that day, July 20th, 1985?

1    "Answer:  That was on a Saturday, sir.  No, sir, I
2    wasn't.
3        "Question:  Do you recall specifically what you did on
4    that date?
5        "Answer:  I have a friend that trained dogs which had
6    called me on a Friday night and wanted me to work with his dog
7    off Calumet.
8        "Question:  Your friend called you and he wanted to
9    work a dog on Saturday?  Question:  Do you remember those
10   questions and those answers under oath at your extradition
11   hearing in Milwaukee to take you back?
12       "Answer:  No.
13       "Question:  Where did you live in July of 1985, in
14   Chicago?
15       "Answer:  I lived in Milwaukee.  I didn't live -- no,
16   I think -- if I recall" --
17      (Discussion off the record.)
18       MR. BEUKE:  Yeah.
19       "I didn't live in Chicago.
20       "You lived in Milwaukee in July of 1985?
21       "Answer:  That's right."
22       Extradition hearing 16.
23       "Question:  Do you recall -- draw your attention to
24   July 20th, 1985, were you in the State of Wisconsin on or about
25   that date?

1          "Answer:  No, sir.

2          "Question:  Were you in the City of Milwaukee on or

3   about that date?

4          "Answer:  No, sir.

5          "Question:  Where were you on or about July 20th,

6   1985?

7          "Answer:  I was here in Chicago.

8          "Do you remember those questions and those answers?"

9          MS. PERRY:  Being in Chicago and living in Chicago are

10  two totally different things, Judge.

11         THE COURT:  Yeah, they are not same thing, so -- he

12  said he was living in Milwaukee today, and then --

13         MR. BEUKE:  Judge --

14         THE COURT:  -- he said he was present in Chicago on

15  that date, so --

16         MR. BEUKE:  Judge, what he has testified --

17         THE COURT:  And --

18         MR. BEUKE:  -- at that hearing under oath is that on

19  the date of that armed robbery he was in Chicago, Illinois, he

20  was not in Milwaukee.

21         The fact is three years later he goes up to Wisconsin

22  and pleads guilty to doing that armed robbery in Milwaukee,

23  Wisconsin.

24         So his answers here are completely -- you know, I mean

25  they are a lie.

1          THE COURT:  Okay.  But all that's relevant here is can

2     you impeach him on what he said on the stand today.  He said, I

3     lived in Milwaukee at the time of -- I was interrogated by

4     Burge.

5          MS. BIFFL:  Which was actually October.  It was

6     actually testified to here was October.

7          THE COURT:  Right.  I mean, if he lied in other

8     proceedings, that may be a bad thing, but it isn't impeachment

9     unless you --

10          MR. BEUKE:  Judge --

11          THE COURT:  -- have prior testimony that impeaches his

12     testimony here.

13          MS. PERRY:  Judge, I think the other problem is it is

14     not even clear it is untruthful.  I could be in Milwaukee two

15     hours from now.  I could be back in four hours.

16          THE COURT:  Right.

17          MS. PERRY:  The fact that I say I'm in Chicago or

18     Milwaukee, this is totally collateral.

19          THE COURT:  Right.  I --

20          MR. MARTIN:  Judge, it is our position under 608(b), a

21     prior statement under oath that is inconsistent is classic

22     impeachment irrespective of 404(b) or any other rule.  A prior

23     statement under oath that's inconsistent is relevant.  It is

24     not collateral.

25          THE COURT:  Well, I agree.

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 72 of 191 PageID #:5871
Mu'min - cross by Beuke
2268

1      MR. MARTIN:  And the witness has an opportunity to

2 explain it.  He could say that that's not what I meant.

3      THE COURT:  Well, we're not going down that long path

4 just for an ambiguous, you know, at best ambiguous

5 impeachment.  So I'll have to deny you again I'm afraid.

6      Okay.  Let's take five minutes.

7   (Brief recess.)

8      THE COURT:  Just to give you a little heads-up here,

9 I'm going to a wedding at 12:00, so I'm going to break so we'll

10 take an early lunch today.

11   (Proceedings had in open court in the presence and hearing

12 of the jury:)

13      MR. BEUKE:  May I proceed, Judge?

14 BY MR. BEUKE:

15 Q.  Mr. Mu'min, I think you told the ladies and gentlemen

16 earlier that the first conviction that you were convicted of

17 was an armed robbery in 1972, correct?

18 A.  That's correct, sir.

19 Q.  The sentence was 10 to 25 years, correct?

20 A.  That's correct.

21 Q.  That was out of Ohio, is that correct?

22 A.  That's correct.

23 Q.  And of that 10-to-25-year sentence you actually served

24 three and a half years, is that correct?

25 A.  That's correct.

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 73 of 191 PageID #:5872
2269
Mu'min - cross by Beuke

1  Q.  You were released on parole, is that correct?

2  A.  That's correct.

3  Q.  And six months later you committed an armed robbery in

4  Indiana, correct?

5  A.  Do you mind repeating that, sir?

6  Q.  Well, while you were on parole from your Ohio armed robbery

7  conviction that you did three and a half years on it, you went

8  or moved to Indiana, is that correct?

9        Yes or no.

10 A.  I don't think I'm understanding the question.  Repeat it

11 one more time.

12 Q.  All right.  I think you told Ms. Biffl in 1972 that was

13 your first conviction for armed robbery, correct, out of Ohio?

14 A.  That's correct.

15 Q.  And your sentence was 10 to 25 years, correct?

16 A.  That's correct.

17 Q.  And you did three and a half years, correct?

18 A.  That's correct.

19 Q.  I think you told Ms. Biffl that your next conviction was in

20 1976, correct?

21 A.  That's correct.

22 Q.  That was an armed robbery out of Indiana, correct?

23 A.  That's correct.

24 Q.  And in '76 that was a short time after you had been

25 released on parole from your Ohio sentence, correct?

Mu'min - cross by Beuke

```
 1   A.  That's incorrect.

 2   Q.  Well, you were still on parole, correct?

 3           In 1976 for that 10-to-25-year sentence.

 4   A.  Sir, I was released from Ohio, and then they came and got

 5   me.  I didn't get out on parole and then committed a crime.

 6   The crime was pending --

 7   Q.  Okay.

 8   A.   -- and then --

 9   Q.  So -- I apologize.  Did -- so you're telling us that the

10   Indiana conviction for armed robbery in 1977 was committed at

11   some point prior to 1977, is that correct?

12   A.  That is correct.

13   Q.  Okay.  And then on the Indiana conviction in 1977, you were

14   sentenced again to 10 to 25 years, correct?

15   A.  That's correct.

16   Q.  And you did four years out of that sentence in Indiana, is

17   that correct?

18   A.  That's incorrect.

19   Q.  Okay.  Well, how long did you spend in the Indiana State

20   Penitentiary for that 10-to-25-year sentence?

21   A.  To the best of my knowledge may have been about two and a

22   half years.  I got released earlier.

23   Q.  Two and a half years?

24   A.  Maybe.

25   Q.  Okay.  And I think you told Ms. Biffl that in addition to
```

1    those two armed robberies, in 1988 you pled guilty to an armed

2    robbery in Wisconsin, correct?

3    A.  That's correct.

4    Q.  So it is clear for the ladies and gentlemen the date for

5    the armed robbery in Wisconsin that you committed was July 20th

6    of 1985, correct?

7    A.  To the best of my knowledge.

8    Q.  And the date of the armed robbery in Chicago, attempt

9    murder that you were convicted of, was July 25th of 1985,

10   correct?

11   A.  I'm not sure on the date.

12   Q.  Okay.  Well, it was after the armed robbery in Wisconsin,

13   correct?

14           Several days?

15   A.  I'm not sure, sir.

16   Q.  Okay.  Well, sir, is it correct that the defendants on your

17   case in Milwaukee, Wisconsin, also included your son and Rio

18   Harper?

19   A.  That's correct.

20   Q.  And they were likewise convicted of the armed robbery in

21   Chicago, correct?

22   A.  That's correct.

23   Q.  They pled guilty to those offenses, didn't they?

24   A.  I'm not sure.

25   Q.  Okay.  Well, in any event, sir, you told us about your

Mu'min - cross by Beuke

1  arrest on October 30th of 1985, correct?

2  A.  That's correct.

3  Q.  You had a light brown Buick, did you not?

4  A.  Correct.

5  Q.  Tactical officers from the 7th District stopped your car

6  after you had pulled away from a house over on Wolcott,

7  correct?

8  A.  Correct.

9  Q.  And when they stopped your car, they told you what you were

10 being stopped for, correct?

11 A.  To the best of my knowledge.

12 Q.  They told you that you were wanted for that armed robbery

13 attempted murder, didn't they?

14 A.  I'm not sure.

15 Q.  Okay.  Well, in any event they searched your car, correct?

16 A.  That's correct.

17 Q.  And they found a --

18       MS. BIFFL:  Objection --

19 BY MR. BEUKE:

20 Q.  -- .38 caliber gun --

21       MS. BIFFL:  -- to relevance.

22 BY MR. BEUKE:

23 Q.  -- in your car, didn't they?

24       MS. BIFFL:  Objection --

25       THE COURT:  Sustained,

1    MS. BIFFL:  -- to relevance.

2    BY MR. BEUKE:

3    Q.  Well, you were -- in addition to this armed robbery,

4    attempt murder, you were also charged with a felony UUW for the

5    .38 that you had in the car when were you stopped, correct?

6    MS. BIFFL:  Objection, Judge.  That was not a

7    conviction that we're talking about.

8    BY THE WITNESS:

9    A.  Repeat that, sir.

10    THE COURT:  Sustained.

11    BY THE WITNESS:

12    A.  Do you mind repeating it?

13    BY MR. BEUKE:

14    Q.  Well, sir, at some point you said you were taken to the

15    Seventh -- a police station on 67th Street, is that correct?

16    A.  I'm not sure --

17    Q.  Well --

18    A.  -- where it was at.

19    Q.  All right.  Do you recall being taken to a police station

20    at 61st and Racine?

21    A.  It is possible it could have been.

22    Q.  And, Mr. Mu'min, your car was impounded also, correct?

23    A.  Yes.

24    Q.  And you had items in your car that were impounded in

25    addition, correct?

Mu'min - cross by Beuke

1    A.   Correct.

2    Q.   And after -- or while you were waiting at the 7th District,

3    you had conversations with those 7th District officers, didn't

4    you?

5    A.   To the best of my knowledge.

6    Q.   Okay.  And I think you told Ms. Biffl -- excuse me --

7    Ms. Biffl at some point during that conversation you were

8    informed that people from Area 2 were coming to pick you up,

9    correct?

10   A.   That's correct.

11   Q.   Okay.  Were you ever informed about charges other than the

12   armed robbery and the attempted murder that arose out of Area

13   2?

14           MS. BIFFL:  Objection, relevance.

15   BY THE WITNESS:

16   A.   No.

17           THE COURT:  Wait.  Wait a minute.

18           THE WITNESS:  Oh.

19           THE COURT:  I'll sustain.

20   BY MR. BEUKE:

21   Q.   Well, sir, at some point you were arrested by the 7th

22   District officers at approximately 7:00 o'clock in the evening,

23   is that correct?

24   A.   Possible.

25   Q.   Well, no one was in the car with you, is that correct?

Mu'min - cross by Beuke

```
 1   A.  That's correct.

 2   Q.  Now you have testified or given statements in the past that

 3   there was in fact people in the car with you, isn't that

 4   correct?

 5   A.  I don't recall, sir.

 6   Q.  Do you ever recall or do you know a young lady by the name

 7   of Latoya?

 8            Or do you know a gentleman by the name of Keith?

 9   A.  Yes.

10   Q.  Okay.  You recall being in Centralia Correctional Center in

11   October of 1990 as a result of your conviction for the attempt

12   murder in 1985?

13   A.  To the best of my knowledge, yes.

14   Q.  And when you were in Centralia, an FBI agent came down to

15   speak with you, isn't that correct?

16            Do you remember an FBI agent by the name of Jackie

17   Kase coming down there on October 29th of 1990?

18   A.  I don't recall, sir.

19   Q.  Do you remember your appellate lawyer, Mr. Joseph Gump, and

20   Timothy Lemming, L-e-m-m-i-n-g, being down there and present

21   for that interview at Centralia?

22            Do you remember that?

23   A.  I can't say that I do, sir.

24   Q.  Well, Timothy Lemming and Mr. Gump, Joseph Gump,

25   represented you on your appeal, didn't they?
```

Mu'min - cross by Beuke

1   A.  To the best of my knowledge, they did.  I don't recall who

2   -- what the names was.

3   Q.  Well, were they from the Public Defender's Office?

4   A.  I'm not sure.

5   Q.  So, sir, is it correct that on October 29th of 1990 in the

6   presence of Mr. Gump and Mr. Lemming from the Public Defender's

7   Office, you told Special Agent Jackie Kase that at

8   approximately 5:30 or 6:00 o'clock in the evening on October

9   30th of 1985, you left Keith's house and were going to drop

10  Keith's wife, Latoya, and her two young children off at the

11  hospital.  As you turned on to Halsted, you were stopped by two

12  plain clothes Chicago police officers.  Both of these officers

13  were white males and you did not know their name.

14         Did you tell that to Special Agent Kase?

15  A.  It is possible.

16  Q.  Well, you just testified when the officers stopped you and

17  placed you under arrest, you were alone in the car, correct?

18  A.  I could have.

19  Q.  Okay.  Well, tell the ladies and gentlemen, Mr. Mu'min,

20  what the truth is.  Were you alone in the car or did you have a

21  young lady by the name of Latoya and her two babies in the car

22  with you?

23  A.  It is --

24  Q.  What's the truth?

25  A.  It is possible that I did have.  I forgot -- my memory, I

Mu'min - cross by Beuke

1  did not remember.

2  Q.  Well, I mean, prior to that you had testified in a motion

3  to suppress your confession, correct?

4  A.  That's correct.

5  Q.  And at that moment to suppress your confession, that was in

6  front of Judge Manion in 1986 or '87, correct?

7  A.  Yes.

8  Q.  And you were asked questions by your attorney, Mr. Doherty,

9  weren't you?

10  A.  Yes.

11  Q.  And during the course of your questioning at your motion to

12  suppress, you were under oath, correct?

13  A.  Correct.

14  Q.  And you talked about being stopped by police, correct?

15  A.  Correct.

16  Q.  And during the course of your testimony, you never

17  mentioned the fact that you were with Latoya and two kids when

18  the officers stopped you, did you?

19  A.  No.

20  Q.  This Latoya and her two babies that you were dropping off

21  at the hospital, that came three years later, didn't it?

22  A.  I have no knowledge.

23  Q.  Well, sir, in any event, at some point you told the ladies

24  and gentlemen that you went to the 7th District and waited

25  there for a period of time and some officer came and got you

Mu'min - cross by Beuke

1   and took you to Area 2.

2            Is that correct?

3   A.  Yes.

4   Q.  Approximately, sir, you got to Area 2 at what time?

5   A.  May have been around 8:00 o'clock, I'm not sure.

6   Q.  8:00 o'clock at night, is that correct?

7   A.  That's correct.

8   Q.  And some time after you were placed in an interview room,

9   correct?

10  A.  Yes.

11  Q.  Handcuffed, correct?

12  A.  Repeat that.

13  Q.  Were you handcuffed in the interview room?  Yes or no.

14            Were you handcuffed?

15  A.  Yes.

16  Q.  Oh, okay.

17            Now at some point after that you told the ladies and

18  gentlemen that Lieutenant Burge came in, correct?

19  A.  That's correct.

20  Q.  And he asked you if you would talk with him, correct?

21  A.  Yes.

22  Q.  He was alone, correct?

23  A.  To the best of my knowledge, he was.

24  Q.  Did he tell you that you were there for the armed robbery

25  attempted murder of the person who owned the Brown's Chicken on

Mu'min - cross by Beuke

1    116th and Western?

2    A.  He could have.  I don't recall.

3    Q.  Well, you told him at that point I don't know anything

4    about it, correct?

5    A.  That's correct.

6    Q.  And so it is clear, Mr. Mu'min, that's a lie.  You knew

7    about it, correct?

8    A.  Yes.

9    Q.  You lied to him, correct?

10   A.  Yes.

11   Q.  And he told you he didn't believe you, correct?

12   A.  Right.

13   Q.  Your testimony is he then came and tightened the cuffs on

14   you, correct?

15          Right?

16   A.  Yes.

17   Q.  Okay.  And he made them so tight that you were -- the

18   circulation was being cut off in your hands, correct?

19   A.  That's correct.

20   Q.  He left out of the room and let you sit there, correct --

21   A.  That's correct.

22   Q.  -- with those cuffs and that --

23   A.  That's correct.  Okay?

24   Q.  -- and your hand -- your hands were beginning to swell,

25   correct?

1   A.  That's correct.

2   Q.  And he came back about 15 minutes later, correct?

3   A.  Somewhere around there, 20, 30 minutes.

4   Q.  All right.  And then you said he asked you again would you

5   -- where is your son, correct?

6   A.  To the best of my knowledge that's what I said.

7   Q.  Yeah, your son, Shadeed Sharif, correct?

8   A.  That's correct.

9   Q.  And that was the guy that you had done the armed robbery

10  attempted murder with, correct?

11  A.  Correct.

12  Q.  And he asked you about G-Man, didn't he?

13  A.  It is possible.

14  Q.  Rio Harper, that's the other guy that went along for the

15  armed robbery attempted murder, correct?

16  A.  Yes.

17  Q.  Okay.  And he asked you again did you know where those

18  people were at.  Correct?

19  A.  Yes.

20  Q.  Did he tell you, Mr. Mu'min, that, listen, you're a twice

21  convicted armed robber.  You can help us.  Give us information

22  about where they are at.  Something to that effect?

23  A.  He could have to --

24  Q.  Well, did he?

25  A.  I'm not sure.

Mu'min - cross by Beuke

1  Q.  Okay.  Well, you remember having a conversation with

2  Lieutenant Burge about the fact that you could help yourself if

3  you helped them locate the whereabouts of G-Man and your son.

4        You remember that conversation, don't you?

5  A.  I'm not sure.

6  Q.  Okay.  Well, at some point you had a conversation with him

7  about your son, correct?

8  A.  Yes.

9  Q.  And you say your testimony is that after you lied to him

10 again, he tightened the cuffs even harder, correct?

11 A.  That's correct.

12 Q.  And did he now handcuff you behind your hands and cuff you

13 to the ring in the wall?

14 A.  Not at first.

15 Q.  Well, did he do that after you told him you didn't know

16 anything about this?

17 A.  After I didn't talk.  That's when he chained the cuff.

18 Q.  Well, my question, sir, is that he made these cuffs even

19 tighter on you, correct?

20 A.  That's correct.

21 Q.  And the pain you were experiencing in your wrist was

22 excruciating.  That's what you are telling the ladies and

23 gentlemen, right?

24 A.  That's the truth.

25 Q.  The circulation in your hands was cut off, correct?

Mu'min - cross by Beuke

1    A.  That's true.

2    Q.  Your hands were swollen up?

3    A.  That's the truth.

4    Q.  Okay.  And then at some point your testimony is he came

5    back in and he got you, unhandcuffed you, and walked you into

6    his office, correct?

7    A.  That's incorrect.

8    Q.  Well, when did he come and get you and bring you into the

9    office?

10   A.  After I had been cuffed to the wall with one hand.

11   Q.  How long?

12   A.  In approximately 20, 30 minutes.

13   Q.  So this is approximately, what, an hour after you had

14   been -- after you arrived at Area 2?

15   A.  It is possible.

16   Q.  Okay.  Could have been longer?

17   A.  Could have.

18   Q.  Okay.  And at some point he came and took you from that

19   interview room and brought you into his office, correct?

20   A.  That's correct.

21   Q.  And when he brought you into his office, you weren't

22   cuffed, that's your testimony.

23          Right?

24   A.  I'm not sure.

25   Q.  Well, you said you sat down in Lieutenant Burge's office,

Mu'min - cross by Beuke

1  didn't you?

2  A.  Yes.

3  Q.  There were police officers who were -- Lieutenant Burge's

4  office is a rather small office, correct?

5  A.  To the best of my knowledge, yes.

6  Q.  Well, you were in there.  What did it look like?

7  A.  It had a desk, chairs.

8  Q.  What else?

9  A.  And a typewriter.

10  Q.  Do you remember a filing -- a big long filing cabinet along

11  the one wall?

12  A.  I'm not sure.

13  Q.  Do you remember a big window being in there?

14  A.  Yes, it had a window.

15  Q.  The door you walked through, you actually had to go through

16  another office to get into the lieutenant's office, correct?

17  A.  I'm not sure.

18  Q.  Well, do you remember seeing two police officers seated at

19  desks in the office outside of the lieutenant's office?

20       Yes or no.

21  A.  I'm not sure.

22  Q.  Okay.  Well, in any event, when you got into Burge's

23  office, there are two chairs on the other side of his desk,

24  aren't there?

25  A.  I'm not sure.

Mu'min - cross by Beuke

1    Q.  Well, you sat down, correct?

2    A.  Yes.

3    Q.  And you remember the chair that you sat in, was it opposite

4    Lieutenant Burge's desk?

5    A.  It was in front of the desk the chair that I sat in.

6    Q.  Was there another chair there also?

7    A.  I'm not sure.

8    Q.  Okay.  Well, in any event you said Lieutenant Burge asked

9    you again about the whereabouts of your son, correct?

10   A.  That's correct.

11   Q.  And he asked you if you could help him locate your son,

12   correct?

13   A.  That's true.

14   Q.  You knew that he was looking for the people who had shot

15   the man inside of the Brown's Chicken, correct?

16   A.  Yes.

17   Q.  He had told you that he didn't want you to go down for the

18   shooting, that you could help yourself, isn't that correct?

19   A.  Could have been.

20   Q.  And he told you, listen, is it possible that your wife

21   might know where your son is, isn't that right?

22   A.  To the best of my knowledge.

23   Q.  And again you lied to him, correct?

24   A.  No.

25   Q.  Well, you told him you didn't know anything about the case,

Mu'min - cross by Beuke

1  correct?

2        Right?

3  A.  When he asked me at the time, I told him I had no knowledge

4  of that, yes.

5  Q.  And you lied.

6        Right?

7        Isn't that right, Mr. Mu'min?

8  A.  That's right.

9  Q.  Okay.  I mean, you had gone down twice for armed robberies,

10  and this would have been your third, is that correct?

11  A.  Yes.

12  Q.  Shadeed Mu'min, when he sat in that room knew that if you

13  went down for a third armed robbery, you could conceivably get

14  60 years in jail, correct?

15        MS. BIFFL:  Objection.

16  BY THE WITNESS:

17  A.  I'm not sure.

18        THE COURT:  Overruled.

19  BY MR. BEUKE:

20  Q.  Well, sir, your testimony is what Lieutenant Burge did then

21  was he asked you or he placed a phone call to your wife, isn't

22  that correct?

23  A.  That's correct.

24  Q.  The purpose of the phone call was to see if anybody could

25  give Mr. Burge and his detectives information about the

Mu'min - cross by Beuke

1  whereabouts of your son, correct?

2  A.  To the best of my knowledge, yes.

3  Q.  And, again, to the best of your knowledge, the conversation

4  you had with Mr. Burge was that he wanted to get the people who

5  did the shooting, correct?

6  A.  I'm not sure.

7  Q.  He knew, didn't he, that you were the driver, correct?

8  A.  I'm not sure.

9  Q.  Well, he told you about Carol Tyree, didn't he?

10  A.  I'm not sure.

11  Q.  Well, you mentioned the young girl that went along with you

12  and your son and Mr. Harper to the Brown's Chicken that day,

13  correct?

14  A.  Yes.

15  Q.  You knew, didn't you, according to your testimony for the

16  ladies and gentlemen, that she didn't make it back to your car

17  that afternoon, correct?

18          She was arrested.

19  A.  Yes.

20  Q.  And you knew that she had been interviewed by the

21  detectives who were working on the case, isn't that correct?

22  A.  That's correct.

23  Q.  And Lieutenant Burge told you that she had given them a

24  statement and she had told the detectives that you were the

25  driver of the car, isn't that right?

Mu'min - cross by Beuke

1   A.  That's correct.

2   Q.  And that she had told them that your son and Rio Harper

3   shot the man in the Brown's Chicken, isn't that right?

4         THE COURT:  Wait.

5   BY MR. BEUKE:

6   Q.  Is that what he told you?

7   A.  I'm not sure what he told me.

8   Q.  Well, you had a conversation with him, you recall, about

9   Carol Tyree, the young girl, correct?

10  A.  I remember that.

11  Q.  Okay.  And he gave you information about what she had told

12  the detectives.  Is that a fair statement?

13  A.  I think so.

14  Q.  Just so it is clear, the car that you were arrested in that

15  night, that was the same car that you used on this armed

16  robbery attempt murder, wasn't it?

17  A.  Yes.

18  Q.  Same car that you guys used up in Milwaukee, wasn't it?

19  A.  I'm not sure what you --

20  Q.  Well --

21  A.  I'm not clear on the question that you are asking.  Repeat

22  it.

23  Q.  Okay.  Did Lieutenant Burge tell you that the car that you

24  were arrested in had been identified as the car that was used

25  to get away from the scene on Western Avenue?

Mu'min - cross by Beuke

1        He told you that, didn't he?

2   A.  I'm not sure.

3   Q.  Well, in any event, sir, with respect to his phone call,

4   did you make the phone call or did he make the phone call?

5   A.  He dialed the number.

6   Q.  Well, you gave him the number, didn't you?

7   A.  Yes, I did.

8   Q.  Yeah.  You told him your wife's number up in Wisconsin,

9   didn't you?

10  A.  Yes, I did.

11  Q.  You were attempting to allow him to call your wife to see

12  if she could give him information about the whereabouts of your

13  son, isn't that right?

14  A.  That's true.

15  Q.  Okay.  You were hoping that she could tell Mr. Burge where

16  your son was, correct, because that would help you out?

17  A.  Nope.  I wasn't --

18  Q.  Well --

19  A.  That's incorrect.  That's not -- that's incorrect.

20  Q.  Well, let me see if I get this right.  You gave Mr. Burge

21  your wife's phone number knowing that he was going to call her

22  and ask where your son was, correct?

23  A.  Yes.

24  Q.  And is it your testimony that you had some prior knowledge

25  that you knew your wife was going to tell him, you know, false

Mu'min - cross by Beuke

1  information?

2  A.  No, I didn't.

3  Q.  Did you have any belief that your wife didn't know where

4  your son was at?

5  A.  Yes, I did believe him.

6  Q.  Well, your son was where back then?

7  A.  I have no knowledge of that.

8  Q.  Well, how do you know that your wife didn't know where he

9  was?

10  A.  I took her word for it.

11  Q.  Well, when did you talk to her prior to October 30th of

12  1985?

13  A.  I don't recall, sir.

14  Q.  Well, did you call her up while you were on the run for

15  this case and say, hey, dear, if you get a phone call from some

16  police officers asking where Sharif is, make sure you tell him

17  you didn't know where he's at.

18          MS. BIFFL:  Objection, Judge, calls for hearsay.

19          THE COURT:  What did you say?

20          MS. BIFFL:  Calls for hearsay.

21          THE COURT:  Sustained.

22  BY MR. BEUKE:

23  Q.  Well, you don't remember when the last time you spoke to

24  your wife prior to October 30th of 1985 was, isn't that

25  correct?

Mu'min - cross by Beuke

2290

1   A.  To the best of my knowledge, yes, that's correct.

2   Q.  Okay.  Now according to you Lieutenant Burge called her,

3   correct?

4          Right?

5   A.  Yes.

6   Q.  Spoke with her, correct?

7   A.  He didn't speak with her.

8   Q.  You spoke to her, right?

9   A.  Yes.

10  Q.  And you asked your wife, hey, dear, do you know where

11  Sharif is, didn't you?

12  A.  Yes, I did.

13  Q.  And did you tell your wife, I am in Area 2 at 111th Street

14  in Chicago locked up for an attempt murder armed robbery?

15  A.  Yes.

16  Q.  You told her that?

17  A.  Yes.

18  Q.  Did you tell her, can you come down here and help me?

19  A.  No, I did not.

20  Q.  Did you tell her the police officers are asking me for

21  information as to where Sharif is?

22  A.  No, I did not.

23  Q.  Did you tell her if you give them information, it could

24  help me?

25  A.  No, I did not.

Mu'min - cross by Beuke

1   Q.  What happened?

2   A.  She said she didn't know.

3   Q.  And then what happened?

4   A.  That was the end of it.

5   Q.  And you say Lieutenant Burge recorded that?

6   A.  He did.

7   Q.  And he played it back for you, right?

8   A.  He did.

9   Q.  Well, why did he have to pay -- play it back for you, you

10  were on the phone with her?

11         Right?

12  A.  I'm not in a position to ask why he taped it.

13  Q.  Well, in any event, he asked you again, according to your

14  testimony, if you could tell him where the boys were at,

15  correct?

16  A.  He asked me.

17  Q.  Okay.  And again you denied knowing anything about their

18  whereabouts, correct?

19  A.  Yes, I did.

20  Q.  Is it at that point in time, Mr. Mu'min, that you say he

21  took this .44 revolver out of a drawer?

22  A.  Around that time, after he made -- after the phone call had

23  been made.

24  Q.  He pulled -- you -- you're familiar with a .44 revolver,

25  correct?

Mu'min - cross by Beuke

1    A.  I think so.

2    Q.  Yeah.  I mean you have seen them before, correct?

3    A.  Yes, I have.

4    Q.  And when he pulled the revolver, according to Mr. Mu'min's

5    version, he took it out and it was fully loaded, correct?

6    A.  Yes, it was.

7    Q.  Six bullets in the chamber, correct?

8    A.  Yes.

9    Q.  You could see that, correct?

10   A.  Yes.

11   Q.  Okay.  And he took all six bullets out of the chambers,

12   correct?

13   A.  Took them all out except one.

14   Q.  Well, you knew there was one in the chamber, correct?

15   A.  I could see it.

16   Q.  And tell the ladies and gentlemen what this mad man did

17   then.  Tell them what he did.

18   A.  He put it back -- the cylinder back in it with the bullet

19   in it and snapped it.

20   Q.  Well, he spun the cylinder, didn't he?

21   A.  He spun the cylinder --

22   Q.  Yeah.

23   A.  -- and he placed it to my head.

24   Q.  I mean, it was his version of Russian roulette with you,

25   correct?

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 97 of 191 PageID #:5896
2293
Mu'min - cross by Beuke

1   A.   Yes.

2   Q.   As soon as he closed the -- slapped the cylinder closed, he

3   put the gun right up to your head, right?

4   A.   That's correct.

5   Q.   Boom, pulled the trigger, didn't he?

6   A.   Then --

7   Q.   You didn't know where the bullet was, did you?

8   A.   No, I did not.

9   Q.   You didn't know if he was going to blow your head off, did

10  you?

11         MS. BIFFL:  Objection to --

12  BY THE WITNESS:

13  A.   That's correct.

14         MS. BIFFL:  -- counsel's --

15  BY THE WITNESS:

16  A.   That's correct.  That's correct.

17  BY MR. BEUKE:

18  Q.   After the gun didn't go off, Mr. Mu'min, you say then he

19  popped the cylinder out again, correct?

20  A.   No, I did not.

21  Q.   Well, did he pop the cylinder out and spin it a second

22  time?

23  A.   He spinned it a second time and --

24  Q.   Slapped the cylinder closed, correct?

25  A.   That's correct.

Mu'min - cross by Beuke

1  Q.  Put it up to your forehead, correct?

2  A.  That's correct.

3  Q.  Leaned over the desk and put it right to your forehead,

4  didn't he?

5  A.  That is correct.

6  Q.  Squeezed the trigger a second time?

7  A.  That is correct.

8  Q.  And again you didn't know where the bullet was, did you?

9  A.  That is correct.

10  Q.  And you didn't know if your head was going to get blown off

11  that time, did you?

12  A.  That's correct.

13  Q.  Third time he did it again, didn't he?

14  A.  That's correct.

15  Q.  And the same thing, leaned over, opened the chamber, spun

16  the cylinder, slapped it shut, and put it to your head, and

17  pulled the trigger, boom, like that, right?

18  A.  Right.

19  Q.  You didn't even, according to Shadeed Mu'min, you didn't

20  even budge, did you?

21  A.  I didn't.

22  Q.  Okay.  You showed him, didn't you?

23          MS. BIFFL:  Objection.

24          THE COURT:  Sustained.

25  BY MR. BEUKE:

Mu'min - cross by Beuke

1  Q.  Well, here, Mr. Mu'min, at that point you said this

2  associate was in the doorway, correct?

3  A.  That's the truth.

4  Q.  Okay.  And the associate that was in the doorway was just

5  standing there, correct?

6  A.  Standing there looking.

7  Q.  Watching everything, right?

8  A.  Yes.

9  Q.  And you said Burge comes around the desk and he puts a

10 plastic typewriter cover over your head, correct?

11 A.  That's correct.

12 Q.  And he pulls the typewriter cover around your neck,

13 correct?

14 A.  I didn't say that.

15 Q.  Well, what did he do?  Tell the ladies and gentlemen.

16 A.  He force it down into my face.

17 Q.  Well, did he hold it against your face?

18 A.  Yes, he did.

19 Q.  And he held it against your face for long enough where

20 Shadeed Mu'min passed out, correct?

21 A.  That is correct.

22 Q.  Then the next thing that Shadeed Mu'min remembers is Burge

23 is right over your mouth blowing -- blowing air into your lungs

24 and brings you back to life, correct?

25          That's your testimony?

Mu'min - cross by Beuke

1   A.  That's my testimony.

2   Q.  Was he giving you mouth to mouth?

3   A.  No.

4   Q.  Pretty close?

5   A.  I wouldn't say that.

6   Q.  Well, he just blew some air at you, and you came back to

7   life miraculously, right?

8          Right?

9   A.  Yes.

10  Q.  After he did that, you say he did it a second time,

11  correct?

12  A.  That's correct.

13  Q.  And this associate is outside in the doorway, right?

14  A.  He was in the doorway.

15  Q.  And choked you out a second time, correct?

16  A.  That's correct.

17  Q.  Shadeed Mu'min passes out again.  Right?

18  A.  Right.

19  Q.  Out cold, correct?

20  A.  I was out.

21  Q.  You don't remember where you were at at that point, do you?

22  A.  That's possible.

23  Q.  And then miraculously you get air blown on you again,

24  correct, and you come back to life, right?

25  A.  Right.

1    Q.  And he did it a third time according to you, right?

2    A.  He started a third time, yes.

3    Q.  And then he, according to you, enlisted the help of the

4    associate, correct --

5    A.  He --

6    Q.  -- who was standing in the doorway, right?

7    A.  Yes.

8    Q.  Okay.  The associate, he saw all of this and was standing

9    in the doorway when Shadeed Mu'min had this .44 revolver put to

10   his head three times, didn't he?

11          MS. BIFFL:  Objection, calls for speculation on this

12   witness's part.

13          THE COURT:  Can you rephrase the question?

14   BY MR. BEUKE:

15   Q.  Well, here, when you -- you told the ladies and gentlemen

16   about him putting the gun to your head the first time.  The

17   associate is right in the doorway, correct?

18   A.  That's true.

19   Q.  And the second time he's right in the doorway, right?

20   A.  That's true.

21   Q.  Third time, same thing.  He never moved, did he, according

22   to you.  Right?

23   A.  He didn't move along as he had the gun to my head.

24   Q.  Well, okay.  And the first time when he came around the

25   desk and put the bag over your head, that's -- the associate

Mu'min - cross by Beuke

1   was still there, right?

2   A.  That's correct.

3   Q.  After you got air blown into you and miraculously woke up,

4   he was still there, wasn't he?

5   A.  That's incorrect.

6   Q.  Where was he?

7   A.  He was there, but he was -- he was standing in the doorway

8   as he was before, but he was present during that the action of

9   all this.

10  Q.  Well, your testimony is that the associate actually got

11  involved in this.

12  A.  He called him -- that's incorrect.  He called him to get

13  involved when I stood up with the chair.

14  Q.  Okay.  And when he told him to get involved, he told him

15  to, hey, hold him down, right?

16  A.  He's coming at me, hold him.

17  Q.  Well, why did he need you held down if he had choked you

18  out twice previously on his own?  Why did he need him?

19  A.  I have no knowledge of that, sir.

20  Q.  Oh, okay.  But the associate, according to Shadeed Mu'min,

21  actually came in and held you down, right?

22  A.  He held my shoulder down.

23  Q.  Oh.  And then you were choked out the third time, correct?

24  A.  I didn't choke all the way out the third time.

25  Q.  All right.  Well, at some point you say that you said to

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 103 of 191 PageID #:5902
2299
Mu'min - cross by Beuke

1   Lieutenant Burge, I'll sign anything, correct?

2   A.  That's correct.

3   Q.  Did you say to Lieutenant Burge, Lieutenant Burge, I will

4   tell you everything that me and Sharif and Rio and Carol Tyree

5   did on July 25th of 1985?

6   A.  No, I did not.

7   Q.  Did you tell -- did he ask you, Mr. Mu'min, okay, Shadeed,

8   tell me what you guys did, tell me what happens when you guys

9   shot the guy in the Brown's Chicken?

10          Did he say that to you?

11  A.  I don't recall.

12  Q.  According to you you didn't say anything to him about the

13  attempted murder or armed robbery, did you?

14  A.  No, I --

15  Q.  Yes or no.

16  A.  No.

17  Q.  And according to you Mr. Burge didn't ask you any questions

18  about that, correct?

19  A.  That's incorrect.

20  Q.  Well, did he ask you, tell me what happened when you guys

21  went to the Brown's Chicken and the guy was shot?

22  A.  I don't recall that.

23  Q.  Well, did he ask you anything about the attempted murder?

24  A.  I don't recall.

25  Q.  Well, what you told the ladies and gentlemen is after that

1   you were taken back to the interview room, right?

2   A.  After the ordeal was over?

3   Q.  Yeah.  Correct?

4   A.  Correct.

5   Q.  By him, correct?

6   A.  To the best of my knowledge.

7   Q.  Okay.  And you were put in the interview room and you

8   weren't handcuffed, is that right?

9   A.  That's correct.

10  Q.  Your handcuffs -- hands were all swollen, correct, from the

11  two hours that you had spent with the cuffs wrapped around your

12  hand so tight, correct?

13  A.  That's incorrect.

14  Q.  Well, you told the ladies and gentlemen that when the cuffs

15  were on, your hands were swelling up, your wrists were swelling

16  up, correct?

17  A.  Yes, I did.

18  Q.  They were on so tight that they cut off the circulation,

19  correct?

20  A.  Yes.

21  Q.  Okay.  And your testimony is you remained in that interview

22  room until some time the next morning, isn't that right?

23  A.  That's incorrect.

24  Q.  Well, how long did you stay in the interview room,

25  Mr. Mu'min?

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 105 of 191 PageID #:5904
2301
Mu'min - cross by Beuke

1   A.  If I may, the answer to the question that you asked first,

2   when the swelling -- my remembrance of telling the ladies and

3   gentlemen of the jury is that happened when I went there that

4   he did -- the cuffs were placed on me and cut my circulation.

5   This didn't happen after I come out of his office.

6   Q.  No, I understand that.  That -- the cuffs that you

7   described how tight they were, and they cut off the

8   circulation, you were in that room cuffed like that for about

9   two hours, correct?

10  A.  No, that's incorrect.

11  Q.  How long?

12  A.  I had said about 20 minutes or 30 minutes.

13  Q.  And long enough, obviously, for your hands and your wrists

14  to swell, correct?

15  A.  That's correct.

16  Q.  Okay.  And long enough for -- after the cuffs were taken

17  off, you could feel the bruises to your hands starting to

18  develop already, isn't that right?

19  A.  I could see it.

20  Q.  Okay.  You saw it, correct?

21  A.  That's correct.

22  Q.  Okay.  Now when did you next see somebody from the police

23  department in that interview room?

24  A.  Next day.

25  Q.  Paladino?

1   A.   Paladino.

2   Q.   9:00 or 10:00 o'clock in the morning, correct?

3   A.   Sound correct.

4   Q.   All right.  Paladino came in and introduced yourself --

5   himself to you and told you he was the detective working on the

6   armed robbery attempted murder, isn't that right?

7   A.   He could have.

8   Q.   Paladino came in and he had advised you of your rights,

9   didn't he?

10  A.   I don't recall.

11  Q.   Okay.  He sat down with you and asked you about the armed

12  robbery attempted murder, isn't that correct?

13  A.   I don't recall.

14  Q.   Okay.  Well, a while after Paladino came in, do you

15  remember Paladino telling you, Shadeed, I'm going to call the

16  State's Attorney's Office?

17          Do you remember him telling that you?

18  A.   I don't recall.  He could have.

19  Q.   Okay.  Well, if he could have, at some point that morning

20  or that afternoon, you actually met somebody who introduced

21  himself to you, correct?

22  A.   That is correct.

23  Q.   Okay.  The person who introduced himself to you, he was a

24  male black, correct?

25  A.   That's correct.

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 107 of 191 PageID #:5906
2303
Mu'min - cross by Beuke

1  Q.  Wilbur Crooks he told you his name was, isn't that right?

2  A.  That's correct.

3  Q.  Mr. Crooks, when he came in the room, he explained to you

4  that he was an assistant State's Attorney, didn't he?

5  A.  He could have, yes.

6  Q.  That he was a prosecutor, correct?

7  A.  He could have.

8  Q.  That he wasn't your lawyer, correct?

9  A.  That's correct.

10 Q.  He told you that he had spoken to Detective Paladino,

11 correct, about the case?

12       Correct?

13 A.  I'm not sure about that.

14 Q.  Well -- okay.  Well, after he told you who he was and who

15 he worked for, did he ask to speak with you about anything that

16 you knew about the armed robbery attempted murder at the

17 Brown's Chicken on July 25th of 1985?

18 A.  I don't recall that either, sir.

19 Q.  Okay.  So your testimony is after he did all of this, he

20 didn't advise you of your rights either, did he?

21 A.  He didn't.

22 Q.  The State's Attorney did.

23 A.  Yes.

24 Q.  You had a conversation with him, didn't you?

25 A.  Not about that.

Mu'min - cross by Beuke

1 Q. Well, did he tell you, Mr. Mu'min, do you understand that

2 you have a right to remain silent?

3 A. He could have.

4 Q. Did he say if you give up your right to remain silent,

5 anything you say can and will be used against you?

6 A. It is possible he said that.

7 Q. Did he tell you that you had the right to an attorney?

8 A. He could have.

9 Q. Did he tell you that if you couldn't afford an attorney and

10 have him present with me during any questioning.

11         If you couldn't afford an attorney -- to hire an

12 attorney, one will be appointed by the Court to represent you

13 before any questioning. Did he tell you that?

14 A. It is possible he did?

15 Q. He explained all of those rights to you, didn't he, sir?

16 A. He could have.

17 Q. And after he explained all of those rights to you, Shadeed

18 Mu'min says that he didn't ask you one question about the armed

19 robbery, did he?

20 A. Repeat that. Do you mind repeating that?

21 Q. He didn't asked you any questions about that armed robbery

22 of the Brown's Chicken and the shooting of Mr. Plowman, did

23 he?

24 A. No, he did not.

25 Q. He left out of the room, according to Shadeed Mu'min,

1    correct?

2          Right?

3    A.  After I signed the statement here.

4    Q.  Well, let's talk about that, Mr. Mu'min.  Is it your

5    testimony that you never told assistant State's Attorney Wilbur

6    Crooks one thing about your involvement in that shooting?

7          Is that your testimony?

8    A.  To the best of my knowledge that's my testimony.

9    Q.  Is it your testimony that assistant State's Attorney Wilbur

10   Crooks came into the room and he gave you a statement and told

11   you to sign it?

12         Yes or no.

13   A.  That's true.

14   Q.  That statement that's in front of you, correct?

15   A.  That's true.

16   Q.  So you never told him any of the things that are in this

17   document, correct?

18   A.  Not to my knowledge, no.

19   Q.  Everything that is in this document is something that

20   Wilbur Crooks just decided to write down and put in front of

21   you, correct?

22   A.  I have no knowledge how he got it.

23   Q.  Well, you didn't give it to him, correct?

24   A.  No, I did not.

25   Q.  None of the information -- you have read this previously,

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 110 of 191 PageID #:5909
2306
Mu'min - cross by Beuke

1   haven't you?

2   A.  Yes, I have read it.

3   Q.  You have gone over it with Ms. Biffl, haven't you?

4   A.  I read it.

5   Q.  So if there are -- there is -- in this document information

6   concerning your son and Rio Harper, that's not information that

7   you gave to Mr. Crooks, correct?

8   A.  That's correct.

9   Q.  If there is information in this document about you driving

10  those three over there to 116th and Western, that's not

11  information that you gave to Mr. Crooks, is it?

12  A.  I didn't give it to him, no.

13  Q.  Well, if there is information about -- in this document

14  about the fact they told you they were going to go do an armed

15  robbery, they had to shoot the guy, that's not something you

16  told Mr. Crooks?

17          MS. BIFFL:  Objection.

18  BY THE WITNESS:

19  A.  I don't recall.

20          THE COURT:  Sustained.

21          Don't answer.

22  BY MR. BEUKE:

23  Q.  Well, do you recall Mr. Crooks ever asking you, Shadeed,

24  how have you been treated since you have been here?

25          Did he ask you that?

Mu'min - cross by Beuke

1    A.  I think I was asked that.

2    Q.  Well, do you remember him asking you that?

3    A.  Yes.

4    Q.  Okay.  And you told him you had been treated fine, correct?

5    A.  That's correct.

6    Q.  You had been treated well since you have been in police

7    custody, correct?

8    A.  That's correct.

9    Q.  Did Mr. Crooks ask you if you had something to eat while

10   you were in custody?

11            Yes or no.

12   A.  I'm not sure.

13   Q.  Well, you told him that you had had something to eat, isn't

14   that correct?

15   A.  I'm not sure.

16   Q.  Well, isn't it true, sir, that after you had a conversation

17   with Mr. Crooks and after you told him everything about your

18   involvement and everything about your son and Rio's and Carol's

19   involvement in that armed robbery murder, he left the room?

20   A.  It is possible.

21   Q.  Well, so you did give him information, didn't you?

22   A.  Not my knowledge I didn't.

23   Q.  Well, did he leave the room, and then at some point come

24   back with that two-page document?  Yes or no.

25   A.  When he came into the room, he had a two-page document with

1    him --

2    Q.  Okay.  And --

3    A.  -- to the best of my knowledge.

4    Q.  -- he put it in front of you, didn't he?

5         Right?

6    A.  Yes, he showed it to me.

7    Q.  Well, I mean, here, take a look at it again, Mr. Mu'min.

8    When he put it in front of you, the handwritten portion was

9    already written out, correct?

10   A.  To the best of my knowledge, yes.

11   Q.  Did he tell you, Mr. Mu'min, I want to go over this with

12   you?

13   A.  He could have.

14   Q.  Well, did he tell you, you see Miranda warnings in the

15   middle of the page?

16   A.  I'm not sure about that.

17   Q.  Well, did he tell you listen, Mr. Mu'min, the rights I gave

18   you earlier, they are contained on page 1, I want you to read

19   them again.  And if you understand them, put your signature

20   underneath the paragraph.

21        He told you that, didn't he?

22   A.  I'm not sure whether he did or not.

23   Q.  Well, whose signature is under the rights?

24   A.  They are mine.

25   Q.  Oh.  Well, did he say to you, Shadeed, I want to read this

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 113 of 191 PageID #:5912
2309
Mu'min - cross by Beuke

1   to you?

2   A.  He could have.

3   Q.  And he did in fact read it to you, didn't he?

4   A.  Yes.

5   Q.  Line by line, correct?

6   A.  To the best of my knowledge.

7   Q.  And line 1 begins, on July 24th, 1985, I was at, and it

8   goes on from there, correct?

9   A.  Correct.

10  Q.  Did -- when he read that to you, did he ask you is this

11  correct as to what you told me, Shadeed?

12  A.  I'm not sure of that either.

13  Q.  Well, did you ever stop him and say, hey, wait a minute,

14  Mr. Crooks, I didn't tell you that?  Did you ever tell him

15  that?

16  A.  No, I did not.  I just told -- I did tell him that I didn't

17  need to hear the rest of it, but he continued to read it.

18  Q.  Isn't it true, sir, Wilbur Crooks read you every sentence

19  on page 1?

20          Yes or no.

21  A.  Yes.

22  Q.  And when he got to the bottom of page 1, Mr. Mu'min, isn't

23  it correct that Wilbur Crooks told you if this is correct, page

24  1, Shadeed, would you sign on the bottom?  Isn't that what he

25  did?

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 114 of 191 PageID #:5913
Mu'min - cross by Beuke
2310

1   A.   I'm not sure.

2   Q.   Well, you signed on the bottom, didn't you?

3   A.   Yes, I did.

4   Q.   And Mr. Crooks signed on the bottom, isn't that right?

5   A.   That's right.

6   Q.   And so did Detective Paladino, isn't that correct?

7   A.   That's correct.

8   Q.   And then you went on to page 2.  And Mr. Crooks turned the

9   page, didn't he?

10  A.   Yes.

11  Q.   And he began to read you page 2, isn't that correct?

12  A.   It is possible.

13  Q.   And the information that was read to you on page 2, did you

14  stop him and say, hey, I didn't tell you any of that?

15  A.   No, I did not.

16  Q.   So it is your testimony that everything on page 2 was

17  something that Mr. Crooks got from who knows where, right?

18  A.   Not sure where it come from.

19  Q.   Well, you didn't tell him it according to you, correct?

20  A.   To my knowledge I didn't.

21  Q.   Okay.  And at the bottom of page 2, isn't it correct,

22  Mr. Mu'min, that he asked you how you have been treated, you

23  have been treated well since you have been in police custody

24  and you have had something to eat, correct?

25          MS. BIFFL:  Asked and answered, Judge.

```
 1              THE COURT:  Yes.
 2              MR. BEUKE:  I'll withdraw it, Judge.
 3    BY MR. BEUKE:
 4    Q.  After he read you that, he asked you if this is true,
 5    Shadeed, will you sign it?  Correct?
 6    A.  Could have.
 7    Q.  And you signed it, correct?
 8    A.  Yes.
 9    Q.  Because it was true, correct?
10              Yes or no.
11    A.  Some of it is true.
12    Q.  Everything that's in here is what you did, correct?
13    A.  Yes.
14    Q.  And it is your testimony that you never told that to
15    Mr. Crooks, correct?
16    A.  To the best of my knowledge I didn't.
17    Q.  Well, afterwards you eventually were taken from Area 2,
18    correct?
19    A.  That's correct.
20    Q.  And you were taken to the Cook County Jail, correct?
21    A.  That's correct.
22    Q.  And when you were booked into the Cook County Jail, you
23    went and were examined by a paramedic, correct?
24    A.  To the best of my knowledge, yes.
25    Q.  Well, there was a gentleman who asked you a number of
```

1   questions, correct?

2   A.  I don't recall.

3   Q.  Well, do you recall on November 1st of 2000 -- I'm sorry --

4   1985, at the Cook County Jail, being interviewed by a

5   paramedic?

6           Yes or no.

7   A.  I don't recall.

8   Q.  Well, do you remember being asked your name?

9   A.  I don't recall.

10  Q.  Do you remember being asked your Social Security number?

11  A.  I don't recall.

12  Q.  Your date of birth?

13  A.  I don't recall.

14  Q.  You were born 4-18-44, correct?

15  A.  That's correct.

16  Q.  Social Security Number 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.

17          MS. BIFFL:  Judge?

18          MR. WEISMAN:  Judge.

19          MR. BEUKE:  Is this a state secret?  I don't know.

20          MS. BIFFL:  Yes.

21          MR. WEISMAN:  Judge, there is rules on this that apply

22  to everyone.  We'd ask that this be removed from the record.

23          THE COURT:  Right.  I'll strike the --

24          MR. BEUKE:  Okay.

25          THE COURT:  -- Social Security number.

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 117 of 191 PageID #:5916
2313
Mu'min - cross by Beuke

1          MR. BEUKE:  What's the number, Marc?

2   BY MR. BEUKE:

3   Q.  Let me show you, Mr. Mu'min, what's been previously marked

4   as Defendant's Number 52.  Ask you to take a look at that

5   two-page document.

6          Is there a Social Security number that appears on

7   line 3?

8          Yes or no.

9   A.  Yes.

10  Q.  Is that your Social Security number?

11  A.  Yes, it is.

12  Q.  Is there a date of birth that appears on line 3?

13  A.  Yes, it is.

14  Q.  Is that your date of birth?

15  A.  That's correct.

16  Q.  Incidentally, Mr. --

17         MS. BIFFL:  Object to the relevance, Judge.  I'm not

18  sure where we're going with this document.  I'd ask that --

19         MR. BEUKE:  It will be clear shortly I think, Judge.

20         THE COURT:  Well --

21  BY MR. BEUKE:

22  Q.  Do you remember --

23         THE COURT:  Overruled.

24  BY MR. BEUKE:

25  Q.  -- Mr. Mu'min, being asked a series of questions by that

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 118 of 191 PageID #:5917
2314
Mu'min - cross by Beuke

1  young man who checked you into the jail?

2  A.  I don't recall, but I may have been.

3  Q.  Okay.  Now do you remember, you wore glasses back then,

4  didn't you?

5  A.  Yes.

6  Q.  And when you went to the jail, Mr. Mu'min, you had glasses

7  on your head, correct?

8  A.  To the best of my knowledge I did.

9  Q.  And you had the glasses with you in Area 2, correct?

10  A.  Yes, I did.

11  Q.  You were wearing them in the lieutenant's office, correct?

12  A.  That's correct.

13  Q.  And these three times that this bag was placed over your

14  head and Mr. Burge put his hand on your face, he never broke

15  your glasses, did he?

16  A.  It wasn't on.

17  Q.  Oh.  Did he tell you, oh, Shadeed, can you please take your

18  glasses off so I can put this bag on your head and choke you

19  out three times?

20  A.  No, he did not.

21  Q.  You took them off for him --

22  A.  They was off --

23  Q.  -- according to you, correct?

24  A.  They was off before I went into his office.

25  Q.  Oh, okay.  Where were they?

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 119 of 191 PageID #:5918
2315
Mu'min - cross by Beuke

1    A.  I don't know where they was at.

2    Q.  Oh.  Well, in any event, when you got done being choked out

3    by this bag, you found your glasses again, right?

4    A.  I don't recall.

5    Q.  Where did you find them, Mr. Mu'min?

6    A.  I don't recall.

7    Q.  Oh.  When did you put them back on your face, Mr. Mu'min?

8    A.  I don't recall.

9    Q.  Oh.  But you had them when you were sitting in the

10   interview room in Area 2, didn't you?

11   A.  Yes, I did.

12   Q.  And you had them when you went to the Cook County Jail,

13   didn't you?

14   A.  Yes, I did.

15   Q.  There was not once -- one mark on them.  They weren't

16   bent.  Nothing was wrong with them, were they, Mr. Mu'min?

17   A.  Because they wasn't on me when he put the bag on me.

18   Q.  Oh, okay.  Well, do you remember that gentleman asking you

19   about any complaints that you had or how you were feeling?  Do

20   you remember him asking you that?

21   A.  I don't --

22   Q.  Yes or no.

23   A.  -- really recall that, sir.

24   Q.  Well, do you remember telling him you were in good health?

25           MS. BIFFL:  Objection to him reading from the

1          Document.

2          THE COURT:  Sustained.

3    BY MR. BEUKE:

4    Q.  Do you remember telling him you were in good health?

5          MS. BIFFL:  Objection.

6    BY THE WITNESS:

7    A.  I don't recall.

8          MS. BIFFL:  It calls for hearsay.

9          THE COURT:  Sustained.

10         MR. BEUKE:  Well, if I read from the document it is

11   okay, Judge?

12   BY MR. BEUKE:

13   Q.  Here.  Mr. Mu'min, isn't it correct that when that

14   gentleman was examining you and when he was visually looking at

15   your body, you didn't stick your wrists out to him and say,

16   hey, listen, I just had my wrists handcuffed for approximately

17   two hours and they swelled up?  You never made a complaint

18   about that, did you?

19   A.  No, I did not.

20         MS. BIFFL:  Object to the form of the question, the

21   foundation as to timing, and to the fact that this witness has

22   said repeatedly I don't remember the exam.

23         MR. BEUKE:  He didn't say that, Judge.

24         THE COURT:  I thought he didn't remember the

25   conversation.  But you can clarify.

```
 1              MS. BIFFL:  I would ask him to clarify the date of the

 2    exam in relation to the date of being at Area 2.

 3              MR. BEUKE:  I'll be happy to, Judge.

 4              THE COURT:  All right.

 5    BY MR. BEUKE:

 6    Q.  You were at Cook County Hospital, weren't you, Mr. Mu'min,

 7    on November 1st of 1985, isn't that correct?

 8    A.  To the best of my knowledge.

 9    Q.  Well, and when you were at Cook County -- or I'm sorry --

10    at Cermak Health Services and you were being examined, you were

11    told that this examination was for the purposes of checking you

12    into the jail, is that fair to say?

13    A.  That's fair.

14    Q.  Okay.  And they asked you all of these questions about your

15    prior history, correct?

16              If you have had any diseases or anything like that,

17    correct?

18    A.  Correct.

19    Q.  Okay.  And they visually -- the paramedic actually looked

20    at all of your parts of your body, fair to say?

21    A.  That's fair to say.

22    Q.  Okay.  And they asked you if you had any complaints,

23    correct?

24    A.  To the best of my knowledge.

25    Q.  And you told him you were in good health, is that correct?
```

Mu'min - cross by Beuke

1    A.  I'm not sure what I said.

2    Q.  Okay.  Well, in any event, sir, you never told that

3    individual paramedic at Cook County -- or at Cermak Health

4    Services that your wrists were hurting you, that you had been

5    handcuffed in such a way that it cut off the circulation to

6    your hands, correct?

7    A.  That's correct.

8    Q.  Okay.  You never made any complaint about that, correct?

9    A.  That's correct.

10   Q.  You never told that paramedic, you know what, I have been

11   tortured while I was in police custody, isn't that correct?

12   A.  That's correct.

13   Q.  And Mr. Burge wasn't present when you were being examined,

14   was he?

15   A.  That's correct.

16   Q.  You were alone with a doctor, correct?

17   A.  That's correct.

18   Q.  Okay.  Now the next day, Mr. Mu'min -- or I'm sorry --

19   later that day you went in front of a judge, correct?

20   A.  I'm not sure when it was I went.

21   Q.  Well, do you recall appearing in front of a judge for the

22   purposes of them setting a bond on your case?

23   A.  Yes.

24   Q.  Okay.  In front of that judge you had a lawyer represent

25   you from the Public Defender's Office, isn't that right?

Mu'min - cross by Beuke

1   A.  I'm not sure where he was from.

2   Q.  Well, you had a lawyer with you, correct?

3   A.  I'm not sure.

4   Q.  Well, they set your bond, the judge set your bond at

5   $30,000, which required you to post $3000, isn't that right?

6   A.  I'm not sure what it was.

7   Q.  Well, nothing was said to the judge, and you didn't saying

8   to that lawyer about the fact that you had been -- had your

9   hands cuffed in such a way that your wrists were all swollen

10  and bruised, isn't that correct?

11  A.  That's correct.

12  Q.  You never said anything to that lawyer about the fact that

13  you had a bag put over your head three times and you had been

14  choked out and passed out, correct?

15  A.  That's correct.

16  Q.  And you never told that lawyer anything about the fact that

17  Mr. Burge put a gun to your head and clicked it three times

18  with a round in the chamber, did you?

19  A.  No, I did not.

20  Q.  Well, sir, eventually you did make bond on November 12th,

21  didn't you?

22  A.  I think that's correct.

23  Q.  Okay.  And you posted or somebody posted money for you,

24  correct?

25  A.  Yes.

1   Q.  And you were out on the street, isn't that right?

2   A.  Yes.

3   Q.  And at some point you retained an attorney by the name of

4   Dennis Doherty and Julius Echeles, correct?

5   A.  That's correct.

6   Q.  And, sir, am I correct that after you bonded out, your car

7   was still impounded, was it not?

8   A.  That's correct.

9   Q.  And the police had custody of your car.  That's what you

10  believed, correct?

11  A.  That's what I believed.

12  Q.  And you had some property in the car that you actually

13  requested to get -- or you wanted back, fair to say?

14  A.  Fair to say.

15  Q.  Tell the ladies and gentlemen of the jury who Shadeed

16  Mu'min called on the telephone.  Tell them.

17  A.  I don't recall.

18  Q.  Well, isn't it a fact, sir, that you called Mr. Burge after

19  you got out on bond?

20  A.  I don't recall when it was.  I called him.  I don't recall

21  when it was.

22  Q.  I mean, you called him on the phone and you said, hey,

23  lieutenant, it is me, Shadeed, I made bond, I need some help

24  getting my car back, didn't you?

25  A.  I could have.

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 125 of 191 PageID #:5924
2321
Mu'min - cross by Beuke

1   Q.   That's why you contacted him, correct?

2   A.   That's the only reason I contacted him.

3   Q.   And he told you, didn't he, that he was going to try to

4   help you get your car back, isn't that right?

5   A.   That's true.

6   Q.   And he did help you get your car back, didn't he?

7   A.   No, he did not.

8   Q.   Well, did tell you that Detective Paladino would call you?

9   A.   I'm not sure.

10  Q.   Well, Paladino and you spoke, didn't they?

11  A.   I don't recall.

12  Q.   Didn't you?

13  A.   I don't recall.

14  Q.   Well, you got your car back, didn't you?

15  A.   No, I did not.

16  Q.   Well, did you get personal property out of the car that you

17  wanted back?

18  A.   I don't recall that either.

19  Q.   Well, did you get purses out of the car that you had in the

20  car?

21  A.   I don't recall that either.

22  Q.   Well, how many times -- you reached out to Lieutenant Burge

23  on more than one occasion, didn't you?

24  A.   It is possible.

25  Q.   Yeah.  I mean, and ultimately you and him spoke several

```
 1  times, didn't you, on the phone?

 2  A.  I spoke with him.

 3  Q.  Okay.  Now, Mr. Mu'min, after Mr. Echeles and Mr. Doherty

 4  began to represent you, you went to court for, on occasion,

 5  maybe once every month, is that correct?

 6  A.  Sound correct.

 7  Q.  And you appeared both with Mr. Echeles and with

 8  Mr. Doherty, correct?

 9  A.  It sound correct.

10  Q.  And, sir, at that point in time while you were on bond for

11  this case, you knew about the armed robbery up in Milwaukee,

12  didn't you?

13  A.  Yes.

14  Q.  And when you went to court on this case, you never told

15  Mr. Doherty that, hey, somebody may be looking for me and my

16  son and Rio Harper on an armed robbery out in Milwaukee?

17         MS. BIFFL:  Objection to questions about the

18  conversations with his lawyer.

19         MR. BEUKE:  Oh.  Judge, I'll move on.

20         THE COURT:  All right.

21  BY MR. BEUKE:

22  Q.  Sir, I want to direct your attention to February 11th of

23  1986.  That's approximately four months after you bonded out of

24  the Cook County Jail.  Do you remember going to court out in

25  Markham on that day?
```

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 127 of 191 PageID #:5926
Mu'min - cross by Beuke
2323

1    A.  Yes.

2    Q.  Do you remember getting arrested from court on that day?

3    A.  Yes.

4    Q.  And you got arrested on the warrant that was outstanding

5    from Milwaukee, Wisconsin, isn't that correct?

6    A.  That's correct.

7    Q.  Now Shadeed Mu'min was back in the county jail, isn't that

8    correct?

9    A.  That's correct.

10   Q.  In 1986, correct?

11   A.  That's correct.

12   Q.  Assigned to Division 1, isn't that correct?

13   A.  That's correct.

14   Q.  With the Wilson brothers, correct?

15   A.  I'm not sure where they was at.

16   Q.  With Melvin Jones, isn't that correct?

17   A.  I'm not sure.

18   Q.  With Aaron Patterson, isn't that correct?

19   A.  I don't recall that.

20   Q.  Ricky Shaw?

21   A.  I don't recall that.

22   Q.  Well, where were you housed on Division 1?

23   A.  I was in Division 1, but I don't recall those names you

24   just mentioned to me.

25   Q.  Well, up until that point -- well, on the February 11th

Mu'min - cross by Beuke

```
 1    court date, do you recall coming to court with your lawyer

 2    prior to being arrested and the State's Attorneys tendering

 3    your lawyer a copy of that two-page statement that you

 4    allegedly gave in Area 2?

 5            Do you remember getting that document?

 6    A.   I don't recall.

 7    Q.   Well, sir, while you were in custody from February 11th of

 8    1986, you and your lawyer met on a number of occasions, isn't

 9    that right?

10    A.   That's correct.

11    Q.   Isn't it true, sir, that it took approximately 12 months

12    for you to first tell your lawyer that something had been done

13    to you to cause you to give that statement?

14    A.   It is possible.

15    Q.   Okay.  And after Mr. Doherty came to you and showed you the

16    statement, you didn't tell him, hey, Burge put a gun to my

17    head, did you, right?

18    A.   Right.

19    Q.   And you didn't tell him Burge put a bag over my head and

20    choked me out three times, did you?

21    A.   No, I did not.

22    Q.   You sat in Division 1 for 14 months before you ever thought

23    it was a good idea to mention this to your what lawyer, isn't

24    that correct?

25    A.   That's correct.
```

1  Q.  Okay.  And when you mentioned that for the first time to

2  Mr. Doherty, you discussed with him about the possibility of a

3  motion to suppress, correct?

4  A.  To the best of my knowledge.

5  Q.  You didn't tell Mr. Doherty at that point in time that it

6  was Lieutenant Burge that had done anything to you, did you?

7  A.  No, I did not.

8  Q.  And you didn't tell Mr. Doherty at that time that there was

9  an associate of Mr. Burge's that was standing outside the

10  doorway, correct?

11  A.  No, I did not.

12  Q.  Well, you sat in Division 1 for another 14 months, didn't

13  you?

14  A.  To the best of my knowledge I don't know how long it was.

15  Q.  Well, you sat with -- in Division 1 with a number of

16  different individuals, correct?

17  A.  It is possible.

18  Q.  All right.  Well, did you begin to discuss your case with

19  people in Division 1?

20       MS. BIFFL:  Objection to the form of the question,

21  case being.  The incident or the Area 2?

22       THE COURT:  Clarify.

23  BY MR. BEUKE:

24  Q.  Well, when you had your conversations with your roomies at

25  Division 1, was it about your case, the substance of the

Mu'min - cross by Beuke

1    prosecution of your case?

2            You guys talked about each other's cases, didn't you?

3    A.  It is possible that I may have mentioned it.

4    Q.  Okay.  Is it possible that you may have mentioned the fact

5    that, hey, I got on my case a handwritten confession that I

6    signed that they are going to use against me?  Is it possible

7    you said that --

8    A.  No.

9    Q.  -- to your roomies over there?

10   A.  No.

11   Q.  Oh.  You never talked about that, correct?

12   A.  No.

13   Q.  Well, you never told them that your case came out of Area

14   2, did you?

15   A.  I don't recall.

16   Q.  Well, is it possible you told them, hey, I got an Area 2

17   case?

18   A.  I don't recall.

19   Q.  Well, is it possible that somebody told you, you know,

20   listen, you should claim that Burge put a bag over your head or

21   Burge put a gun to your head?  Is it possible somebody told you

22   that might be a good idea?

23   A.  No.

24   Q.  Oh.  Well, on May 13th of 1987, you and Mr. Doherty came

25   back to court, didn't you?

Mu'min - cross by Beuke

1          Yes or no.

2   A.  Yes.

3   Q.  And for the very first time you told Mr. Doherty that it

4   was Burge who put a gun to your head, isn't that right?

5   A.  It is possible.

6   Q.  And for the very first time you told Mr. Doherty that it

7   was Burge who put a bag over your head, isn't that right?

8   A.  It is possible.

9   Q.  Now, sir, over the years you have told the ladies and

10  gentlemen that you have had an opportunity to give information

11  on this particular investigation to people and give testimony

12  on several occasions, isn't that right?

13  A.  True.

14  Q.  Now the -- you had some people from the People's Law Office

15  come out to see you in Centralia, isn't that right?

16  A.  That's true.

17  Q.  They had a video camera with them, didn't they?

18  A.  That's true.

19  Q.  And they set up a video camera so they could take a

20  videotaped statement of you, isn't that true?

21  A.  That's true.

22  Q.  And there was a young lady and an attorney by the name of

23  Mr. Haas, isn't that right?

24  A.  I'm not sure what her name was.

25  Q.  Okay.  Was there two attorneys that were there?

Mu'min - cross by Beuke

1   A.  I'm not sure.

2   Q.  Video camera was set up, correct?

3   A.  That's correct.

4   Q.  And when they set up the video camera, they turned it on,

5   correct?

6   A.  That's true.

7   Q.  Right?  Mr. Mu'min, tell us what happened to you in Area

8   2.  Do you remember that being asked of you?

9   A.  It is possible.

10  Q.  Well, you have seen that video, haven't you?

11  A.  I think I have seen part of it, not the whole video.

12  Q.  Do you remember that you -- describing the person who did

13  this to you as Commander Burtner?

14  A.  I don't recall that.

15  Q.  Well, do you remember on two or three different occasions

16  referring to this guy who tortured you as Commander Burtner?

17  Yes or no.

18  A.  I don't recall that either.

19  Q.  Do you remember the young lady then stopping you and

20  saying, are you referring to Commander Burge?

21  A.  I don't recall that either, sir.

22  Q.  Okay.  Well, in any event do you remember telling those

23  people in that video interview that after you had been treated

24  in this manner, that Burge went out and Burge got a statement

25  and brought it back in for you to sign?  Do you remember saying

1   that?

2   A.  I don't recall that, sir.

3   Q.  Okay.  Well, sir, you have given information to the FBI

4   back in 1990.  Do you remember that conversation also at

5   Centralia?

6   A.  No.

7   Q.  Well, do you remember when your lawyers were sitting next

8   to you, Mr. Gump and Mr. Lemming?  We have talked about that

9   before, haven't we?

10  A.  It is possible.

11  Q.  Well, do you remember telling FBI Agent Jackie Kase that

12  there was a black detective who was present for all of this

13  also?

14  A.  I could have.

15  Q.  Well, you have never testified at your motion to suppress

16  about the presence of a black detective during all this

17  mistreatment, had you?

18  A.  No, I did not.

19  Q.  Well, that was the very first time that you had ever

20  mentioned a black detective being present when you were being

21  tortured, isn't that right?

22          Correct?

23  A.  That's correct.

24  Q.  All right.  And you even gave a description of the black

25  detective, didn't you?

Mu'min - cross by Beuke

1   A.  I don't recall.

2   Q.  Well, do you recall saying that the black detective could

3   see and hear everything.  He did nothing to stop it.  He was

4   laughing, as was the white detective.

5           Do you remember telling those -- FBI agent Jackie

6   Kase that?

7   A.  That very well could be, sir.

8   Q.  You didn't see a black detective there, did you?

9   A.  When I first went into the room, there was an adjoining

10  room, and there was someone who I assume was a detective, but

11  he was part of the police unit.

12  Q.  There was a black detective who was standing -- seated at a

13  desk outside the door?

14  A.  Not outside the door, he was in his own office.

15  Q.  Well, it was in the office outside of Mr. Burge's office?

16  A.  Down from it in the unit up there.

17  Q.  Five or ten feet from where you were sitting in the chair,

18  right?

19  A.  I have no knowledge how far, but he could see.

20  Q.  How far away from you was he?

21  A.  I have no knowledge of that.

22  Q.  Farther than I am from you?

23          MS. BIFFL:  Objection, asked and answered.

24          THE COURT:  Sustained.

25  BY MR. BEUKE:

Mu'min - cross by Beuke

1  Q.  Well, you told FBI Agent Jackie Kase, didn't you, that he

2  could see and hear everything, isn't that right?

3  A.  That's true.

4  Q.  He was sitting there laughing at everything that was being

5  done to you, isn't that right?

6  A.  That's true.

7  Q.  And that's the very first time you had ever mentioned the

8  black detective, isn't that right?

9  A.  That's true.

10  Q.  You never gave FBI Agent Kase a description of the

11  associate, did you?

12  A.  No, I did not.

13  Q.  Now, sir, after you gave this statement to FBI Agent Kase

14  and your lawyers, did you -- well, some time later you were

15  asked to give a statement to the Office of Professional

16  Standards in 1993, isn't that right?

17  A.  I don't recall when it was.

18  Q.  Well, how about if I direct your attention to June 7, 1993,

19  9:45 in the morning, being taken -- being interviewed by

20  Investigator Leti Lawrence up at the Milwaukee parole office on

21  Walnut Street in Milwaukee, Wisconsin.

22          Do you remember that?

23          Yes or no.

24  A.  I don't recall.

25  Q.  Well, sir, do you remember telling Investigator Lawrence

Case: 1:08-cr-00846 Document #: 397 Filed: 07/01/11 Page 136 of 191 PageID #:5935
Mu'min - cross by Beuke
2332

1  that there was a black detective involved in this torture

2  again?

3  A.  I don't recall that.

4  Q.  Do you remember the conversation coming up about a black

5  detective?

6  A.  I don't recall that, sir.

7  Q.  Do you remember, sir, being asked this question and giving

8  this answer?

9       "Question:  What did you do when Burge put the

10  typewriter cover over your head?

11       "Answer:  I hollered each time.  There was an office

12  across a small hallway from Burge's office, and there was a

13  black detective who was seated in the office.  The door to

14  Burge's office was open, and the black detective's door was

15  also open.  He saw what was going on.  This detective appeared

16  to be in his 30s and was dark skinned."

17       Do you remember telling that to Investigator

18  Lawrence?

19  A.  It is possible I may have said that, I don't recall.

20  Q.  Well, after you had your conversation with Ms. Lawrence,

21  isn't it a fact that she typed up the questions and answers

22  that she asked of you, isn't that correct?

23  A.  I'm not sure of that, sir.

24  Q.  Well, you eventually were given a copy of that statement,

25  weren't you?

Mu'min - cross by Beuke

1   A.  I'm not sure of that either.

2   Q.  I'm going to show you Defendant's Number 53, Mr. Mu'min.

3   I'm going ask you to take a look at this document.

4          Tell the ladies and gentlemen of the jury if you

5   recognize it, and if you do, what you recognize it to be.

6          Do you recognize it, sir?

7   A.  It look familiar.

8   Q.  Well, you have seen it before, haven't you?

9   A.  It is possible I have.

10  Q.  Take a look at the -- page 3.

11         I'm sorry.  Page 4.  Do you see that?

12  A.  Yeah.

13  Q.  Did you remember being asked this question and giving this

14  answer?

15         "Question:  Is there anything that you wish to add to

16  this statement?

17         "Answer:"

18         MS. BIFFL:  Objection, your Honor.  Irrelevant and not

19  impeaching.

20         MR. BEUKE:  Oh, okay.  Well, I'll withdraw it, Judge.

21  BY MR. BEUKE:

22  Q.  Mr. Mu'min, at your motion to suppress statements you were

23  asked a lot of questions by your lawyer and a lot of questions

24  by the prosecutor, correct?

25  A.  Yes.

1    Q.  You never testified at the motion to suppress statements

2    that Mr. Burge appeared to be drunk during the course of time

3    that you spent with him, did you?

4    A.  I don't recall.

5    Q.  You never told anybody prior to being interviewed by the

6    Office of Professional Standards that Mr. Burge appeared to be

7    drunk during your encounter with him on October 30th?

8            MS. BIFFL:  Your Honor, objection again to relevance.

9            And impeaching he hasn't testified to anything today.

10           THE COURT:  Right, it is not impeaching.  Sustained.

11   BY MR. BEUKE:

12   Q.  Well, sir, that's an accurate account of the questions that

13   were asked of you and the answers that you gave on that day,

14   isn't that correct?

15   A.  It is possible.

16   Q.  Sir, do you recall approximately three weeks after that

17   interview that you had out at the Milwaukee parole office with

18   Ms. Lawrence her calling you on the phone?

19   A.  I don't recall it.

20   Q.  Well, you remember her calling you on the phone, sir, and

21   saying, Mr. Mu'min, I would like to come up -- back up to

22   Wisconsin, and I'd like to show you some photographs of

23   detectives from Area 2?  Do you remember her asking you about

24   that?

25   A.  No.

1  Q.  Well, sir, isn't it correct that you told Ms. Lawrence, I

2  don't want to look at any photographs, I just want to get on

3  with my life, isn't that correct?

4  A.  That's very possible I did -- I did say that.

5  Q.  That was after you sat down and gave this big interview to

6  her, isn't that right?

7  A.  I don't recall.

8  Q.  So when she called you and said, listen, Shadeed, can you

9  look at some photos and see if you can identify the associate

10  or the black detective, it was Shadeed Mu'min who said, no, I

11  don't want to look at anything, right?

12  A.  That's true.

13  Q.  You made that decision, correct?

14  A.  That's correct.

15  Q.  You never even identified Commander Burtner, did you?

16  A.  I wasn't asked.

17  Q.  Oh.  Well, you decided I'm not going look at any

18  photographs, correct?

19  A.  Yes, I did.

20  Q.  Okay.  And Ms. Biffl or Ms. Perry or Mr. Weisman in all the

21  times that you have sat down with them, did they ever say,

22  listen, Shadeed, I would like to show you a photograph of a

23  detective from Area 2 so you could tell me whether or not this

24  is the guy who was standing in the doorway?  Did they ever do

25  that?

1  A.  I don't recall that, sir.

2  Q.  Well, you have talked to them five or six times in the last

3  couple weeks, haven't you?

4  A.  That wasn't mentioned to me.

5  Q.  Well, they never asked you to do that, did they?

6  A.  No, they did not.

7  Q.  Oh.

8        THE COURT:  Okay.  All right.  It is time to break.

9        We'll resume at 1:15.

10    (Proceedings had in open court outside of the presence and

11  hearing of the jury:)

12        THE COURT:  You may step down, sir.

13        THE WITNESS:  Okay.

14    (Witness temporarily excused.)

15        THE COURT:  Thank you.

16    (Adjournment at 12:00 P.M. to reconvene at 1:15 P.M., June

17  15, 2010.)

18

19

20

21

22

23

24

25

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   UNITED STATES OF AMERICA,          )
                                        )
 4            Plaintiff,                )
                                        )
 5            vs.                       )  No. 08 CR 846
                                        )
 6   JON BURGE,                         )  Chicago, Illinois
                                        )  June 15, 2010
 7            Defendant.                )  1:25 P.M.

 8                                VOLUME 10B
                    TRANSCRIPT OF PROCEEDINGS - Trial
 9        BEFORE THE HONORABLE JOAN HUMPHREY LEFKOW, and a jury

10   APPEARANCES:

11   For the Government:    HON. PATRICK J. FITZGERALD
                            219 South Dearborn Street
12                          Chicago, Illinois  60604
                            BY:  MR. M. DAVID WEISMAN
13                               MS. APRIL PERRY

14                          DEPARTMENT OF JUSTICE
                             CIVIL RIGHTS DIVISION
15                           CRIMINAL SECTION
                             601 D Street NW
16                           Room 5339
                             Washington, DC  22314
17                           BY:  MS. ELIZABETH L. BIFFL

18   For the Defendant:     MR. RICHARD MICHAEL BEUKE
                            53 West Jackson Boulevard
19                          Suite 1410
                            Chicago, Illinois   60604
20

21                    PAMELA S. WARREN, CSR, RPR
                         Official Court Reporter
22             219 South Dearborn Street, Room 1928
                       Chicago, Illinois   60604
23                          (312) 294-8907

24

25
```

2338

1   APPEARANCES:  (Continued)

2

3                         MR. WILLIAM GEORGE GAMBONEY, JR.
                          216 South Marion Street
                          Oak Park, Illinois   60302

4

5                         MR. MARC WILLIAM MARTIN
                          53 West Jackson Boulevard
                          Suite 1410

6                         Chicago, Illinois    60604

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          (Proceedings had in open court outside of the presence and

 2   hearing of the jury:)

 3          THE COURT:  Bring in the jury, please.

 4          (Proceedings had in open court in the presence and hearing

 5   of the jury:)

 6          THE COURT:  Mr. Beuke, you may continue.

 7          Good afternoon, ladies and gentlemen.

 8          MR. BEUKE:  Judge, I don't have any other questions,

 9   your Honor.

10          THE COURT:  You don't?

11          MR. BEUKE:  No.

12          THE COURT:  All right.

13          MS. BIFFL:  I do have a few redirect.

14          THE COURT:  Okay.

15      SHADEED MU'MIN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

16                      REDIRECT EXAMINATION

17   BY MS. BIFFL:

18   Q.  Mr. Mu'min, there is just a few things I want to go over

19   with you before you finish.  First of all, when you were being

20   cross examined, you were asked about how many times we have met

21   in preparation for your testimony.  Do you remember those

22   questions?

23   A.  Yes.

24   Q.  Do you remember the first time that we met what state that

25   was in?
```

1    A.   Yes.

2    Q.   And where was it?

3    A.   In Ohio.

4    Q.   Okay.  And was that in 2008?

5         MR. BEUKE:  Sorry, Judge, I didn't hear the answer.

6         THE COURT:  The answer?  I think he said Ohio.

7         Right?

8         MR. BEUKE:  Thank you, Judge.

9    BY MS. BIFFL:

10   Q.   Was that in 2008?

11   A.   To the best of my knowledge I think it was.

12   Q.   And then this year -- and that was Agent Kelly and I came

13   to see you in Ohio, right?

14   A.   That's correct.

15   Q.   Okay.  And in April of this year Ms. Perry and Agent Kelly

16   and I came to see you in Ohio, is that right?

17   A.   That's correct.

18   Q.   And from 2008 to April of this year, had we been to see you

19   any other time?

20   A.   No.

21   Q.   Okay.  Then between April when we came out to see you and

22   two days ago, Sunday, had I seen you at all during that time?

23   A.   Repeat the question.

24   Q.   Okay.  I went to see you in April, right, in Ohio?

25   A.   Yes.

1 Q. Okay.  And then when did you come to Chicago for trial?

2 What day did you get here?

3 A. Sunday.

4 Q. All right.  As in two days ago, correct?

5 A. Two days ago.

6 Q. Had we seen each other any other time between my trip to

7 Ohio in April and Sunday?

8 A. No.

9 Q. Okay.  And Agent Kelly and Agent Butler and I met with you

10 on Sunday in this building, is that right?

11 A. That's correct.

12 Q. All right.  And then yesterday do you remember what time

13 you came to the courthouse?

14 A. It may have been around 2:00 o'clock, 1:30, 2:00 o'clock.

15 Q. And then what time did you leave when you found out you

16 wouldn't testify yesterday?

17 A. That's around 4:30, 5:00 o'clock, somewhere.

18 Q. All right.  And then today what time did you arrive at the

19 courthouse?

20 A. About 9:00 o'clock or after.

21 Q. All right.  And about 9:15 is when you got up there, right?

22 A. Yes.

23 Q. Now you were asked some questions about calling -- about

24 trying to get your car back after your arrest in October of

25 1985.

1          Do you remember those questions?

2     A.  Yes.

3     Q.  Okay.  And you were asked why you called the defendant,

4     Lieutenant Burge, about your car.  Can you tell us why you

5     called him of all people?

6     A.  He had informed me that if I cooperated with him, he would

7     get my car back.

8     Q.  All right.  And when you called him about getting your car,

9     did he ask you any questions?

10    A.  Yeah, had I found out where the other defendants were.

11    Q.  All right.  Your son and his friend?

12    A.  Yes.

13    Q.  And what did you tell him?

14    A.  No.

15    Q.  And so did you get your car back?

16    A.  No.

17    Q.  Okay.  Why didn't you get your car back?

18    A.  They wouldn't let me have it.

19    Q.  I'm sorry?

20    A.  They wouldn't let me have it.

21    Q.  Okay.  And when you say they, who do you mean?

22    A.  I think it was impound by the police, I'm sure.

23    Q.  Okay.  Did you go to anybody besides Lieutenant Burge to

24    try to get your car?

25    A.  I don't recall if I did or not.

1  Q.  Now you were asked about this interview of you by the

2  People's Law Office when you were in prison.

3        Do you remember those questions?

4  A.  Yes.

5  Q.  Okay.  You were asked about getting the defendant,

6  Lieutenant Burge's name wrong.  Do you remember those

7  questions?

8  A.  Yes.

9  Q.  Okay.  That interview was after the defendant no longer

10  worked at the Chicago Police Department, is that right?

11        MR. BEUKE:  Objection, Judge.

12  BY THE WITNESS:

13  A.  To the best of my knowledge --

14        THE COURT:  Wait, wait.  Don't answer.

15        THE WITNESS:  Oh.

16        THE COURT:  What's your objection?

17        MR. BEUKE:  Well, if he can establish a foundation as

18  to when that occurred.

19        THE COURT:  I don't know if it is in the evidence or

20  not.  But if not, lay the foundation.

21        MS. BIFFL:  Okay.

22  BY MS. BIFFL:

23  Q.  Mr. Mu'min, do you remember prior to those people coming to

24  prison to interview you, had you testified in an administrative

25  hearing in this building about what happened to you at Area 2?

 1    A.   I don't recall.

 2    Q.   Okay.  Do you know what year it was that they came to

 3    interview you?

 4    A.   No.

 5    Q.   Do you remember, was it after your motion to suppress?

 6    A.   Yes.

 7    Q.   All right.  And in your motion to suppress did you name

 8    Lieutenant Burge?

 9              MR. BEUKE:  Objection, Judge.

10              THE COURT:  Overruled.

11    BY MS. BIFFL:

12    Q.   You can go ahead.

13    A.   To the best of my knowledge.

14    Q.   Okay.  And prior to your motion to suppress to that

15    hearing, had you told your attorney Lieutenant Burge's name?

16    A.   There's a great possibility I could have.

17    Q.   Okay.

18    A.   I don't recall that, but --

19    Q.   Okay.  Did you tell him who had done the things to you that

20    you said happened at Area 2?

21              MR. BEUKE:  Objection, Judge, asked and answered.

22              MS. BIFFL:  It is a different question.

23              THE COURT:  Overruled.

24    BY THE WITNESS:

25    A.   Yes.

 1   BY MS. BIFFL:

 2   Q.  Now did you -- you testified during cross examination about

 3   a black detective who you saw on your way to Lieutenant Burge's

 4   office.

 5          Do you remember those questions?

 6   A.  Yes.

 7   Q.  Okay.  You have also mentioned during your testimony an

 8   associate who stood in the doorway.  Do you remember that?

 9   A.  Yes.

10   Q.  Are those two different people that you are talking about?

11   A.  They are two different people.

12   Q.  Okay.  Now finally you were asked about in 1993 when you

13   spoke with someone from OPS.

14          Do you remember those questions?

15   A.  Yes.

16   Q.  And Mr. Beuke asked you if you remembered telling OPS about

17   this black detective.

18          Do you remember those questions?

19   A.  Yes.

20   Q.  All right.  And then Mr. Beuke asked you about whether OPS

21   later contacted you and wanted to meet with you again to show

22   you some photos.  Do you remember that?

23   A.  Yes.

24   Q.  And did you -- what did you tell OPS when they asked you to

25   look at photos?

1    A.  To the best of my knowledge -- I don't remember what I

2    informed them.  I could possibly have told them I didn't want

3    no photo.  I want to be through with this.

4    Q.  Okay.  And why did you want to be through with it?

5          MR. BEUKE:  Objection, Judge.

6    BY THE WITNESS:

7    A.  At that time --

8          THE COURT:  Overruled.

9    BY MS. BIFFL:

10   Q.  Go ahead.

11   A.  At that time I was already incarcerated, and I feel what

12   was behind me, behind me.  A lot of things occurred -- certain

13   incident occurred -- occurred in my life I didn't want to

14   remember.  And that's what's happening in some aspect that I

15   didn't want to remember that horror -- torment I had been

16   subjected to.

17   Q.  And you were subpoenaed to come here, is that right?

18   A.  That's correct.

19          MS. BIFFL:  I don't have anything further.

20                    RECROSS EXAMINATION

21   BY MR. BEUKE:

22   Q.  Well, Mr. Mu'min, on June the 7th of 1993, the investigator

23   from OPS came out to the parole office in Milwaukee and asked

24   to speak with you, correct?

25          Yes or no.

1    A.  I don't recall that.

2    Q.  Well, you identified the statement that I showed you a

3    little earlier, correct?

4    A.  That's correct.

5    Q.  And there was an OPS investigator that came up to

6    Milwaukee, Wisconsin, and asked you about your involvement

7    after your arrest in '85, correct?

8    A.  It is a possibility it could have happened.  I don't

9    remember.

10   Q.  Well, it did happen, did it?

11        You gave a five-page statement.

12   A.  Yes, it happened.

13   Q.  Okay.  And three weeks later after you sat down with that

14   young lady and after you gave her a five-page statement, she

15   called you up and she said, Mr. Mu'min, I'd like you to look at

16   some photographs, isn't that right?

17   A.  Yes.

18   Q.  And she said I'll drive up to see you, Mr. Mu'min, and show

19   you the photograph.

20        MS. BIFFL:  I object to Mr. Beuke reenacting this

21   conversation.  As far as I know he wasn't there.  I'm not sure

22   how he knows what she said.

23        MR. BEUKE:  It is a question, Judge.

24        MS. BIFFL:  It is a question in the form of a --

25        MR. BEUKE:  Certainly with the good --

1    THE COURT:  All right.  It is the same issue as

2  before.  But try your question again.

3  BY MR. BEUKE:

4  Q.  Well, Ms. Biffl asked you, did you get a call about viewing

5  some photographs.  Do you remember her question?

6  A.  Yes, I do.

7  Q.  And you did get a call from that investigator asking you to

8  look at some photographs, isn't that correct?

9  A.  Yes.

10  Q.  And you told the investigator you didn't want to look at

11  any photographs, correct?

12  A.  That's correct.

13  Q.  And Ms. Biffl asked you, well, you have been subpoenaed to

14  testify here, isn't that right?

15  A.  That's correct.

16  Q.  And Ms. Biffl came out to see you in 2008, isn't that

17  correct?

18  A.  That's correct.

19  Q.  You didn't tell her you didn't want to talk to her, did

20  you?

21  A.  No, I did not.

22  Q.  You talked to her, correct?

23  A.  That's correct.

24  Q.  Did she show you any photographs in 2008?

25  A.  Not to my knowledge.

1  Q.  How about when you came here -- or when she came out the

2  second time?

3           MS. BIFFL:  Objection, your Honor.

4  BY MR. BEUKE:

5  Q.  This year.

6           MS. BIFFL:  Relevance and hearsay.

7           MR. BEUKE:  I --

8           THE COURT:  Well, we don't have a question yet, but --

9  BY MR. BEUKE:

10  Q.  Well, Mr. Mu'min, she came out with Mr. -- with Ms. Perry

11  in 2010 -- was it 2010 to Ohio to see you?

12  A.  Yes.

13  Q.  Is that right?

14  A.  Yes.

15  Q.  And you didn't tell her you didn't want to speak to her,

16  did you?

17  A.  No, I did not.

18  Q.  You spoke with her, right?

19  A.  Yes.

20  Q.  Did she show you any pictures on that day?

21  A.  Not to my knowledge.

22  Q.  How about when you came in from Ohio and met with them on

23  Sunday?  You didn't tell them, hey, I don't want to have

24  anything to do with this, did you?

25  A.  No, I did not.

Cullen - direct by Biffl

1  Q.  You were here and agreed to testify, correct?

2  A.  That's correct.

3  Q.  Did they show you any pictures on Sunday?

4  A.  No, they did not.

5  Q.  How about yesterday?

6  A.  No.

7          MR. BEUKE:  Nothing else, Judge.

8          MS. BIFFL:  Nothing further, your Honor.

9          THE COURT:  All right then, Mr. Mu'min, you're

10 finished.  Thank you for your testimony.  You're excused.

11         THE WITNESS:  Thank you, your Honor.

12    (Witness excused.)

13         MS. BIFFL:  The government calls Special Agent Peter

14 Cullen.

15    (Witness sworn.)

16       PETER B. CULLEN, GOVERNMENT'S WITNESS, DULY SWORN

17                     DIRECT EXAMINATION

18 BY MS. BIFFL:

19 Q.  Good afternoon.  Would you state your name, please?

20 A.  My name is Peter, middle initial B., last name Cullen,

21 C-u-l-l-e-n.

22 Q.  How are you employed?

23 A.  I'm a special agent of the FBI.

24 Q.  How long have you been with the FBI?

25 A.  Thirty-two years.

Cullen - direct by Biffl                2351

1    Q.  Now what year did you go through the academy?

2    A.  1978.

3    Q.  Okay.  And from there can you tell us how you progressed

4    through the FBI?  What your assignments were?

5    A.  Sure.  I spent the first 25 years investigating white

6    collar crime, economic crimes.

7              And after I finished doing that, I became a

8    supervisor supervising public corruption in Chicago for five

9    and a half years.

10             And then I became an acting ASAC, special agent in

11   charge, for a year.

12             And now I'm a special assistant to the special agent

13   in charge in Chicago.

14   Q.  Do you have an impending retirement date?

15   A.  Two weeks.

16      (Laughter.)

17   BY MS. BIFFL:

18   Q . We just got you.

19             As a special agent with the FBI, do you carry a

20   firearm?

21   A.  I do.

22   Q.  And when you started with the FBI, what was the standard

23   issue back in 1978?

24   A.  The standard issue was a revolver.

25   Q.  What model?

Cullen - direct by Biffl

1   A.  It was Model 10 dash 8.

2   Q.  And, I'm sorry, what make?

3   A.  A Smith & Wesson.

4   Q.  Were you trained in the academy using a revolver?

5   A.  Yes.

6   Q.  And is part of -- how long was the academy at the time that

7   you went through it?

8   A.  Approximately four months.

9   Q.  And can you describe for us the type of firearm training

10  that you got in the academy?

11  A.  Sure.  We would shoot our revolvers every day, usually in

12  the morning.  And I think by the time we graduated, we shot

13  maybe three or four thousand rounds through that weapon.

14  Q.  Now did you have, in your time with the FBI, have you had

15  any specialized duties that required additional firearm

16  training?

17  A.  I did.

18  Q.  What was that?

19  A.  I joined the Special Weapons and Tactics team here in

20  Chicago in 1980.

21  Q.  All right.  And that's commonly known as SWAT, is that

22  right?

23  A.  The SWAT team.

24  Q.  How long were you on the SWAT team?

25  A.  Thirteen years.

1  Q.  How often were you required to go to the firing range as

2  part of SWAT?

3  A.  Every month.

4  Q.  Now when you started with SWAT, what type of weapon were

5  you using?

6  A.  Primary weapon was your firearm, was your revolver.

7  Q.  Okay.  So still the Smith & Wesson revolver?

8  A.  Yes.

9  Q.  I want to ask you a little bit about safety training with

10  firearms.  What are -- are there some sort of cardinal rules

11  with firearms that you learned in the academy and also in your

12  SWAT training?

13  A.  Yeah.

14  Q.  Concerning safety.

15  A.  Sure.  The safety rules would be, you never take the weapon

16  out of your holster unless you plan to use it.  If you take it

17  out of your holster prior to an arrest, you would always have

18  it in a safe position, usually in a ready down position so the

19  barrel is facing down.  But that would be just prior to an

20  arrest.

21         And, of course, never point the weapon at anybody

22  ever any time whether it is unloaded or unloaded, just never do

23  that.

24  Q.  And if you do do it, your intention would be what?

25  A.  If you pointed the weapon at someone, you would --

1    intention would be to shoot them.

2    Q.  Would you ever point a firearm in jest?

3    A.  Never.

4    Q.  You have talked about the ready position.  Can you show the

5    jurors what you mean by that?

6    A.  Sure.  Would you like me to stand up and show them?

7    Q.  Sure, if that is easier.

8    A.  The firearm in this position.  Prior to making entry,

9    barrel down.  So if you come in a room, then you can actually

10   identify targets.

11   Q.  I'm not sure if the jurors down here could see you.

12          If I could just ask you to step to this corner here

13   and just again with your hands.

14   A.  Sure.  You would line up with -- in the ready position with

15   the barrel down and finger outside of the trigger guard.  And

16   once we make an entry into the room, once you identify the

17   threat, only then would the weapon come up in that position.

18   Q.  Okay.  And for the record you were standing with your hands

19   pointing down at the ground and in the low ready position,

20   correct?

21   A.  Yes.

22   Q.  All right.  Thank you.  You can go ahead and sit back

23   down.

24          Now are there different models of Smith & Wesson

25   revolvers?

 1   A.  Yes.

 2   Q.  Do they all have the same basic operation?

 3   A.  As a revolver, yes.

 4   Q.  All right.  What are the differences between different

 5   model numbers?  Can you give us some examples?

 6   A.  Yeah, my understanding would be -- we generally use one

 7   model that I was trained on, which was the one which was 10-8,

 8   but they all operate the same way.  The differences might be

 9   the length of a barrel.  It might be the grips you are using.

10   What might be caliber of round you're using in that weapon.

11   Q.  All right.  When you say caliber of round, you're referring

12   to the bullet?

13   A.  Yes.

14   Q.  Now you brought with you today a Smith & Wesson firearm, is

15   that correct?

16   A.  I did.

17   Q.  And has that been checked by both you and the marshals and

18   it is safe?

19   A.  Yes, it is.

20   Q.  It is unloaded?

21   A.  Uh-huh.

22   Q.  Would being able to handle that firearm help you in

23   describing the function of a revolver?

24   A.  Yes.

25   Q.  All right.  You can go ahead and take it out of the case,

Cullen - direct by Biffl

1    please.

2            Okay.  And actually before I have you do that, I'm

3    going to show you what has been marked for demonstrative

4    purposes as Government Exhibit 24.

5            Would you look at that exhibit.  What is that a

6    picture of?

7    A.  I call it a cylinder.

8    Q.  Okay.  And that's a part of a revolver, right?

9    A.  It is.

10   Q.  Will that picture help you as we go through explaining the

11   function of a firearm and how the cylinder works?

12   A.  I believe it will.

13   Q.  Okay.  First, before we get to the demonstrative, can you

14   please tell the jury on a revolver where do the bullets go.

15   How do you load the gun?

16           You can hold it up to show.

17   A.  It will be a little easier to show and tell here.  But

18   right now the cylinder is open, you can see.  And this weapon

19   has never been fired.  It came right from Quantico as a relic

20   to the FBI's vault, so it has never been loaded or fired

21   before.

22           But your primary action would be when you open this

23   weapon up is to open the cylinder, and then you would start

24   dropping in the rounds as you use your thumb to kind of rotate

25   it.

Cullen - direct by Biffl

1   Q.  Agent, I'm going to ask to -- if you could stand up while

2   you're showing that.  But that means you also have to keep your

3   voice real loud.  But it is a little hard for us to see with

4   the bar there.

5   A.  Sure.

6   Q.  Okay.  So you have just opened the cylinder.

7   A.  Opened the cylinder.  Then you would take the rounds.

8   Usually there is a speed loader or some in your pocket, and you

9   just start dropping these in one at a time.  And your thumb

10  would kind of rotate the cylinder.  You kept dropping one round

11  after the other until you got all six in the cylinder, and then

12  you would snap it shut.

13          MS. BIFFL:  Okay.  At this time I'll ask Agent Kelly

14  to go ahead and put up on the screen Exhibit 24 if there is no

15  objection.

16          MR. GAMBONEY:  No objection.

17          MS. BIFFL:  With the Court's permission.

18          Thank you.

19  BY MS. BIFFL:

20  Q.  Okay.  Agent Cullen, you have just described -- now does

21  this picture show the -- a cylinder like you have just

22  described?

23  A.  Yes, it does.  A little different than this one I'm looking

24  at right here, but essentially the same.  You have six holes

25  representing the cylinder in a central plunger.

Cullen - direct by Biffl

 1  Q.  All right.  And on this exhibit we have the holes numbered

 2  two, four, six, eight, twelve.

 3          Does that make sense to you in terms of as we talk

 4  about how the cylinder is used and how it works?

 5  A.  Yes.  I think it is standard nomenclature for firearms.

 6  Q.  Now when the cylinder is closed, like you just showed us,

 7  can the person who is holding the gun see any of the bullets?

 8  A.  When it is closed?

 9  Q.  Yes.  If it is loaded and closed.

10  A.  Yes.

11  Q.  And how is it -- well, first of all, which -- in which

12  chambers can the person holding the gun see whether there is a

13  bullet or not?

14  A.  Yeah.  It would be visible in chambers two, chamber four,

15  chamber eight, and chamber ten.

16  Q.  Okay.  And how much of the bullet would be visible to the

17  person holding the gun?

18  A.  You would have a -- like a crescent of the brass.  So kind

19  of like a crescent shape of each corner, not the full round.

20  Q.  Okay.  On the outside edge, is that right?

21  A.  Yes.

22  Q.  Okay.  Now how about the person who is on the barrel end of

23  the gun, can they see any of those chambers when the cylinder

24  is closed?

25  A.  I wouldn't want to be on that side of the gun.  But if I

Cullen - direct by Biffl

1   was, you would be able to see the rounds, the actual lead, the

2   bullet part, from you, yes, you would.

3   Q.  Okay.  And again using the numbers to refer, in which

4   chambers would that person -- would they be visible?

5   A.  They would see chamber two, chamber four, chamber eight,

6   and chamber ten.

7   Q.  Okay.  And I'm going to use this little brush that I have.

8   If you would hold the gun up with the cylinder closed and use

9   this to just show the jury how if those chambers are open from

10  the bottom.

11          Excuse me.  Sorry.

12          Can you put the brush up into those holes even though

13  the cylinder is closed?

14          Okay.  Can you hold the brush down by the tip just so

15  we can see.

16  A.  That would be in the 10:00 o'clock position.

17          This would be in the 8:00 o'clock position.

18          This would be in the 2:00 o'clock position.

19          Sorry.

20          And this is the 4:00 o'clock position.

21  Q.  Okay.  So even though the cylinder is closed, those holes

22  are still open.

23  A.  Yes.

24  Q.  You can go ahead and sit back down.  Thank you.

25          Now, in fact, in your SWAT training, were there

1  exercises that you would do that involved only putting one

2  bullet into the cylinder?

3  A.  Yes.

4  Q.  Okay.  Can you explain -- how many of those exercises were

5  there?

6  A.  There were two.

7  Q.  Can you explain those to us one at a time?

8  A.  Right.  The principal firearms instructor would have us put

9  one round, as I call it, into the chamber.  And then close the

10  chamber.  First spin it, and then close it.  So the agent would

11  not have any idea if that round was in position two, four, six,

12  eight, ten or twelve.  You just wouldn't know.

13         The reason for that drill was to prevent any

14  hesitation or anticipation of a round firing.  It is supposed

15  to make you better at focusing on your site picture.  So that

16  was the first drill we would do.

17  Q.  Now when you would do that drill, was there a way that you

18  could kind of cheat?

19  A.  Yes.

20  Q.  And what was that?

21  A.  Well, clearly from the back side you could see when the

22  round was in the 2:00 o'clock position because you would see

23  some of the crescent brass in that position.  You would know

24  that that round was going to move from the 2:00 o'clock

25  position to the 12:00 o'clock position and fire.

Cullen - direct by Biffl                    2361

1   Q.   Okay.  Now what was the second exercise that you used to do

2   with just putting one bullet into the cylinder?

3   A.   That was just the test, I think, fire discipline, where you

4   would put one round into the cylinder, and on a timed position

5   how fast we could get the cylinder into the -- get the round

6   into the 2:00 o'clock position.  So that as soon as the

7   instructor blew the whistle, we could raise and fire without

8   having a misfire.

9   Q.   Now you have mentioned twice the 2:00 o'clock position.

10  What is the significance of the 2:00 o'clock position in a

11  Smith & Wesson revolver?

12  A.   The ones I carried, the -- since the cylinder rotates from

13  right to left, like counterclockwise, you drop the round in the

14  2:00 o'clock position.  As you started squeezing the trigger,

15  the cylinder turns to the 12:00 o'clock position, and then it

16  is fired and it goes out the barrel.

17  Q.   So the 2:00 o'clock is sort of a key.  That's the firing

18  position.  That's what will be fired next.

19  A.   Yes.

20  Q.   Now you mentioned that the cylinder rotates

21  counterclockwise.  How -- what on the gun makes the cylinder

22  rotate?

23  A.   The squeezing of the trigger or the pulling back of the

24  hammer.

25  Q.   Okay.  Let's talk about those separately.

Cullen - direct by Biffl                    2362

1          First of all, can you hold the gun up and show the

2    jury what you mean by the hammer.  What part of it are you

3    talking about?

4    A.  This is the hammer piece here.  This is the -- what you

5    pull back.

6    Q.  Okay.  How does that make the -- doing what to the hammer

7    makes the cylinder rotate?  What do you have to do?

8    A.  When you pull the hammer back to -- it is -- first

9    position, it will start rotating that cylinder

10   counterclockwise.  You got to pull it back, straight back.

11   Q.  Now is there -- and then what would you do -- if you pulled

12   the hammer back, then what do you do to fire the gun?

13   A.  Then you just pull the trigger.  That's a single action.

14   Q.  Okay.  And is there some -- a way of firing the gun that's

15   called double action?

16   A.  Yes.

17   Q.  Can you tell us what that is?

18   A.  That would be the same idea, except you don't have to pull

19   back the hammer, you just squeeze the trigger through its full

20   stroke, and that would cause the hammer to go back on its own

21   and squeeze and fire.

22   Q.  And that's double action because then the trigger is doing

23   both the rotating and the firing, is that right?

24   A.  Yes.

25   Q.  Is there a way -- well, first, can I ask you to hold the

Cullen - cross by Beuke

1    firearm with the -- so you -- or you can pull the microphone

2    down, and I just want you to pull the hammer back.

3              Okay.  Now is there a way to release the hammer

4    without pulling the trigger?

5    A.  Yes.

6    Q.  Okay.  Can you show us how you do that?

7    A.  If I pulled this back to the single action position, now it

8    is ready to fire.

9              What I would have to do is pull back on the hammer

10   ever so slightly, and just depress the trigger, and that

11   releases the hammer back down to a safe position.  It is called

12   decocking.

13   Q.  All right.  Agent, finally, I'm just going to ask you if

14   you could please three times just pull the hammer back and then

15   decock it, please.

16             As close to the microphone as you can.

17   A.  That's one.

18             Two.

19             Three.

20             MS. BIFFL:  Thank you.  I don't have anything further.

21                         CROSS EXAMINATION

22   BY MR. BEUKE:

23   Q.  Agent, I'm just a little curious, this is -- the photograph

24   on the screen is a photograph of the cylinder that the person

25   that the gun is pointed at would see, correct?

1   A.  Could be.

2   Q.  Well, I mean, the barrel would be coming out from that --

3   what's depicted on that photograph, correct?

4   A.  Yeah.  When I testified about this earlier, the extractor

5   on this one could be seen in that middle section.  Not exactly

6   the same weapon.

7   Q.  But I mean what's shown on the photograph is what somebody

8   would be looking at if you were on the -- the gun was pointed

9   at you, correct?

10  A.  Not correct.

11  Q.  Okay.  Can you explain to me what's depicted on that

12  photograph?

13  A.  Yeah.  You would be missing the barrel and hardware.  So

14  just to visualize, starting at the 12:00 o'clock to 6:00

15  o'clock position, you're now pointing a barrel assembly, so you

16  would no longer see the 12:00 and 6:00 o'clock holes.

17  Q.  Oh.  Yeah, that's what I mean.  I mean, you add the barrel

18  to that --

19  A.  Right.

20  Q.  -- and the person who is getting the gun pointed at them is

21  looking at those wide open cylinders, correct?

22  A.  He would see four of the cylinders, you're correct.

23  Q.  All right.  Did Ms. Biffl ever ask you to retrieve a

24  photograph of what you would see if you were holding the gun

25  and looking at the back end of the gun and pointing it at

Cullen - cross by Beuke                    2365

1    somebody's head?

2    A.  No.

3    Q.  Do you have any photographs like that around?

4    A.  I don't.

5    Q.  Your testimony is you can see a little portion of the

6    bullet, correct?

7    A.  Based on my experience, yes.

8    Q.  And have you ever, like in your -- spun the cylinder,

9    thrown a round in there, spun it, slammed it shut, and pointed

10   it at somebody's head, and pulled the trigger?

11   A.  I'm sorry, say that again.

12   Q.  Have you ever put a round in the chamber or in the

13   cylinder, spun it and slammed it shut, and then pointed it at

14   somebody's head and pulled the trigger?  Have you ever done

15   that in your career?

16   A.  Never.

17   Q.  Okay.  You would never do that, right?

18   A.  Correct.

19   Q.  I mean, if you were leaning over a desk and putting it up

20   to somebody's head, that wouldn't be too smart, would it?

21   A.  No.

22   Q.  What's blow back?

23   A.  No idea.

24   Q.  Well, when the -- if you fired the weapon, that .44

25   revolver you have in your hand, where does the gun powder go?

Cullen - cross by Beuke

1  A.  Well, it is not a .44 revolver, it is a Model 19.

2  Q.  Whatever it is.

3  A.  I'm sorry?

4  Q.  Well, did Ms. Biffl ask you to look at a .44 revolver?

5  A.  No, she asked me to bring a revolver I brought from the gun

6  vault.  it is a Model 19 Smith & Wesson.

7  Q.  Well, did she tell you that the gun of interest in this

8  case was a .44 revolver?

9  A.  I think it was a .44 caliber, correct?

10 Q.  Revolver, correct?

11 A.  Yes.  Yes.

12 Q.  Did you bring out a .44 caliber revolver from the gun

13 vault?

14 A.  We don't have a .44 caliber in the gun vault in the FBI.

15 Q.  Did you attempt to try to find one so the ladies and

16 gentlemen of the jury could see what the back end of a .44

17 caliber revolver looks like?

18 A.  The gun vault carries FBI approved weapons.  We don't have

19 a .44 Magnum --

20 Q.  That's not my question, sir.

21        Did you attempt to retrieve a .44 caliber revolver

22 from anywhere for the purposes of your demonstration here to

23 the ladies and gentlemen?

24 A.  No.

25 Q.  Yes or no.

Cullen - redirect by Biffl                    2367

```
 1   A.  No.
 2   Q.  You don't know or you can't tell the ladies and gentlemen
 3   of the jury what the back end of a .44 caliber revolver looks
 4   like, can you?
 5   A.  It is very similar to this prototype here.
 6   Q.  Well, you don't have one in front of you, do you?
 7   A.  Correct.
 8   Q.  You didn't bring one for the ladies and gentlemen, did you?
 9   A.  Did not.
10   Q.  And you don't have the ability to show them whether or not
11   you could see a portion of that bullet when you're holding it
12   pointing it at somebody's head, do you?
13   A.  I testified the Smith & Wesson is a similar platform.
14   Q.  Well, you didn't -- you didn't bring it here, did you?  You
15   brought that gun.
16   A.  I did.
17   Q.  Oh.
18            MR. BEUKE:  Nothing else, Judge.
19                         REDIRECT EXAMINATION
20   BY MS. BIFFL:
21   Q.  Special agent, that is a Smith & Wesson revolver you have
22   in front of you, correct?
23   A.  Yes, it is.
24   Q.  And you have fired -- have you fired more than one model
25   Smith & Wesson over your career?
```

1   A.  I have.

2   Q.  And have the back, from your position holding the firearm,

3   have the cylinders all had the same view where you could see

4   the crescent shape at the two, four, eight, and ten?

5   A.  Yes.

6         MS. BIFFL:  Nothing further.  Thank you.

7         MR. BEUKE:  Nothing else, Judge.

8         THE COURT:  All right.  Agent, thank you for your

9   testimony.  You're excused.  Happy retirement.

10        THE WITNESS:  Thank you, Judge.

11    (Witness excused.)

12        MR. WEISMAN:  Judge, we have a quick stipulation we'd

13   like to read, please.

14        THE COURT:  All right.

15        MR. WEISMAN:  Judge, we'd ask permission to publish to

16   the jury.

17        THE COURT:  All right.

18        MR. WEISMAN:  It is hereby stipulated and agreed by

19   and between the United States of America by Patrick J.

20   Fitzgerald, United States Attorney for the Northern District of

21   Illinois, and defendant Jon Burge, that the government's

22   evidence would show as follows:

23        If recalled to testify, Sam Perryman, assistant

24   supervisor of police records for the Chicago Police Department,

25   would testify that Government Exhibit 5A is a gun registration

form for defendant Jon Burge which provides additional details

regarding the make, model, and type of gun that defendant Jon

Burge registered with the City of Chicago on November 8th,

1982.

Mr. Perryman would further testify that this record is

a record of the Chicago Police Department and reflects an

activity conducted by the Chicago Police Department that is a

registered -- I'm sorry -- that is the registration of handguns

within the City of Chicago's limits.

So stipulated?

MR. MARTIN: So stipulated.

MR. WEISMAN: Judge, we'd like to publish 5A at this

point.

THE COURT: You may.

MR. WEISMAN: Judge, we have some additional

stipulations, and then we have our final witness.

THE COURT: All right.

MR. WEISMAN: The next stipulation relates to Andrew

Wilson's incident. The stipulation reads as follows:

It is hereby stipulated and agreed by and between the

United States of America by Patrick J. Fitzgerald, United

States Attorney for the Northern District of Illinois, and

defendant Jon Burge, that the government's evidence would show

as follows:

On July 13, 1989, the defendant Jon Burge was asked

1    the following questions and gave the following answers under

2    oath:

3             "Question:  Now on the 14th you had been up without

4    much sleep at all for five and a half or six days at that

5    point, hadn't you?

6             "Answer:  Yes, sir.

7             "Question:  Now at the scene when Andrew Wilson was

8    arrested, he didn't have a shirt on, did he?

9             "Answer:  No, he did not.

10            "Question:  On at least two occasions while you were

11   at the scene, his chest was facing you, isn't that right?

12            "Answer:  That's correct.

13            "Question:  On those occasions you noticed no injury

14   to his chest, did you?

15            "Answer:  I didn't notice any, no."

16            So stipulated?

17            MR. MARTIN:  So stipulated.

18            MR. WEISMAN:  The next stipulation also relates to the

19   Andrew Wilson incident.

20            It is hereby stipulated and agreed by and between the

21   United States of America by Patrick J. Fitzgerald, United

22   States Attorney for the Northern District of Illinois, and

23   defendant Jon Burge that the government's evidence would show

24   as follows:

25            On June 6th, 1985, defendant Jon Burge was asked the

1   following questions and gave the following answers under oath:

2           "Question:  Did you have occasion to be assigned to an

3   incident relative to a shooting of two police officers, Fahey

4   and O'Brien?

5           "Answer:  Yes, I did.

6           "Question:  How did that assignment come to you?

7           "Answer:  I was off duty and was paged on my pager.

8           "Question:  What did you do after being paged?

9           "Answer:  Responded to area headquarters.

10          "Question:  And what, if anything, happened at the

11  area headquarters?

12          "Question:"

13          I'm sorry.

14          "Answer:  At that time I took personal charge of the

15  investigation.

16          "Question:  Okay.  Were there other people who would

17  also be considered to be in charge of the investigation aside

18  from you?

19          "Answer:  There were numerous different operational

20  type officers involved, but the investigation was mine.

21          "Question:  So in terms of the brunt of the

22  investigation that was to follow from that period of time,

23  would it be fair to say that you were the person that was

24  directly in charge of that?

25          "Answer:  Yes.

1          "Question:  Okay.  Did you have other people who were

2     also assigned to this particular project?

3          "Answer:  Numerous people.

4          "Question:  Okay.  Could you tell me to the best of

5     your recollection who they were?

6          "Answer:  Be impossible for me to tell you.  We had

7     over 50 detectives in the areas who were assigned on a

8     continuing basis.  Hundreds of other police officers literally

9     were assigned who weren't under my command.

10          "Question:  And what were you doing in relationship to

11     the investigation?

12          "Answer:  Attempting to coordinate it to the best of

13     my ability."

14          Then there is another series -- another question and

15     answer.

16          "Question:  Were you personally involved in the arrest

17     of Andrew Wilson?

18          "Answer:  Yes, I was."

19          So stipulated?

20          MR. MARTIN:  So stipulated.

21          MR. WEISMAN:  The next stipulation also relates to the

22     Andrew Wilson case.

23          It is hereby stipulated and agreed by and between the

24     United States of America, by Patrick J. Fitzgerald, United

25     States Attorney for the Northern District of Illinois, and

1  defendant Jon Burge that the government's evidence would show

2  as follows:

3      On October 24, 1988, defendant Jon Burge was asked the

4  following questions and gave the following answers under oath.

5      "Question:  Who, if anyone, did you see enter the

6  interview room that Andrew Wilson was being kept in on the --

7  during the day of the 14th of February?

8      "Answer:  I don't specifically recall seeing anybody

9  enter the room.

10     "Question:  So -- so you to your own knowledge do not

11  know whether anyone, whether no one or everyone in that

12  building went into that room, is that right?

13     "Answer:  To my knowledge the only people that entered

14  the room and spoke with Mr. Wilson were Detective O'Hara,

15  Detective McKenna, State's Attorney Hyman, and the court

16  reporter, whatever his name was.

17     "Question:  And that -- and you base that on the fact

18  that those were your orders, is that right?

19     "Answer:  I base that on the fact that I was in close

20  proximity to a room for the majority of the time that

21  Mr. Wilson was in Area 2.

22     "Question:  Now from 6:30 to 8:30 did you hear, in the

23  evening, did you hear any noise coming out of that room at any

24  time?

25     "Answer:  No, sir.

1          "Question:  And if there were somebody screaming or in

2     pain, screaming out in pain, you could have heard from your

3     office, isn't that right?

4          "Answer:  I would assume I could, yes.

5          "Question:  And you heard no such noise at any time?

6          "Answer:  No, sir."

7          So stipulated?

8          MR. MARTIN:  So stipulated.

9          MR. WEISMAN:  Last stipulation, your Honor.

10         It is hereby stipulated and agreed by and between the

11    United States of America by Patrick J. Fitzgerald, United

12    States Attorney for the Northern District of Illinois, and

13    defendant Jon Burge that the government's evidence would show

14    as follows:

15         On September 22nd, 1988, defendant Jon Burge was asked

16    the following questions and gave the following answers under

17    oath:

18         "Question:  How did you supervise interrogations of

19    witnesses and suspects?

20         "Answer:  I never really paid attention to witnesses.

21    I would quite often when people would have seen me doing it,

22    when a suspect was being interrogated, go over and stand

23    immediately outside the door to the interview room where the

24    interrogation was going on and listen to what questions were

25    being raised, what the questions were, and going on inside.

1    "At other points in time, if I had been more than

2   directly involved in the investigation, I might crack the door

3   a couple inches and listen to what's going on.

4       "Question:  Why did you do that?  Why?

5       "Answer:  I was interested in what was going on.

6       "Question:  Were you looking for anything in

7   particular?

8       "Answer:  Yes.  What the content of the conversation

9   was going on in the interview room.

10      "Question:  Were you also sensitive to or the

11  possibility of coercion or harassment or physical violence

12  being used in those interrogations?

13      "Answer:  I never had that occasion arise.  But if I

14  felt that something like that were going on, yes, I most

15  certainly would be interested.

16      "Question:  Well, was that something that you were,

17  shall we say, vigilant for?

18      "Answer:  I don't like the way you're trying to put

19  words in my mouth, counselor.  I just told you that I never

20  knew an occasion as you described it to have taken place.  Had

21  something along those lines come to my attention, either

22  directly involving myself or attempting to overhear

23  conversations, yes, I would have taken immediate action."

24      So stipulated?

25      MR. MARTIN:  So stipulated.

1        MR. WEISMAN:  Thank you, your Honor.

2        THE COURT:  All right.

3        MS. PERRY:  The government calls Michael Conlon.

4     (Witness sworn.)

5        MICHAEL CONLON, GOVERNMENT'S WITNESS, DULY SWORN

6                    DIRECT EXAMINATION

7  BY MS. PERRY:

8  Q.  Good afternoon.  Could you please state and spell your name

9  for the court reporter?

10  A.  Michael Conlon.  Last name is spelled C-o-n-l-o-n.

11  Q.  What's your educational background, sir?

12  A.  I have a bachelor's in English from Loyola University, and

13  a master's in information and Library Science from Dominican

14  University.

15  Q.  And where do you currently work?

16  A.  I am employed by the Chicago Public Library.  I work in the

17  business science technology division at Harold Washington

18  Library Center.

19  Q.  And what in particular do you do at Harold Washington?

20  A.  I am a librarian 2.  My main duties are as science fair

21  librarian.  I work with groups of students who come in to do

22  science fair projects.

23           And in addition to that I do reference, programming,

24  collection, maintenance, and building.

25  Q.  Now in connection with those duties, have you come to learn

Conlon - direct by Perry

1   how the library currently maintains and keeps its periodicals?

2   A.  Yes, I have.

3   Q.  Just generally speaking how does the library first receive

4   and then maintain the periodical collections?

5   A.  When periodicals come in, those volumes come in, they are

6   checked in either on -- by hand or on an automated system.

7   They are date stamped with -- stamped for the library.  And

8   then they are held until they are bound, usually behind a

9   counter where the public can request to see them.  And then

10  after about a year so or they are bound and held -- or they are

11  placed on shelves out in the public areas of the library.

12  Q.  And, sir, as best you know, is that how it has always been

13  done at Harold Washington Library?

14  A.  Yes.

15  Q.  Were you asked to bring something with you to court?

16  A.  Yes, I was.

17  Q.  What did you bring?

18  A.  I brought the May 1973 edition of Good Housekeeping.

19  Q.  And is that bound up with some other versions?

20  A.  Yes, it is.  It is the first half of 1973, the other issues

21  from that year, for Good Housekeeping.

22  Q.  I'm going to hand you what's been marked as Government

23  Exhibit 20A.

24  A.  Thank you.

25  Q.  Do you recognize that, sir?

1   A.  Yes, I do.

2   Q.  And is that what you brought to court with you?

3   A.  Yes, it is.

4   Q.  Where was it that you found that?

5   A.  This was -- actually this was given to me by my

6   supervisor.  But he found it on the shelves where the rest of

7   the editions of Good Housekeeping where the periodicals are

8   held.

9   Q.  And to the best of your knowledge has that been in the

10   custody of the Chicago Public Library since around 1973?

11   A.  Yes.

12   Q.   I'm also going to hand you Government Exhibit 20B.

13       Do you recognize that, sir?

14   A.  Yes, I do.

15   Q.  What is that?

16   A.  That is the cover -- copy of the cover of the June 1973

17   issue.

18   Q.  And is there more than one page in there with 20B?

19   A.  Yes.

20   Q.  What are the other pages?

21   A.  There is a copy of the index page, the publication

22   ownership page, and then there is also a copy of an

23   advertisement.

24   Q.  And do those fairly and accurately represent some of the

25   pages that are in that Good Housekeeping bound version that is

Conlon - direct by Perry

1  20A?

2  A.  Yes.

3       MS. PERRY:  The government now moves 20A and B into

4  evidence.

5       MR. GAMBONEY:  No objection.

6       THE COURT:  All right.  20A and B are received in

7  evidence.

8     (Government's Exhibit Number 20A and 20B received in

9  evidence.)

10      MS. PERRY:  Request permission to publish the first

11  page of 20B.

12      THE COURT:  All right.

13  BY MS. PERRY:

14  Q.  And, sir, looking at that first page, can you tell when

15  this was received by the library?

16  A.  It was received on May 14th, 1973.

17  Q.  And you mentioned an advertisement that was in that Good

18  Housekeeping that was received in May 1973.  I'm going to ask

19  to put that picture up on the screen.

20       Sir, does that particular issue of Good Housekeeping

21  that was received in May 1973 contain an advertisement for

22  plastic bags?

23  A.  Yes, it does.

24  Q.  Of all shapes and sizes?

25  A.  Yes.

Conlon - cross by Gamboney                    2380

1    Q.  All right.  Thank you very much, sir.

2         MS. PERRY:  No further questions.

3                    CROSS EXAMINATION

4    BY MR. GAMBONEY:

5    Q.  Mr. Conlon, good afternoon.

6    A.  Good afternoon, sir.

7    Q.  Is it fair to say that up until the time you were contacted

8    by the FBI or the U.S. Attorney's Office, you had never seen

9    this particular issue of Good Housekeeping, correct?

10   A.  That's correct, yes.

11   Q.  And when you -- who did ask you to look this up?

12   A.  Well, as I said previously, it was given to me by my

13   supervisor.

14   Q.  Okay.  And as a result of any involvement you had in

15   finding this or talking to your supervisor, you certainly don't

16   have any knowledge of when plastic liner bags were introduced

17   into distribution in this area, do you?

18   A.  No, I do not.

19   Q.  And you were never asked by anybody to look and find any

20   documentation of when plastic liner bags were introduced into

21   the market.

22   A.  No, I was not.

23   Q.  And this -- in fact, I believe the issue of Good

24   Housekeeping is from June of 1973.

25   A.  That's correct.

Conlon - cross by Gamboney

1    Q.  Are you aware that -- has anyone asked you to go back

2    farther or asked your supervisor to go back farther, '72, '71,

3    '70?

4    A.  We were not asked to search for the advertisements.  We

5    were asked for a particular copy, that particular issue of Good

6    Housekeeping.  So the library didn't do any searching for the

7    ads.

8    Q.  Okay.  You weren't asked then to find any ads in '72, '71,

9    '70 --

10   A.  We were not.

11   Q.  -- fair to say?

12           And as a consequence you don't know when plastic bags

13   were introduced into the market, correct?

14   A.  No, I do not.

15   Q.  You don't know how many manufacturers of those plastic bags

16   there were, correct?

17   A.  No, I do not.

18   Q.  Don't know if they were generally available in Illinois in

19   1973, correct?

20   A.  I do not.

21           MR. GAMBONEY:  Judge, no further questions.

22           THE COURT:  All right.

23           MS. PERRY:  No further questions, Judge.

24           THE COURT:  All right.  Mr. Conlon, thank you for your

25   testimony.

1          THE WITNESS:  You're welcome.

2      (Witness excused.)

3          MR. WEISMAN:  Judge, could we have a quick second to

4  double check some stuff?

5          THE COURT:  Yes.

6      (Brief interruption.)

7          MS. BIFFL:  Your Honor, at this time the government

8  rests.

9          THE COURT:  All right.  I am going to excuse you for

10  the rest of the day, ladies and gentlemen.  We'll start the

11  defense case tomorrow morning at 9:15.  Thank you for your

12  attention.

13          MR. WEISMAN:  Oh, Judge --

14          THE COURT:  Wait.

15          MR. WEISMAN:  -- could we have a quick sidebar?

16          THE COURT:  Oh, I think I know what you are talking

17  about.

18          One more thing.  Did anyone -- just don't tell me

19  anything except raise your hand if you saw any headlines in the

20  newspaper this morning about this case.

21          All right.  Anyone else?

22          Any other stories in the last few days that you have

23  been exposed to?

24          Okay.  Can we just keep Mr. S.?

25          All right.  The rest of you are excused, and we'll ask

1     you to stay again, Mr. S.

2          (Proceedings had in open court outside of the presence and

3     hearing of the jury:)

4          THE COURT:  I hope you don't feel you're being picked

5     on, sir.

6          A JUROR:  No.

7          THE COURT:  All right.  Would you tell us what you

8     saw?

9          A JUROR:  Yes.  I mean, again, I am just trying to be

10    as honest as I possibly could.  I was reading the sports

11    section, started to turn it over, I saw the first name and part

12    of the second line, and that was it.

13         THE COURT:  All right.  Can you recall what the tenor

14    of the headline --

15         A JUROR:  I believe this gentleman -- defendant's

16    name, and I believe the second word might have been cop, but I

17    wasn't a hundred percent sure.

18         THE COURT:  Cop?

19         A JUROR:  I thought so.  I wasn't sure.

20         THE COURT:  Okay.

21         And I gather from what you say that you didn't read

22    the article.

23         A JUROR:  No, not at all.

24         THE COURT:  All right.  And seeing that headline, will

25    that influence you in any way?

1          A JUROR:  No.

2          THE COURT:  All right.  Does either of counsel have

3  any questions?

4          MR. WEISMAN:  Nothing on behalf of the government,

5  your Honor.

6          MR. BEUKE:  Thank you, sir, nothing.

7          THE COURT:  All right.  You're excused.  We'll see you

8  tomorrow then.  Thanks.

9      (Juror excused.)

10          THE COURT:  All right.  I'd like to do jury

11  instructions some time this afternoon.

12          MR. WEISMAN:  The government would be -- we're

13  available whenever you would like us.  If we had our druthers,

14  maybe we could have get a half hour, 45 minutes.

15          THE COURT:  Sure.

16          MR. MARTIN:  Judge, and of course I'm available

17  whenever the Court wants.  I was going to work on getting

18  witnesses together for tomorrow, but if you want me to come

19  back here, I will.

20          I do have a motion for judgment of acquittal, which is

21  in writing.  We'll file it online this afternoon.  I'll tender

22  a courtesy copy to the Court and a copy to the government.

23          THE COURT:  All right.  Thank you.

24          MR. MARTIN:  It is a motion pursuant to Rule 29(a) of

25  the Federal Rules of Criminal Procedure.

2385

1          THE COURT:  All right.  Well, I don't want to

2    interfere with your preparation, Mr. Martin, if you -- I

3    mean --

4          MR. MARTIN:  Judge, and another reason why I bring it

5    up, is I think some instructions will be affected by the

6    defense case.  So we're going to have to return, for instance,

7    if the defendant testifies, if there is impeachment of defense

8    witnesses, things likes that, theory of defense.

9          THE COURT:  Have you looked at the instructions in any

10   detail?

11         MR. MARTIN:  Yes, I have, your Honor.  And we

12   submitted substantial instructions ourselves.  The -- we're far

13   apart on the perjury elements instruction because there is no

14   pattern.  So there is competing versions of that.  That's a

15   significant issue.

16         THE COURT:  Okay.

17         MR. MARTIN:  I would say as an overall view the

18   Seventh Circuit has convened a committee to rewrite the

19   instructions, and they are in the process of rewriting those

20   instructions now.

21         All of the boilerplate instructions, if you will, have

22   been rewritten by Judge Kennelly and Judge Kennelly's group.  I

23   have submitted those instructions as part of our submission.

24   Most of it is grammatical.  There is a few substantive issues.

25   I asked Judge Kennelly if I could do that.  He said, yes.  I'm

1    on the committee, so I had access to the instructions, so --

2          THE COURT:  Well, if we can improve.

3          MR. MARTIN:  Yeah, those instructions have been

4    submitted, so --

5          THE COURT:  All right.  Well, I guess for me if these

6    are -- if there is something that there is a significant

7    dispute about, such as the elements of perjury, I would like to

8    know about it so we can work on it in advance.

9          MR. WEISMAN:  I do think there are significant

10    differences.  I mean, the pattern stuff, I'm sure we can work

11    through.  We were aware of the proposed ones.  But since they

12    are not approved, we didn't submit them.

13          THE COURT:  Okay.

14          MR. WEISMAN:  We're not on the committee.

15          MR. MARTIN:  Well, there are assistants on the

16    committee, so --

17          MR. WEISMAN:  So, anyway, but with that I'm not -- I

18    don't think we're as worried about it as the more substantive

19    issues.

20          THE COURT:  All right.  And when are we going to have

21    closings in this case, do we know?

22          MR. MARTIN:  Your Honor, the way I see it, I think we

23    have defense evidence Wednesday, Thursday, and Monday morning.

24    I don't know if the government is going to have a rebuttal case

25    and how long that would be.

1         MR. WEISMAN:  Obviously I can't --

2         THE COURT:  So Monday afternoon?

3         MR. WEISMAN:  -- predict that.

4         So if we have a rebuttal case, it would be short.

5         THE COURT:  So Monday afternoon?

6         MR. WEISMAN:  I'm game.

7         MR. MARTIN:  That would be a good time.

8         THE COURT:  Okay.  Well, then I suggest that -- let's

9  just take a little time today.  We don't have to go through it

10  all the way -- all the way, but I'd like to find out where the

11  problems are.  So could you come back at 3:00 o'clock?

12         MR. WEISMAN:  Sure.

13         MR. MARTIN:  Fine.

14         THE COURT:  I'll try to get you in and out in a half

15  an hour.

16         MR. MARTIN:  Okay.

17         THE COURT:  All right.

18    (Brief recess.)

19    (Jury instruction conference off the record.)

20    (Adjournment at 3:00 P.M. to reconvene at 9:15 A.M., June

21  16, 2010.)

22

23

24

25