**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | 08 CR 846 |
| JON BURGE, | |
| Defendant | |

**PETITION TO INTERVENE FOR GRAND JURY TRANSCRIPTS OF GOVERNMENT WITNESS MICHAEL MCDERMOTT**

Ebony Reynolds, by and through his counsel, Dena M. Singer of Bedi & Singer, LLP, respectfully intervenes and requests this Honorable Court to order the United States Attorney's Office to release Detective Michael McDermott's federal grand jury transcripts pursuant to Federal Rule of Civil Procedure 24. In support of this motion, Mr. Reynolds states the following:

**I.   BACKGROUND AND PROCEDURAL HISTORY OF MR. REYNOLDS'S CASE**

On August 18, 2021, Mr. Reynolds's case was recommended for judicial review by the Illinois Torture Inquiry and Relief Commission ("TIRC"). *See* Exhibit A, Reynolds TIRC Disposition. The TIRC Act requires the Commission first examine claims of tortured confessions and determine whether sufficient evidence exists to merit judicial review. *See* 775 ILCS 40 (West 2010). The Commission reviewed Mr. Reynolds's claim and concluded: "There is substantial evidence here that Mr. Reynolds was tortured while in police custody, and that his torture led directly to his signing of a false confession." *See id*. at 20. Mr. Reynolds's case is now assigned to a trial judge for a hearing. *See* 775 ILCS 40/50 (West 2010). An evidentiary hearing under the TIRC Act has been likened to a third-stage evidentiary hearing under the Post-Conviction

1

Hearing Act. *See People v. Christian*, 2016 IL App (1st) 140030, ¶ 78. The trial judge is permitted to receive proof by affidavits, depositions, oral testimony, or other evidence. *See* 775 ILCS 40/50 (West 2010). If the trial judge finds for Mr. Reynolds, it must grant appropriate relief. *Id*. Relief is required regardless of any other post-conviction proceedings. *Id*.

Mr. Reynolds plans to move to suppress his confession, vacate his conviction, or dismiss the charges under the TIRC Act. *See* 775 ILCS 40/50(a) (providing the trial court with discretion to grant appropriate relief); *People v. Wilson*, 2019 IL App (1st) 181486, ¶ 48 (stating "the court has a variety of remedies at its disposal."). To succeed on this motion, Mr. Reynolds must show by a preponderance of the evidence his coerced confession would likely have been suppressed if the detectives who abused him were impeached with evidence of their patterns of abusive tactics used on other suspects. *See id. at* ¶ 49; *see also People v. Patterson*, 192 Ill. 2d 93, 145 (2000); *People v. Galvan*, 2019 IL App (1st) 170150, ¶ 68; *People v. Whirl*, 2015 IL App (1st) 111483, ¶ 80. Further, Mr. Reynolds must show by a preponderance of the evidence his confession was involuntary. *See Wilson*, 2019 IL App (1st) 181486, ¶ 52. The State has the opportunity to rebut such evidence. *Id*. For these reasons, Mr. Reynolds requests the grand jury transcripts of McDermott because he is one of the detectives who tortured Mr. Reynolds.

In May 1996, Mr. Reynolds was arrested in connection with the murder of Dora Cobb. *See* Exhibit A at 5. During the police's interrogation at Area 2, Mr. Reynolds suffered numerous forms of torture at the hands of Detective McDermott, Detective James Boylan, and two other detectives. *See id*. at 9-11. Mr. Reynolds was locked inside an interrogation room for over thirty hours with no food, no water, no phone call, and no attorney. *Id*. at 10-11. Mr. Reynolds repeatedly told the detectives he did not want to speak with them and requested to call his mother so she could hire an attorney. *Id*. at 10. These requests, and others, were ignored. *Id*. After

twenty-four hours and several interrogation attempts, McDermott and Boylan had still not gotten what they wanted from Mr. Reynolds—a confession. McDermott thus resorted to punching Mr. Reynold's in the ribs, slapping him in the face, and striking him in the mouth with a flashlight, chipping his tooth. *Id*. The detectives also threatened to "knock out" Mr. Reynolds's unborn daughter from his then-pregnant girlfriend, who was also in police custody. *Id*. at 1. After hours of physical and psychological torture, the police promised Mr. Reynolds that if he gave a statement about Ms. Cobb's murder, Mr. Reynolds and his girlfriend would be placed in protective custody and granted immunity. *Id*. at 10-11. The torture employed by the detectives directly resulted in Mr. Reynolds signing a confession.

In February 1997, Mr. Reynolds moved to suppress his confession, arguing it was obtained through coercion. *See id*. at 6. At the suppression hearing, Mr. Reynolds testified to the abuse he suffered, while the detectives denied any wrongdoing. *Id*. The judge denied Mr. Reynolds's motion to suppress because he found the detectives' testimonies more reliable. *Id*. In 1999, Mr. Reynolds' trial began. *Id*. at 11-13. His coerced confession led to his conviction for first-degree murder. *Id*. at 1-2. He was sentenced to natural life in confinement. *Id*. at 2.

In 2006, a second investigative report regarding Burge-era torture was released. *See* Exhibit B, 2006 SSA Report.[1] The report substantiated claims of abuse at Area 2 by specific officers, including McDermott. The report detailed that McDermott and another detective denied murder suspect Alfonso Pinex's his right to a lawyer and instead beat Pinex in the face and ribs to extract a confession. *Id*. at 278-279. The report found there was sufficient evidence to prove beyond a reasonable doubt that McDermott committed aggravated battery, perjury, and obstruction of justice in Pinex's case. *Id*. at 290. However, the Special State's Attorneys ("SSA")

---

[1] The Conclusion and Investigation of Pinex have been included in the Exhibit. The rest of the Report has been excluded for length considerations.

appointed to investigate the torture claims declined to seek an indictment against McDermott or any other officer because of they believed the statute of limitations had run. *Id*. at 16.

In 2010, McDermott testified with immunity in Burge's criminal case. *See* Exhibit C, McDermott Trial Testimony.[2] McDermott attempted to walk a thin line between an outright repudiation of his grand jury testimony and a perjury charge. At the trial, McDermott claimed Burge briefly pointed his gun in Shadeed Mu'min's direction, not directly at Mu'min, *id.* at 13, 17-19; it was a 20-second "scuffle" between Burge and Mu'min, not a one-sided attack, *id*. at 12, 135-36; Burge put a piece of plastic in front of Mu'min's face, not a plastic bag over his head, *id*. at 23-24; Mu'min did not appear to be intimidated or have his breathing cut off from the plastic bag, *id*. at 29, 30-31; and McDermott was only "guessing" when he said he was sure Burge was seeking to coerce a confession, *id.* at 19-20. The Government aggressively and repeatedly impeached McDermott with his grand jury testimony. However, on direct McDermott admitted to not telling the Office of Professional Standards ("OPS") about the abuse of Mu'min and lying to them about "a couple things." *Id*. at 39-40. On cross, McDermott gave confusing and evasive answers regarding Pinex's case but ultimately denied abusing him. *Id*. at 106-10. Defense counsel impeached McDermott with his grand jury testimony.

In February 2012, Mr. Reynolds submitted his claim to the Torture Commission. *See* Exhibit A. After a lengthy investigation, the Commission found there is substantial evidence Mr. Reynolds was tortured while in police custody, which resulted in his coerced confession. *Id*. at 21. The Commission determined both McDermott and Boylan have lengthy, consistent, and substantiated histories of abuse which were almost identical to the abuse they inflicted on Mr. Reynolds. *Id*. The Commission believed the evidence showed Mr. Reynolds was yet another

---

[2] The Exhibit includes the pages cited in this motion. The rest of the transcript was excluded for length considerations.

4

victim of the detectives' cruelty and abuse. *Id*. Therefore, the Commission recommended Mr. Reynolds's case for judicial review.

Mr. Reynolds is now requesting all of McDermott's grand jury transcripts for his hearing under the TIRC Act. This Court has already released portions of McDermott's grand jury testimony regarding Pinex to similarly situated petitioners. *See* Dkt 438 (authorizing disclosure of McDermott's grand jury transcripts in 2014 to petitioner Keith Mitchell for state post-conviction proceedings); Dkt 445 (authorizing the disclosure of transcripts to petitioner Ralph Harris in 2015 for state post-conviction proceedings). Mr. Reynolds, however, is requesting all of McDermott's grand jury testimony. Without all of McDermott's testimony, Mr. Reynolds will be prevented from adequately establishing McDermott's pattern and practice of abuse, from attacking McDermott's credibility, and from accurately presenting McDermott's active and passive role in the systemic abuse that occurred at Area 2 for decades. This result would lead to a significant injustice in Mr. Reynolds's case.

## II.     ALL OF MCDERMOTT'S GRAND JURY TESTIMONY SHOULD BE DISCLOSED TO MR. REYNOLDS

Federal Rule of Criminal Procedure 6(e) provides for grand jury secrecy. Fed. R. Crim. P. 6(e). However, Rule 6(e) allows federal courts to authorize disclosure of grand jury matters in connection with judicial proceedings. *See Matter of Grand Jury Proceedings*, Special Sept., 1986, 942 F.2d 1195, 1198 (7th Cir. 1991). The party seeking disclosure must meet a three-part test and show: (1) the material he seeks is necessary to avoid a possible injustice in another judicial proceeding; (2) the need for disclosure is greater than the need for continued secrecy; and (3) his request is structured to cover only needed materials. *See Douglas Oil Co. of Ca. v. Petrol Stops NW*, 441 U.S. 211, 221 (1979). Here, Mr. Reynolds can meet all three parts of the test.

### 1. McDermott's grand jury transcripts are needed to avoid a possible injustice

Mr. Reynolds needs McDermott's grand jury testimony to avoid an injustice during his state post-conviction proceedings. Disclosure of grand jury matters is proper to assure the reliability of a witness's testimony, to refresh a witness's recollection, or to discover a hostile witness's testimony. *See Lucas v. Turner*, 725 F.2d 1095, 1104-06 (7th Cir. 1984); *Williams v. O'Meara*, No. 82 C 278, 1987 WL 10305, at *2 (N.D. Ill. April 30, 1987). At Mr. Reynolds's evidentiary hearing, McDermott is likely to invoke his Fifth Amendment right, claim he does not remember certain allegations, or deny any misconduct. Disclosure is thus necessary to present McDermott's grand jury testimony to the court when he becomes a hostile witness and refuses to testify; to refresh his recollection when he claims not to remember the abuse of certain suspects; or to impeach McDermott with his grand jury testimony when he denies any misconduct.

Disclosure of McDermott's grand jury testimony is also necessary to avoid an injustice because it is the first—and only—time that McDermott has admitted to (1) abusing Pinex and testifying untruthfully during his suppression hearing; (2) failing to report Burge's abuse of Shadeed Mu'min; and (3) lying to OPS, the police oversight body, about witnessing the abuse of Mu'min. These instances of torture and dishonesty support Mr. Reynolds's claim by establishing a pattern of abuse and by undermining McDermott's and other officers' credibility. Without the grand jury transcripts, however, Mr. Reynolds would be unable to present such evidence to the court if McDermott remains silent, refuses to testify, or claims he does not remember.

First, Detective McDermott's grand jury testimony regarding the abuse and perjury he committed against Pinex in 1985 is necessary to demonstrate McDermott's pattern of abuse and

lack of credibility. Illinois law states that prior allegations of police brutality are relevant to show a pattern and practice of abuse when the allegations involve the same officers, similar methods of abuse, or the prior allegations occurred close in time to when the petitioner's allegations occurred. *See People v. Martinez*, 2021 IL App (1st) 190490, ¶¶ 61-62 (citing *People v. Reyes*, 860 N.E.2d 488 (Ill. App. 3d 2006)). Allegations of abuse which span several years are also relevant to demonstrate a pattern and practice of torture. *Id*. (citing *People v. Wilson*, 2019 IL App (1st) 181486, ¶ 63)). In 2006, the SSA found there was sufficient evidence to prove beyond a reasonable doubt McDermott committed aggravated battery, perjury, and obstruction of justice for the abuse of Pinex; however, no criminal charges were filed because the statute of limitations had run. *See* Exhibit B at 16.

McDermott's grand jury testimony is necessary because it is the only time McDermott has admitted to pushing Pinex and being untruthful at his suppression hearing. *See* Exhibit C at 106-12. McDermott's misconduct is relevant in this case because McDermott similarly abused Mr. Reynolds ten years later, at the same location, with the same methods of abuse, and subsequently lied at the suppression hearing, presumably because McDermott believed that Mr. Reynolds was a "murderer, and [McDermott] didn't want him to get off." *Id*. at 112 (McDermott explaining at the grand jury that he lied at Pinex's suppression hearing "[b]ecause he was a murderer, and [McDermott] didn't want him to get off."). In fact, Mr. Reynolds is serving a life sentence because his coerced confession lead to a murder conviction. If McDermott refuses to testify or denies his misconduct of Pinex at Mr. Reynolds's hearing, serious injustice would result because Mr. Reynolds could not impeach McDermott without his grand jury testimony.

Second, McDermott's grand jury testimony that he witnessed Burge torture Mu'min and failed to report it is necessary to demonstrate McDermott's lack of credbility and a pattern and

practice of abuse at Area 2. Illinois law provides where an officer stood by while another officer committed acts of abuse is relevant to the credibility of both the witness officer and the abusive officer. *See People v Whirl*, 39 N.E.3d 114, 135 (Ill. App. 2015); *see also People v. Harris*, 2021 IL App (1st) 182172, ¶ 56 ("The fact that other officers may have stood by doing nothing, while McDermott committed acts of abuse, is relevant to the issue of McDermott's and the other detectives' credibility."). The fact McDermott stood by doing nothing while Burge tortured Mu'min in 1985 and never reported it until he testified before the grand jury in 2008 is clearly relevant. A significant injustice would result if Mr. Reynolds was not able to attack McDermott's credibility and demonstrate McDermott's role in the systemic abuse that occurred at Area 2.

Third, McDermott's testimony that he lied to OPS in 1993 about Burge's torture of Mu'min is necessary to demonstrate McDermott's lack of credibility and his willingness to lie for others. If "silent acceptance" of torture is relevant to an officer's credibility determination, then actively covering up torture is equally, if not more, relevant to the same credibility determination. *See Whirl*, 39 N.E.3d at 135. In addition, it shows an officer's willingness to lie and influence the outcome of other torture investigations. This fact is particularly relevant in Mr. Reynolds's case where other detectives, like Detective Boylan, are involved in the torture and their patterns of abuse also must be established.

Boylan's torturous acts are less well-known than McDermott's. However, Boylan was McDermott's partner in Area 2, and they two often worked together to abuse suspects and violate their rights in the 1990s. *See People v. Smith*, 596 N.E.2d 789, 792 (Ill. App. 1992) (stating the detectives made an illegal arrest and the trial judge rejected McDermott's testimony as incredible where McDermott testified that he, Detective Boylan, and two other officers went to the house of a suspect merely to verify his address); *see also* Exhibit C at 8 (McDermott testifying that he

8

"had one partner, Jim Boylan."). It is relevant and necessary for the state court to consider whether McDermott's willingness to lie influenced the outcome of torture investigations involving his partner Boylan. For example, Boylan had twenty-four police complaints filed against him from 1990 to 2003; McDermott was involved in eight of those complaints, all occurring in the early 1990s. *See* Exhibit D, TIRC Summary of Boylan Complaints. Many of the complaints involved acts of abuse committed by Boylan and McDermott against suspects who were in custody or at their homes. *Id*. However, only one of the twenty-four complaints was substantiated against Boylan; that single substantiated complaint involved a road rage incident where Boylan shot three times at another police officer's son out of anger. *Id*. Consequently, without McDermott's grand jury transcripts, Mr. Reynolds will be prevented from attacking McDermott's credibility or arguing that McDermott's willingness to lie influenced the outcome of torture claims against Boylan.

Finally, an injustice would result if Mr. Reynolds was not provided with McDermott's grand jury transcripts because this Court has already authorized disclosure of the transcripts to petitioner Ralph Harris, who has a remarkably similar case to Mr. Reynolds. In 1995, Harris was charged in three separate cases with various crimes, including capital murder, attempted murder, aggravated criminal sexual assault, and armed robbery. *People v. Harris*, 2021 IL App (1st) 182172, ¶ 5. Harris was convicted and sentenced to death in two cases and given a 120 year-prison sentence in the third case. *Id*. at ¶ 27. Harris consistently and repeatedly maintained for years "he was physically abused by McDermott and Boylan at Area 2 on August 29-30, 1995." *Id*. at ¶ 28. Specifically, Harris claimed that Boylan and McDermott hit him with their fists in the stomach, head, and neck, hit him with a phone book, placed a gun in his mouth, and another detective threatened to charge Harris's girlfriend and remove her children. *Id*. at ¶ 6.

In 2015, this Court authorized disclosure of McDermott's grand jury transcripts for Harris's post-conviction hearing. *See* Dkt 445. Harris's state evidentiary hearing began in June 2018. *Harris*, 2021 IL App (1st) 182172, ¶ 28. Harris submitted a number of exhibits, including some of McDermott's grand jury admissions and the 2006 SSA report. *Id*. at ¶ 36. In September 2018, the circuit court found Harris established a pattern of abuse by McDermott which would have called his testimony into doubt; however, it ultimately concluded "McDermott's credibility unimpeached" because his testimony was corroborated by the other detectives. *Id*. at ¶ 41-42, 51. In 2021, the appellate court reversed and ordered a new suppression hearing. *Id*. at ¶ 64. The appellate court found the circuit court's ruling was manifestly erroneous and relied heavily on Harris's exhibits to come to this conclusion. *Id*. at ¶ 52-61.

Mr. Reynolds needs McDermott's grand jury transcripts for the same reason as Harris. Like Harris, Mr. Reynolds was abused by the same detectives, in the same manner, in the same location, for approximately the same length of time, only nine months later in 1996. If Mr. Reynolds is denied access to the transcripts, there is no doubt that Mr. Reynolds's hearing will result in yet another injustice.

### 2. Disclosure is greater than the need for continued secrecy

The need for secrecy here does not outweigh Mr. Reynolds's need for the grand jury transcripts. The need for grand jury secrecy is diminished once the grand jury has fulfilled its duties or the criminal case has concluded. *See United States v. Calabrese*, No. 06 CR 239, 2010 WL 3613973, at *5 (N.D.Ill. Sept. 8, 2010); *In re Petition of Moore*, No. 80 C 450, 1985 WL 2357, at *3 (N.D. Ill. Aug. 20, 1985). The Burge trial has concluded; Burge was sentenced in January 2011. *See* Dkt 362. The Seventh Circuit affirmed his conviction in 2013, and the Supreme Court denied his petition for a writ of certiorari the same year. *See United States v.*

10

*Burge*, 711 F.3d 803 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 315 (2013). There is also a diminished need for secrecy because McDermott's grand jury testimony was used to impeach him at Burge's trial. *See In re Continental Illinois Sec. Litig.*, 732 F.2d 1302, 1308-16 (7th Cir. 1984) (explaining that information used at trial becomes part of the public record); *see also Mitchell v. City of Chicago*, No. 18 C 7357, 2019 WL 3287844, at *4-5 (N.D. Ill. July 22, 2019). Finally, this Court has already authorized disclosure of McDermott's grand jury transcripts to several other third parties, some upon the United State's Attorney's request. *See* Dkts 376, 382-383, 409, 413-414, 437-438, 445, 457). Because Mr. Reynolds has demonstrated a substantial need for McDermott's grand jury material, this Court should find the need for disclosure outweighs any secrecy interests that still remain.

### 3. Mr. Reynolds's request covers needed materials

Finally, Mr. Reynolds is requesting *all* of McDermott's grand jury testimony because it is necessary to avoid an injustice. The Court has previously limited disclosure to only a portion of McDermott's grand jury testimony which relates to the abuse of Pinex. However, counsel detailed above why certain admissions, other than those related to Pinex, are necessary for Mr. Reynolds's case. *See* II(1). Moreover, all of McDermott's grand jury testimony is necessary because McDermott continues to provide dishonest and evasive answers about different parts of his grand jury testimony.

For example, on December 11, 2013, Keith Mitchell petitioned this Court to intervene in Burge's criminal case to seek transcripts of McDermott's grand jury testimony. *See* Dkt 434. Mitchell argued the grand jury transcripts were necessary for his state post-conviction proceedings in the event McDermott testified. *Id*. The Court granted Mitchell's petition in part, stating: "Mitchell has shown here that [McDermott's grand jury testimony] is a highly relevant

11

consideration, especially in light of the fact that McDermott has previously perjured himself and even gave testimony at the Burge trial that was inconsistent with his grand jury testimony." *See* Dkt 438, at 5. However, the United States' Attorney was ordered to provide Mitchell with only thirteen pages of McDermott's grand jury testimony from September 25, 2008 as it related to Pinex. *Id*. at 1.

After successful post-conviction proceedings, Mitchell filed a 42 U.S.C. § 1983 suit against Burge and others in 2018. *See Mitchell v. City of Chicago*, No. 18 C 7357, 2019 WL 3287844, at *4 (N.D. Ill. July 22, 2019). Mitchell again sought all of McDermott's grand jury testimony. *Id*. at 1. This time, Judge Feinerman granted Mitchell's request in its entirety. *Id*. The court first reasoned that the "Government itself repeatedly used McDermott's grand jury testimony to impeach his June 2010 testimony at Burge's criminal trial." *Id*. at 4-5 (citing several examples of impeachment). Thus, there was an obvious need to impeach McDermott with his grand jury testimony during Mitchell's case as well. In fact, the court explained the need was not speculative because during Mitchell's post-conviction hearing in 2015, "McDermott continued to dispute an admission he made before the Burge grand jury despite having been impeached on that same point during Burge's criminal trial." *Id*. at 5 (referring to McDermott's inconsistent testimony about his truthfulness at Pinex's suppression hearing). Finally, the court reasoned "[i]n addition to releasing a portion of McDermott's September 25, 2008 grand jury transcript" to some third parties, the Court has also authorized disclosure of "all transcripts" of grand jury witnesses to other third parties. *Id*. at 3.

This Court should similarly authorize disclosure of all of McDermott's grand jury testimony because McDermott's dishonest and evasive answers are not limited to Pinex or the past. For example, in 2021 McDermott was a named defendant in a civil lawsuit. *See* Exhibit E,

12

McDermott Deposition.[3] During a deposition, McDermott stated there was an "allegation" that he made a false statement to OPS. *Id*. at 20-21. When asked by defense counsel about the nature of this "allegation," McDermott said: "I don't remember it but according to the paperwork, I went by an open room, I saw [Jon Burge] do something inappropriate to a person in this room." *Id*. at 21. Defense counsel asked McDermott what he saw Burge do to the person, and McDermott said he was going to "stand by" his grand jury testimony. *Id*. at 21-22. Defense counsel asked McDermott what he meant by that because he was providing inconsistent answers about what he witnessed Burge do to Mu'min. McDermott responded that he "put this stuff out of [his] mind," and he did "not know the actual truth or facts now because it's been so long." *Id*. at 22.

Mr. Reynolds has every reason to believe McDermott will provide the same dishonest, evasive testimony at his upcoming hearing. Yet, Mr. Reynolds cannot know what grand jury testimony McDermott will "stand by" or impeach McDermott's inconsistent answers without all of McDermott's grand jury testimony.

### III. CONCLUSION

Wherefore, Mr. Reynolds respectfully requests this Honorable Court to authorize the disclosure of McDermott's grand jury transcripts pursuant to Rule 24.

Respectfully submitted,
/s/ Dena M. Singer
Dena M. Singer
Bedi & Singer, LLP
53 West Jackson #1505
Chicago, IL 60604
(312) 525 2017
dsinger@bedisinger.com
Attorney for the Defendant

---

[3] The Exhibit includes the pages cited in this motion. The rest of the deposition was excluded for length considerations.

13

**Certificate of Service**

I, Dena M. Singer, hereby certify, I caused a copy of the foregoing Motion to be served on upon the Assistant United States Attorney by causing it to be electronically filed with the Clerk of the Court using the CM/ECF system.

/s/ Dena M. Singer
Dena M. Singer