# EXHIBIT C

1

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3    UNITED STATES OF AMERICA,           )
                                          )
 4              Plaintiff,                )
                                          )
 5              vs.                       )   No. 08 CR 846
                                          )
 6    JON BURGE,                          )   Chicago, Illinois
                                          )   June 14, 2010
 7              Defendant.                )

 8                            EXCERPT OF
         TRANSCRIPT OF PROCEEDINGS - Michael McDermott testimony
 9        BEFORE THE HONORABLE JOAN HUMPHREY LEFKOW, and a jury

10    APPEARANCES:

11    For the Government:     HON. PATRICK J. FITZGERALD
                              219 South Dearborn Street
12                            Chicago, Illinois  60604
                              BY:  MR. M. DAVID WEISMAN
13                                 MS. APRIL PERRY

14                            DEPARTMENT OF JUSTICE
                               CIVIL RIGHTS DIVISION
15                             CRIMINAL SECTION
                              601 D Street NW
16                            Room 5339
                              Washington, DC  22314
17                            BY:  MS. ELIZABETH L. BIFFL

18
      NOTE:  THIS IS A PARTIAL TRANSCRIPT.  IN THE EVENT OF AN
19    APPEAL, PLEASE CHECK TO SEE IF A FULL TRANSCRIPT IS ON FILE.
      IF ONE IS, USE THE PAGINATION OF THAT TRANSCRIPT.
20

21                   PAMELA S. WARREN, CSR, RPR
                        Official Court Reporter
22             219 South Dearborn Street, Room 1928
                      Chicago, Illinois   60604
23                        (312) 294-8907

24

25
```

** TRANSCRIPT EXCERPT **

2

1    APPEARANCES:    (Continued)

2    For the Defendant:       MR. RICHARD MICHAEL BEUKE
                              53 West Jackson Boulevard
3                             Suite 1410
                              Chicago, Illinois    60604
4
                              MR. WILLIAM GEORGE GAMBONEY, JR.
5                             216 South Marion Street
                              Oak Park, Illinois    60302
6
                              MR. MARC WILLIAM MARTIN
7                             53 West Jackson Boulevard
                              Suite 1410
8                             Chicago, Illinois    60604

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

** TRANSCRIPT EXCERPT **

McDermott — direct by Perry                3

1    (Proceedings had in open court outside of the presence and
2  hearing of the jury:)
3                        ** ** ** ** ** **
4    (Witness sworn.)
5    MICHAEL McDERMOTT, GOVERNMENT'S WITNESS, DULY SWORN
6                        DIRECT EXAMINATION
7  BY MS. PERRY:
8  Q.  Good morning.  Could you please state and spell your name
9  for the court reporter.
10  A.  Michael McDermott, M-c-D-e-r-m-o-t-t.
11  Q.  And you are here today, sir, pursuant to subpoena, is that
12  right?
13  A.  Yes, ma'am.
14  Q.  And you are being compelled to testify today pursuant to a
15  court order, is that right?
16  A.  Yes, ma'am.
17  Q.  Specifically Judge Lefkow has ordered that you come today
18  and testify, is that correct?
19          MR. BEUKE:  Objection, Judge, relevance.
20          THE COURT:  Overruled.
21  BY THE WITNESS:
22  A.  That's correct.
23  BY MS. PERRY:
24  Q.  You understand, sir, that you have been given immunity by
25  an assistant Attorney General for the Department of Justice.

** TRANSCRIPT EXCERPT **

1   Is that right?

2   A.   That's right.  I don't know what -- for what, but, yes.

3   Q.   And what is your understanding of what you are required to

4   do under that immunity agreement?

5   A.   Well, if I am under oath, I'll tell the truth.

6   Q.   You have never spoken with the government except when

7   ordered by a Court to do so, is that right?

8   A.   That's correct.

9   Q.   So you and I have never had a conversation before today, is

10  this right?

11  A.   Yes, ma'am.

12  Q.   And is it fair to say that you are not entirely pleased to

13  be here today?

14          MR. BEUKE:   Objection, Judge, relevance.

15          THE COURT:   Sustained.

16  BY MS. PERRY:

17  Q.   Did you previously work for the Chicago Police Department,

18  sir?

19  A.   Yes.

20  Q.   When did you work for the Chicago Police Department?

21  A.   From 1977 to 2006.

22  Q.   Would you please take us through what your assignments were

23  during that time?

24  A.   1977 I was a patrolman.  A year later I became a tactical

25  officer.  And I took the test for detective.

McDermott - direct by Perry                    5

1          And in 1981 I became a detective in Area 2.  I

2    remained there until 1999, where I worked as a detective in the

3    cold case homicide unit.

4          I went to Area 4 briefly as a homicide detective.

5    And I was promoted to sergeant.  And I became the sergeant in

6    the homicide section of the West Side.

7    Q.   Now you said that you became a detective in Area 2.  Were

8    you assigned to a particular group within Area 2?

9    A.   They had two groups.  One was violent crimes, one was

10   property crimes.  I was assigned to violent crimes.

11   Q.   And between what years were you assigned to violent crimes

12   at Area 2?

13   A.   It was always violent crimes in Area 2.  So I would say

14   from 1981 till I left there about '99, I think.

15   Q.   Sir, did you retire from the Chicago Police Department?

16   A.   Yes, ma'am.

17   Q.   What rank did you retire with?

18   A.   Sergeant.

19   Q.   Do you know Jon Burge?

20   A.   Yes.

21   Q.   When did you first meet Jon Burge?

22   A.   He was one of my four lieutenants that was in Area 2 when I

23   was in Area 2 or some time in the early '80s.

24   Q.   Now you say one of your four lieutenants.  Is it accurate

25   to say there is only one lieutenant at a time?

** TRANSCRIPT EXCERPT **

McDermott - direct by Perry                6

1   A.   There is one lieutenant in violent crimes, there is one

2   lieutenant in property crimes.

3   Q.   So over the time that you were an Area 2 detective, you had

4   four separate lieutenants over violent crimes?

5   A.   That's correct.

6   Q.   Do you know what years Jon Burge was the lieutenant of

7   violent crimes?

8   A.   Not the exact years.  I know it was early '80s.  He wasn't

9   there when I first got there.  In '85, '86 maybe, like three or

10  four years.

11  Q.   So he was there in approximately the mid 1980s?

12  A.   Early '80s, right.  I'm not exactly sure.

13  Q.   During the time that he was a lieutenant over violent

14  crimes, would he have been your commanding officer?

15  A.   Yes.

16  Q.   Now how would you describe Jon Burge as a commanding

17  officer?

18  A.   Out of the four, he was probably one of the better ones.

19  He was more concerned with clearing crimes than I think the

20  other lieutenants.  He was on top of things.  I think he

21  aggravated some of the lazier detectives and held them

22  responsible.

23          I thought he was concerned a lot about the victims of

24  these crimes, their families.  And overall I think he was a

25  good lieutenant.

** TRANSCRIPT EXCERPT **

1    Q.   Now you say he was on top of things.  By that do you mean

2    that he was engaged in the cases that were being investigated?

3    A.   Not necessarily.  The cases would come in.  And per year

4    there was actually thousands of violent crimes in Area 2.

5    There was upwards to 200 murders a year at that time in Area 2

6    alone.  And he would, from what I understand, review most of

7    the cases as they came in; whereas the other lieutenants never

8    did that, they were just passed out to the individual

9    detectives to work on.

10          So if a report came in, he was aware if something

11   wasn't done that should have been done.

12   Q.   And would he then speak with the detectives about that as

13   well as the progress?

14   A.   Yeah, he would -- he would call them on it, how come this

15   wasn't done, and stuff like that.

16   Q.   Did he play any kind of active role in any of the

17   investigations that you had?

18   A.   No.

19          Well, take it back.  We would go out periodically to

20   search for individuals who were wanted.  One time there was a

21   robbery crew that was working the Walgreen's.  And like there

22   would be a group of us that would go out and try to find them,

23   and you would apprehend them and try to make the arrest.

24   Q.   Was he generally at Area 2?

25   A.   He was on a different shift than me, but -- so I don't know

1    if he was there or not

2    Q.  What shift was he on?

3    A.  I think he was on days and I was mostly nights.

4    Q.  Would you see him at Area 2 during times that it wasn't his

5    assigned shift?

6    A.  I know one time, this Andrew Wilson case where several

7    police officers were murdered, and he didn't go home.  He slept

8    on his desk for like five days or something.  He never left the

9    office, so --

10   Q.  So he was at Area 2 to the best of your knowledge for the

11   entire five days of that Andrew Wilson investigation?

12   A.  That's my understanding, yes.

13   Q.  What other detectives worked with you during the time that

14   Lieutenant Burge was your commanding officer?

15   A.  Oh, I don't know.  Patricia Hickey, Tony Maslanka.

16        You know, sometimes you would break off and work with

17   other detectives, so I -- I had one partner, Jim Boylan.  But I

18   don't know, I think Lieutenant Burge was gone at that time.

19   Q.  Do you remember any other detectives who worked with you at

20   the time that Lieutenant Burge was there?

21   A.  Other detectives would work on, you know, on specific

22   cases.  It was never like one or two.  So if -- you know, if

23   you went out usually -- you're on the street a lot, and you

24   would go searching for people.  You know, you usually would

25   have two other detectives with you.  And whoever was available,

** TRANSCRIPT EXCERPT **

McDermott - direct by Perry                    9

1    you would have them come with you.

2          But specifically I -- well, John Galvan.  I'm not

3    quite sure of the timeline.  I know I -- initially when I got

4    there I was by myself working midnights, and I was detailed out

5    a lot.  So I was detailed out for months.

6          And then I worked with Patricia Hickey, and then Tony

7    Maslanka.  And I think at that point Lieutenant Burge was gone.

8    Q.  At the time that Lieutenant Burge was the lieutenant over

9    violent crimes, did he have his own office?

10   A.  The lieutenant has his own office.

11   Q.  Can you describe what that office looked like?

12   A.  It is 10 by 12, carpet, desk, couple chairs.  Big window

13   on, it would be, the north end.

14   Q.  Was there a window on the door or was the door straight

15   wood?

16   A.  The door was usually open.

17         No, I don't think there is a window in that door.  I

18   know there is a big window facing outside.

19   Q.  Are you familiar with a man named Shadeed Mu'min?

20   A.  Yes.

21   Q.  When did you first meet Mr. Mu'min?

22   A.  Well, I wasn't sure of his name.  They told me his name

23   like ten years later.  But it was some time in the '80s.

24   Q.  Do you remember when in the '80s?

25   A.  No.

** TRANSCRIPT EXCERPT **

1    Q.   Do you remember where you were when you met Mr. Mu'min?

2    A.   I was standing by, I believe, the doorway between the

3    sergeants's offices and the lieutenants's office.

4    Q.   Would this have been at Area 2?

5    A.   Yes.

6    Q.   And you said you were standing at the doorway.  Were you

7    inside one of the offices or were you in the hallway?

8    A.   No, there is no hallway there.  There is like a big room

9    where like several sergeants sit.  The detectives come and go.

10   That's where all the files are at.  That's where most of the

11   activity is at.

12   Q.   And where were you?

13   A.   I was between the doorway.  You have a central area where

14   all the detectives work, and then you have a sergeants's

15   office, which I just described, which is fairly big.  And then

16   off that they have the lieutenants's office.

17   Q.   Where were you standing?

18   A.   On the doorway between the lieutenants's office and the

19   sergeants's office.

20   Q.   Which direction were you looking?

21   A.   I have no idea.

22   Q.   What did you see happen?

23   A.   At one point in time I saw a scuffle between a suspect and

24   Lieutenant Burge.

25   Q.   Let's talk about that.

** TRANSCRIPT EXCERPT **

1          First of all, did you ever enter Lieutenant Burge's

2     office?

3     A.   I may have been there.  It has been 25 years.

4          Like I said, I thought I was by the doorway.

5     Q.   Did you look into the office?

6     A.   Yes.

7     Q.   Who was in the office?

8     A.   Lieutenant Burge and this suspect.

9     Q.   And as best you know is that Mr. Mu'min?

10    A.   That's the name they told me.

11    Q.   Were you working on a case involving that individual?

12    A.   No.

13    Q.   Do you remember why you were in this particular place at

14    this particular time?

15    A.   No.

16    Q.   Would it have been standard procedure for Lieutenant Burge

17    to have a suspect in his office?

18    A.   It has happened on occasion.

19    Q.   How often --

20    A.   I mean, it has happened on many occasions with other

21    lieutenants.

22    Q.   How often have you seen a suspect in Lieutenant Burge's

23    office?

24    A.   That's the only time I can remember.

25    Q.   So this would be the only time you ever saw a suspect in

** TRANSCRIPT EXCERPT **

1  Lieutenant Burge's office?

2  A.  The best as I can remember, yes.

3  Q.  What was the first thing you remember seeing take place

4  between Mr. Mu'min and Mr. Burge?

5         MR. BEUKE:  Objection, Judge, asked and answered.

6         THE COURT:  Overruled.

7  BY THE WITNESS:

8  A.  I saw a scuffle between Lieutenant Burge and the suspect.

9         THE COURT:  I'm sorry.  You were right.

10  BY MS. PERRY:

11  Q.  You said you saw a scuffle.  What did this scuffle consist

12  of?

13  A.  There was a brief scuffle.  I estimated at the grand jury

14  it was 20 seconds.  It could have been less.  But I saw

15  Lieutenant Burge scuffling with the guy.  I don't even know if

16  the guy was standing up or sitting down.

17         I saw at some point that Lieutenant Burge had

18  something in his hand, and it went across the face of the bad

19  guy.

20  Q.  So isn't it true the first thing you saw in that office was

21  Lieutenant Burge place a gun to Mr. Mu'min's head?

22         MR. BEUKE:  Objection.

23  BY THE WITNESS:

24  A.  I never said that.  That's an absolute lie.  And if he said

25  that, that's a lie.

1    I saw Lieutenant Burge take his gun out and secure

2    it.  He did raise it up and point it at the other side of the

3    room where the suspect was at.  And I testified it was no more

4    than a second.  So he had the gun out, and he secured it

5    somewhere.  And there was no threats made.  There was nothing

6    -- flinches made by this suspect.

7    But he did point it up, and he did point it in the

8    direction of where this guy was sitting ten feet away.  But at

9    no time did he place a gun to that man's head.

10   BY MS. PERRY:

11   Q.  So, sir, you saw Lieutenant Burge take his gun out of his

12   holster, is that correct?

13   A.  I don't know if it was in his holster.  Shadeed Mu'min

14   testified it came out of his desk.  Whether or not it came out

15   of his desk, he raised it up and secured it in his holster or

16   vice versa, I don't know.

17   I know he looked over at one point in time.  He did

18   have the gun up.  It was pointing on the other side of the

19   room, and it was put away.

20   Q.  You said that he took the gun out of somewhere.  You don't

21   remember where, is that right?

22   A.  Correct.  I saw -- when I looked over, I saw the gun was

23   up.  I testified it was just for a second.  I hear from Shadeed

24   Mu'min, he said it was retrieved from a desk.  That's

25   possible.  And then he put it in his holster.

** TRANSCRIPT EXCERPT **

1        MR. BEUKE:  Judge, I'm going to object.  Just can we

2    be heard briefly at sidebar?

3        (Sidebar proceedings had in open court outside of the

4    hearing of the jury:)

5        MR. BEUKE:  Judge, my objection is I don't mean to --

6    or I don't think it is proper for Mr. McDermott to testify as

7    to what he believes Mr. Mu'min may have said in his testimony

8    or grand jury appearance, and I don't know if there is a way

9    to, you know, admonish him outside of the presence of the jury

10   just that he is to relate what he recalls and not what he

11   believes Mu'min said.

12       MS. PERRY:  Judge, I agree completely.

13       MR. BEUKE:  Get out of here.

14       MS. PERRY:  If I could just point a position for him

15   to -- I'd like for him to be treated as a hostile witness so

16   that I can lead him through the rest of his direct.

17       MR. BEUKE:  Well --

18       MS. PERRY:  His testimony is different than what he

19   has said at grand jury, and he's offering a lot that is not

20   admissible.

21       MR. BEUKE:  Well, you know, I'm making that request

22   that he be admonished not to relay to what he believes Mu'min

23   may have testified to or may have said to people in the past.

24   I don't want that out, that's clearly improper.  But I don't

25   think he has demonstrated that he is a hostile witness just

1    because Ms. Perry may not like some of his answers.  I mean

2    that happens to me all the time.

3              MS. PERRY:  Well, but I'm going to have start

4    impeaching him with his grand jury testimony.

5              MR. BEUKE:  Well, Judge, that's a --

6              THE COURT:  Well --

7              MR. BEUKE:  -- horse of a different color, so -- I'm

8    just here for the purposes of trying to get him admonished, you

9    know.

10             THE COURT:  What would you propose that I say?

11             MR. BEUKE:  Well, Judge, I obviously don't want it

12   done in the presence of the jury.  I don't know if there is a

13   way to, you know, excuse them for a couple minutes and just

14   maybe, you know, instruct him.

15             MS. PERRY:  If I am allowed to lead him, I don't think

16   we'll have this problem --

17             MR. BEUKE:  Well --

18             MS. PERRY:  -- because I'll just be asking him --

19             MR. BEUKE:  I'm uncomfortable with that, Judge.  I

20   mean, I would prefer that you admonish him, you know, outside

21   of the presence of the jury.

22             THE COURT:  Well, I don't want to interrupt.

23             MR. BEUKE:  Yeah, but this is not --

24             THE COURT:  He's not -- he is a reluctant witness

25   clearly, so --

 1          MS. PERRY:  You can have him walk over here, Judge.

 2          MR. BEUKE:  Well, no, I don't want to do that either,

 3  Judge, but --

 4          MS. PERRY:  Well --

 5          MR. BEUKE:  I mean, here I have given my suggestion.

 6  I mean, I would like the jury to be excused for two minutes.

 7  It is not a big deal, I don't think, and then brought back in.

 8          THE COURT:  But you want me to say to him that he's

 9  not to relate what he has read about Mu'min's testimony?

10          MR. BEUKE:  Yes, I think he has testified, at least in

11  response to two questions that I don't -- you know, I believe

12  Mr. Mu'min may have said this or Mr. Mu'min may have said that,

13  and that's not what I recall.  I mean, that's not the question

14  Ms. Perry asked, and, you know, I don't --

15          MS. PERRY:  You think that --

16          THE COURT:  All right.  Well --

17          MR. BEUKE:  We're starting to get along here.

18          THE COURT:  -- I'll reserve your request.  And I guess

19  we can do this.  It won't take long.

20          MR. BEUKE:  Okay.  Thanks.

21      (Proceedings were had in open court in the presence and

22  hearing of the jury:)

23          THE COURT:  Members of the jury, I'm going to have to

24  excuse you for a brief time.  So please rise, everyone.

25      (Proceedings had in open court outside of the presence and

** TRANSCRIPT EXCERPT **

McDermott - direct by Perry                    17

1  hearing of the jury:)

2           THE COURT:  Be seated.

3           Mr. McDermott, counsel for Mr. Burge has asked that I

4  instruct you that your testimony not include what you think

5  Mr. Mu'min may have said at some previous testimony.

6           THE WITNESS:  Okay.

7           THE COURT:  Just respond to the questions based on

8  your own knowledge.

9           THE WITNESS:  Yes, ma'am.

10          THE COURT:  All right.

11          Is that sufficient, Mr. Beuke?

12          MR. BEUKE:  It is, Judge.  Thank you.

13          THE COURT:  All right.  We'll have the jury come back

14  in.

15     (Proceedings had in open court in the presence and hearing

16  of the jury:)

17  BY MS. PERRY:

18  Q.  Sir, is it your testimony today that you did not see Jon

19  Burge point a gun at Mr. Mu'min?

20  A.  He had pointed a gun at the side of the room, at least ten

21  or twelve feet away from where Shadeed Mu'min was at.  From

22  where I was at, I can't see if the gun is directly pointed at

23  him or next to him or above him.  But it was pointed, I would

24  say -- it appeared it was pointed at him, but you can't tell

25  from the perspective I was at.

1    Q.  Sir, you testified before the grand jury on July 3rd, 2008,

2    is that correct?

3    A.  Yes, I did.

4    Q.  And at that time you were sworn to tell the truth, is that

5    correct?

6    A.  Yes.

7    Q.  And you did tell the truth, is that correct?

8    A.  Yes, I did.

9          MR. BEUKE:  Objection, Judge, to the leading the

10   witness.

11   BY MS. PERRY:

12   Q.  I'm going to hand you what's --

13          MR. BEUKE:  Leading.

14          THE COURT:  Overruled.

15   BY MS. PERRY:

16   Q.  -- been marked as Government Exhibit 23.

17          I'm going to direct your attention to page 13.

18   A.  Okay.

19   Q.  Isn't it true, sir, that you were asked these questions and

20   gave these answers before the grand jury?

21          "What do you recall occurring while you were in

22   there?

23          "Answer:  I was standing there, and I saw Jon Burge

24   point a gun at him.

25          "Question:  Do you know whose gun it was?

** TRANSCRIPT EXCERPT **

1          "Answer:  It must have been his.

2          "Question:  And what was he saying as he was pointing

3    the gun at him?

4          "Answer:  I'm sure" --

5          MR. BEUKE:  Objection, Judge.

6    BY MS. PERRY:

7    Q.   -- "something to the effect about confessing."

8          MR. BEUKE:  Objection.

9          THE COURT:  All right.  The last question and answer

10   is stricken as not impeaching.

11   BY MS. PERRY:

12   Q.  Sir, were you asked those questions, and did you give those

13   answers?

14   A.  Yes.

15   Q.  And at the time that Jon Burge was pointing a gun, and as

16   you say in the general direction of Shadeed Mu'min, he was

17   talking to him about confessing, wasn't he?

18   A.  No.  I was guessing that's what the gist of it was.  I told

19   you repeatedly that I don't remember the conversation that was

20   said.  I know that there was not a threat like I'm going to

21   shoot you or anything like that.

22          And I also responded that the response from Shadeed

23   Mu'min was there no flinching or ducking or anything like

24   that.

25          But I'm guessing this whole thing, which I had -- is

1   just a few minutes in this whole office, the more I'm thinking

2   about it, the more since I have testified, I find that hard to

3   believe that this was about a confession.  I don't know if this

4   was something personal or he knew one of the victims or maybe

5   I'm misreading the whole thing.

6          But it is not his case and it is not my case, and I

7   can't see this as somebody trying to get a confession from

8   somebody when you don't know the facts or all the facts.  You

9   should have the detective that was there.

10         So I don't -- this is in an open room in his office,

11  and I don't know if it was a confession or not, and that's what

12  I testified to.  I don't know, but that's what I was assuming.

13  Q.  Sir, at the time you testified before the grand jury, you

14  were sure that this was something to the effect about

15  confessing, isn't that right?

16  A.  No, I said I was guessing.  Repeatedly I said I'm assuming

17  that's what was going on.

18  Q.  Sir, directing your attention to page 14, were you asked

19  this question, and did you give this answer?

20         "Question:  And what was he saying as he was pointing

21  the gun at him?

22         "Answer:  I'm sure it was something to the effect

23  about confessing.  I do not remember the content of the

24  conversation, but he pointed a gun.  I thought it was kind of

25  silly, you know, but I saw him point a gun at the suspect."

** TRANSCRIPT EXCERPT **

McDermott - direct by Perry                21

1          Were you asked those questions, did you give those

2    answers under oath?

3    A.   Yes, I did.

4    Q.   Sir, at the time that you saw Lieutenant Burge point a gun

5    at Mr. Mu'min, how far away was Burge from Mr. Mu'min?

6    A.   Ten to twelve feet.

7    Q.   Where was Lieutenant Burge at the time?

8    A.   He was on one side of the room where the windows are at,

9    and the other side of the room is where the suspect was at.

10   Q.   And was the suspect sitting or standing at the time?

11   A.   I don't recall.

12   Q.   Is there anything that might refresh your recollection?

13   A.   I believe I testified at the grand jury I don't recall.

14   Q.   How far away were you from this as it took place?

15   A.   Not exactly sure, but the doorway would be more towards

16   where the suspect was at.

17   Q.   So were you a few feet away?

18   A.   Yes.

19   Q.   And were you able to hear what was spoken at the time?

20   A.   Like I said something was going on.  I don't recall the

21   conversation.

22   Q.   I understood you don't remember the exact words spoken, but

23   were you able to hear what was going on?

24   A.   There was somewhat confrontational or argumentative between

25   the two.

** TRANSCRIPT EXCERPT **

McDermott - direct by Perry                22

```
 1          Like I said, it wasn't my case.  I wasn't paying
 2   attention to everything.  And I do know when the gun was raised
 3   up for a second that I didn't hear any threat.
 4   Q.  You said that Lieutenant Burge's demeanor at the time was
 5   somewhat confrontational.
 6   A.  I would say both of them were.
 7   Q.  Was Mu'min doing anything to deserve having a gun pointed
 8   at him, sir?
 9          MR. BEUKE:  Objection to the form of the question,
10   Judge.
11          THE COURT:  Overruled.
12   BY THE WITNESS:
13   A.  Like I said, I thought they were both argumentative.
14   BY MS. PERRY:
15   Q.  My question was was he doing anything to deserve having a
16   gun pointed at him?
17          MR. BEUKE:  Objection, Judge.
18          THE COURT:  Overruled.
19   BY THE WITNESS:
20   A.  As I testified before, it may not have been directly at
21   him.  It was towards that room, which is 10 to 12 feet away
22   from anybody's position.
23          Where I was at you can't tell if that gun was aimed
24   at -- directly at him.  Was it reckless?  Possibly.  It was
25   only for a second.
```

** TRANSCRIPT EXCERPT **

1          So whether or not you say he deserved it or not, I

2    know it was argumentative.  I don't believe it was really meant

3    to be a threat, but that's my opinion.

4    BY MS. PERRY:

5    Q.  All right.  Well, let's talk about what happened next,

6    sir.  What did you see happen after that?

7    A.  I saw Jon Burge scuffle with the suspect I'm saying for

8    about 20 seconds or so.

9    Q.  Isn't it true, sir, you saw Jon Burge take a piece of

10   plastic and put it over Mr. Mu'min's head?

11   A.  I testified I didn't know what it was.  I saw something in

12   his hands.  I thought it was something clear.  It wasn't over

13   his head.  I saw something briefly in front of his face.  The

14   suspect was talking at the time.  So this whole scuffle thing I

15   testified to was about 20 seconds.

16   Q.  Is it your testimony today that Lieutenant Burge did not

17   approach Shadeed Mu'min and put something over his head?

18   A.  You guys keep on wanting me to say that.  No, he did not

19   put something over his head.  His arm might have went over his

20   head and there was something in front of his face.  I clarified

21   it a few times at the grand jury.  I don't know what it was.

22   It was just a glimpse of something.  I thought it was clear.

23   It was 25 years ago.  And it was very brief.  And I know

24   Shadeed Mu'min was talking at the time.

25   Q.  Sir, directing your attention to page 17 of your grand jury

1    testimony.  Were you asked this question, did you give this

2    answer?

3            "Question:  What happened after that, after he pointed

4    the gun at him?

5            "Answer:  He approached Shadeed Mu'min, and he put

6    something over his head."

7            Was that the question you were asked, and was that the

8    answer you gave?

9    A.  Yes.

10   Q.  And was that truthful at the time, sir?

11   A.  I'm describing it -- I clarified it.  If you read all the

12   transcript, I clarified it a few times when you guys asked me

13   this.  And I said there was nothing on his head.  His arm might

14   have went over his head.  The only thing I saw was some

15   material that was in front of the face for Shadeed Mu'min for a

16   brief time.

17   Q.  And, sir, that was transparent material, was that right?

18   A.  It appeared to have been, yes.

19   Q.  And then you saw Shadeed Mu'min hunched over, and you

20   couldn't see the front of his head anymore, is that correct?

21   A.  I think they were both hunched over.

22   Q.  Well, Shadeed Mu'min was sitting, is that correct?

23   A.  As I stated before, I don't know if he was sitting or

24   standing.

25   Q.  Lieutenant Burge you know was standing, is that right?

** TRANSCRIPT EXCERPT **

McDermott – direct by Perry                    25

1    A.   I believe he was.

2    Q.   He was over Shadeed Mu'min, is that right?

3    A.   At one point in time I believe he was on the side or behind

4    him.

5    Q.   And Lieutenant Burge approached him from behind, is that

6    right?

7    A.   At one point he did.

8    Q.   And that was at the point right before he put the plastic

9    thing over his face, is that right?

10   A.   I saw a scuffle.  I didn't see it like play by play.  It

11   happened kind of quick.  He approached him.  He did come up

12   from the side or behind him, and there was a scuffle.  And I

13   glanced over and at one point it looked like there was

14   something in Jon Burge's hand.

15   Q.   And you saw that thing go over Shadeed Mu'min's face, is

16   that right?

17   A.   It appeared that it was in front of his face, yes.

18   Q.   And as far as you could tell Shadeed Mu'min had not

19   instigated any kind of physical contact with Lieutenant Burge,

20   isn't that right?

21   A.   Physical contact?  No.

22   Q.   So Lieutenant Burge approached him and made the first

23   physical move, isn't that right?

24        MR. BEUKE:  Objection, Judge, asked and answered.  We

25   have been through this three times.

** TRANSCRIPT EXCERPT **

McDermott - direct by Perry                    26

1          THE COURT:  He's under cross.  Overruled.

2     BY MS. PERRY:

3     Q.  As you saw Lieutenant Burge place something over Shadeed

4     Mu'min's face, you could tell that Lieutenant Burge was still

5     saying something about confessing, isn't that right?

6     A.  As I said before, I don't know if it was about confessing.

7     That's what I assumed this whole thing was about.

8     Q.  And you understood that this was about confessing because

9     your take of that was that that's what Lieutenant Burge was

10    doing this to Shadeed Mu'min for, isn't that right?

11    A.  Like I said I assumed that.  I'm guessing.

12    Q.  And you --

13    A.  But it was only for like three minutes.  You -- I have

14    never seen an interview with a violent criminal that lasted

15    three minutes, and it was in a lieutenants's office.

16         I thought it might have been something different,

17    like he knew one of the victims or he -- this was -- he had a

18    history with this guy.  But to bring somebody in the

19    lieutenants's office unhandcuffed for a three-minute interview

20    when you're not even assigned the case, it doesn't make sense

21    to me.

22         I have been a detective for 30 years.  I have never

23    seen it done.  So I thought there was something else going on

24    here.  But I would assume if you are talking to a bad guy,

25    you're trying to get a confession, but I'm guessing.

** TRANSCRIPT EXCERPT **

McDermott - direct by Perry                    27

 1   Q.  And, sir, it only took three minutes because that's all it

 2   took before Shadeed Mu'min agreed to confess, isn't that right?

 3   A.  He didn't confess when I was there.

 4   Q.  I understand you did not take the confession, sir.  But

 5   your understanding of the reason that this all ended was

 6   because Shadeed Mu'min agreed to confess.

 7              MR. BEUKE:  Objection.

 8   BY THE WITNESS:

 9   A.  I would think he could confess right after that, and he

10   never confessed.

11              THE COURT:  Overruled.

12   BY THE WITNESS:

13   A.  That was the end of it.  If he says I'm going to confess,

14   the next thing you would do is listen to a confession.  He

15   never confessed.

16   BY MS. PERRY:

17   Q.  I understand that you did not take the confession.  But,

18   yes or no, sir, you understood this ended because he had agreed

19   to confess, is that correct?

20   A.  As I repeatedly said, I'm guessing about all this.  I have

21   no idea.

22   Q.  Now, sir, you said that this was not your case, is that

23   correct?

24   A.  Yes.

25   Q.  You also said it was not Lieutenant Burge's case, is that

** TRANSCRIPT EXCERPT **

1  correct?

2  A.   The lieutenant wouldn't handle a robbery case as far as I

3  know.   I mean, he doesn't assign himself cases.   It is assigned

4  to a detective.

5  Q.   So to the best of your knowledge there was no reason this

6  interview should have been happening at all, isn't that true?

7         MR. BEUKE:   Objection, Judge.   Form of the question.

8         THE COURT:   Overruled.

9         MR. BEUKE:   Calls for speculation.

10  BY MS. PERRY:

11  Q.   Sir, you knew of no reason why this interview should be

12  taking place.

13         MR. BEUKE:   Objection, Judge.   Same objection.

14         THE COURT:   Overruled.

15  BY THE WITNESS:

16  A.   Like I said I thought there might be some history here.

17  Either he locked him up before for robberies or the kid that

18  was shot in the chest, maybe he knew him.   It was a few blocks

19  from his house.   Maybe it was something personal, I don't know.

20  BY MS. PERRY:

21  Q.   And you assumed it would have been something personal

22  because of the way Lieutenant Burge was treating Shadeed

23  Mu'min, isn't that true?

24  A.   He might have been talking to him, and the guy had dope in

25  his mouth.   I mean, that's a common thing.   Maybe he's trying

1    to get dope out of his mouth.  Maybe he's spitting on the

2    floor.  I have no idea.  I don't know Jon Burge's intentions.

3    And it is wrong for me to say why this occurred if you don't

4    know what a person's intentions were.

5            What I do know is that Shadeed Mu'min wasn't

6    intimidated by this, and he never complained.  And it lasted

7    less than 20 seconds.  So this is -- I changed my mind about

8    this, I don't believe this is abuse in any way.

9    Q.  When Jon Burge put that piece of plastic over Shadeed

10   Mu'min's face, he couldn't breathe, could he?

11   A.  I testified ---

12           MR. BEUKE:  Objection.

13   BY THE WITNESS:

14   A.  -- that he was talking so I imagine if he was --

15           THE COURT:  Wait.

16   BY THE WITNESS:

17   A.  -- talking, he could --

18           THE COURT:  Wait.  Don't --

19   BY THE WITNESS:

20   A.  -- breathe.

21           THE COURT:  Okay.  Wait.  When there's an objection,

22   Mr. McDermott, please don't answer.

23           THE WITNESS:  I'm sorry.

24           MR. BEUKE:  Judge, my objection is he has testified I

25   think on four or five different occasions in the last 30

1   minutes that it was something transparent.  He never said it

2   was plastic.

3           THE COURT:  That I believe is correct.

4           All right.  I'll sustain.

5   BY MS. PERRY:

6   Q.  When Jon Burge put that thing over Shadeed Mu'min's head,

7   he could not breathe, could he?

8           MR. BEUKE:  Objection, Judge.  He didn't say he put it

9   over his head.  Misstates the testimony.

10          THE COURT:  Try again.

11  BY MS. PERRY:

12  Q.  When Lieutenant Burge put that thing in front of Mu'min's

13  face, he could not breathe, could he?

14  A.  I am not Shadeed Mu'min.  I think that's a possibility.

15  But I also testified Shadeed Mu'min was talking during this

16  time.  So if he could talk, I guess he could breathe.  And the

17  fact that it less -- lasted less than 20 seconds, I don't if it

18  was -- I don't know what the intent was.  I -- I have no idea.

19  Q.  You have no idea.

20          Directing your attention to page 20 of your grand

21  jury statement, sir, were you asked this question, did you give

22  this answer?

23          "Question:  Could you tell whether or not Mu'min was

24  able to breathe while this bag was over his head?

25          "Answer:  I don't think he would have been able to.  I

1   believe that's the whole idea of doing that."

2          Were you asked those questions, did you give those

3   answers?

4   A.   I did give those answers, and again I'm guessing.

5   Q.   And you were guessing that that was the reason that it was

6   done was to be able to scare him, is that correct?

7   A.   That's a guess.

8   Q.   And that was based upon your years as a police officer, is

9   that right?

10  A.   That's not knowing the intention of the person doing it.

11  And that's -- that's a guess, right.

12  Q.   And it was your guess that this was being done in order to

13  get a confession, is that right?

14  A.   That would be my guess.

15  Q.   And, sir, you have testified today, at least, that you're

16  not sure what it was, but it was indeed a plastic bag, isn't

17  it?

18  A.   I never said it was a bag.  I said I saw something clear in

19  his hands.

20  Q.   Directing your attention to page 21, were you asked this

21  question, did you give this answers?

22          "This was a plastic bag over the head.

23          "Answer:  Correct."

24          Were you asked that question, did you give that answer

25  under oath?

McDermott - direct by Perry                    32

1   A.  Yes.  But you got to read all of it, and it started the

2   September grand jury, I did clarify it again.  You guys keep on

3   saying it is a bag, and I'm it wasn't a bag.  I don't know what

4   it was.

5           But, yes, I started agreeing to some -- these are

6   questions given by the U.S. Attorney, and then the plastic bag,

7   and then the plastic bag, and I kept on stopping and clarifying

8   it that I had no idea what it was.  So --

9   Q.  Sir, were you asked the question:  "This was a plastic bag

10  over the head."

11          And did you give the answer:  "Correct."

12          Were you asked that question --

13  A.  Yes.  But you need to read the whole transcript.

14  Q.  -- did you give the answer?

15  A.  Yes, I said that.  You need to read whole transcripts.

16  Q.  Your question today, sir, is were you asked that question,

17  did you give that answer?

18  A.  Yes.

19  Q.  And that was under oath, is that right?

20  A.  Yes.  I misspoke.

21  Q.  And that was over head for approximately 20 seconds, is

22  that right?

23  A.  It was in front of his face for about 20 seconds, yes.

24  Q.  At this time Lieutenant Burge was standing, is that

25  correct?

1   A.  I believe so.

2   Q.  And Mu'min was sitting, is that correct?

3   A.  I don't know if he was setting or standing.

4   Q.  Sir, directing your attention to page 22.  Were you asked

5   this question, did you give this answer under oath?

6           "Question:  But again he remained seated during this

7   entire period of time.

8           "Answer:  I don't know.  I believe he was seated.

9           "Question:  Well, while you were in the room --

10          "Answer:  I believe he was seated."

11          Were you asked those questions, did you give those

12  answers?

13  A.  I answered I don't know.

14          That's correct.  That's what I answered, I don't

15  know.

16  Q.  You were asked the question, and you answered:  "I

17  believe -- I don't know.  I believe he was seated."

18          Is that correct?

19  A.  Correct.

20  Q.  And again Shadeed Mu'min had not done anything physically

21  to instigate this with Lieutenant Burge, had he?

22          MR. BEUKE:  Objection, Judge, asked and answered.

23          THE COURT:  You did ask it.

24  BY MS. PERRY:

25  Q.  At the time the bag was placed over his head, had he done

1  anything physically to instigate it?

2  A.  Again there was not a bag put over his head.  I don't know

3  if there was something to instigate it.  Like I said, did he

4  have narcotics in his mouth, was he spitting, was this

5  intimidation, I don't know the intentions of Jon Burge.

6  Q.  Well, sir, you were there.  Were there narcotics in his

7  mouth?

8  A.  Not that I am aware of.

9  Q.  And would it be an effective remedy to having narcotics in

10  your mouth to put something over someone's face so they can't

11  breathe?

12  A.  So you get your fingers bit, and you are telling them to

13  give it up or spit it out --

14  Q.  And is that what Lieutenant Burge was telling him, to give

15  it up or spit it out, sir?

16  A.  I don't hear spit it out.  I don't remember the

17  conversation.  All I know is he was scuffling with him.  I was

18  kind of shocked about the whole thing.  I don't know why it

19  happened.

20  Q.  You didn't hear him tell him to spit any narcotics out, did

21  you, sir?

22  A.  I didn't hear those words.  If he did say it, I don't

23  remember it.

24  Q.  And it was your understanding that this was in order to get

25  a confession, isn't that true?

** TRANSCRIPT EXCERPT **

1    A.   That was my initial guess, yes.

2    Q.   Wasn't just initial guess, it was also your guess in July

3    of 2008, isn't that true?

4    A.   I have had a lot --

5         MR. BEUKE:  Objection, Judge, asked and answered.

6         THE COURT:  Overruled.

7    BY THE WITNESS:

8    A.   I have had a lot of time to thing about it since then.  It

9    doesn't make sense to me that a three-minute so-called

10   interview would have been an attempt to get a confession about

11   a case that nobody was working on in that room.  So, again, I

12   don't know what.  Maybe that's what it was.  I'm guessing.

13        What I am saying it doesn't make sense that you would

14   do this in an open interview room with people that were there

15   who don't know all the facts of the case.  You never interview

16   a bad guy unless you know all the facts of the case.  And

17   neither of us, as far as I know -- I know I didn't, and I would

18   be surprised if the lieutenant would be aware of all the

19   facts.  You don't confront people and try to do an interview in

20   three minutes.

21        So I'm guessing -- that's what we do when we bring in

22   bad guys to the area, we try to get statements.  So -- but I

23   don't know what this was about.

24   Q.   But you believed it was an attempt to get a statement,

25   didn't you, sir?

1          MR. BEUKE:  Objection, Judge.  Asked and answered

2  again.

3          THE COURT:  Overruled.

4  BY THE WITNESS:

5  A.  Again I was -- I'm guessing I don't know.

6  BY MS. PERRY:

7  Q.  After Lieutenant Burge put that piece of whatever in front

8  of Mr. Mu'min's face that made it unable for him to breathe,

9  you said that that was there for about 20 seconds, is that

10  right?

11  A.  No, I said the scuffle lasted about 20 seconds.  I don't

12  know how long that was there.  I just had a glimpse of it.  And

13  you're assuming that he couldn't breathe.  I was assuming

14  that's possible, but I also said that he was talking during

15  this time.  So if he was talking he could breathe.

16  Q.  Sir, you keep calling it a scuffle.  Tell me exactly what

17  Mr. Mu'min did to serve having this piece of plastic put over

18  his face?

19  A.  Maybe he had narcotics in his mouth --

20          MR. BEUKE:  Objection.

21  BY THE WITNESS:

22  A.  -- that's why he deserved it.

23  BY MS. PERRY:

24  Q.  Do you have any evidence at all that he had narcotics put

25  in his mouth, sir?

** TRANSCRIPT EXCERPT **

1  A.  No.

2  Q.  And you have testified before the grand jury twice, is that

3  right?

4  A.  Yes.

5  Q.  And at no time did you ever say that this might have been

6  because he had narcotics in his mouth, is that right?

7          MR. BEUKE:  Objection.

8  BY THE WITNESS:

9  A.  Right.

10 BY MS. PERRY:

11 Q.  That's a conclusion you just reached when, sir?

12 A.  Thinking about it for the last year and a half.

13 Q.  So this happened in the early '80s, is that right?

14 A.  Yes.

15 Q.  And over the 25 years between when this occurred and the

16 time that you testified before the grand jury in 2008, those

17 whole 25 years you believed that this was in order to get a

18 confession, is that right?

19 A.  Believe me I'm not thinking about a 20-second scuffle.  You

20 don't believe what went on in Area 2.  I mean, hundreds of

21 murders a year.  You are getting cases of rapes and robberies

22 every day.  Thousands of cases.  I'm not thinking about a

23 20-second scuffle inside the lieutenants's office.  I'm

24 thinking about it now because I didn't want to lose my pension

25 and go to jail.  But, you know, I didn't give it a lot of

** TRANSCRIPT EXCERPT **

McDermott - direct by Perry                38

1   thought until recently.  I had to go out into the grand jury.

2   Q.  And, sir, you are thinking about it now because you think

3   you might lose your pension, is that right?

4   A.  I'm losing my job.  I was told that there is a possibility

5   I was going to get charged with obstruction.  That means I lose

6   my pension, I lose my health insurance.  Yeah, I was concerned.

7   Q.  And you're still concerned to this day, isn't that right?

8   A.  Yeah.  I asked the U.S. Attorney what did I do, am I going

9   to jail, and they shrug their shoulders, they don't tell me.

10  Q.  Because you realized that you witnessed a crime, isn't that

11  true, sir?

12  A.  There might have been an explanation for it.

13  Q.  Sir, you realized you witnessed a crime, isn't --

14           MR. BEUKE:  Objection.

15  BY MS. PERRY:

16  Q.  -- that true?

17           MR. BEUKE:  That's a legal conclusion.

18           THE COURT:  Overruled.

19           MR. BEUKE:  What question is that?

20  BY THE WITNESS:

21  A.  It was very physical and violent job.  I would scuffle and

22  fight with people all the time.  My partner has been shot.  I

23  have been put in the hospital.  You're fighting with people on

24  a weekly basis.  I don't know if that is a crime or not.  That

25  should be up to the jury.

** TRANSCRIPT EXCERPT **

McDermott – direct by Perry                    39

1          I saw a 20-second scuffle that happened 25 years

2    ago.

3    BY MS. PERRY:

4    Q.  You believe what Jon Burge did was a crime, don't you,

5    sir?

6    A.  With not knowing the intentions of Jon Burge, it may be

7    there was an explanation.  From what I saw I thought it was

8    inappropriate, yes.

9    Q.  And you realized that when you witnessed something

10   inappropriate, that you should have done something about it as

11   a sworn law enforcement officer, isn't that true?

12   A.  Yes.

13   Q.  And you did not do anything about it, did you, sir?

14   A.  No, I didn't.

15   Q.  Tell me what OPS is, please.

16   A.  It's a civilian group, but it is called the Office of

17   Professional Standards, and they review cases of misconduct by

18   policemen.

19   Q.  After you saw what Lieutenant Burge did to Shadeed Mu'min,

20   you had an obligation to tell OPS, didn't you?

21   A.  Maybe tell somebody.  I don't know about OPS.

22   Q.  Well, you certainly didn't tell OPS, isn't that true?

23   A.  I was interviewed by OPS, correct.

24   Q.  And in fact you lied to them, isn't that right?

25   A.  About a couple things, yes.

** TRANSCRIPT EXCERPT **

McDermott – direct by Perry                40

1   Q.  One of those things you lied about was that if you had ever

2   seen a gun pointed at Mr. Mu'min, isn't that true?

3   A.  Possibly.

4   Q.  Would you like something to refresh your recollection?

5   A.  No.  If that was asked, I probably gave that answer.

6   Q.  One the other things you lied about was whether you had

7   ever seen Lieutenant Burge place something over Mr. Mu'min's

8   head.  Isn't that true?

9   A.  Correct.

10  Q.  You had seen both of those things happened, hadn't you?

11  A.  Again nothing was put over his head.  There was something

12  put in his face.  But Shadeed Mu'min was lying about a lot of

13  things too, and OPS was doing an unauthorized investigation.

14  Q.  That was not my question, sir.  My question was you had

15  seen those things happen, hadn't you?

16  A.  I was trying to explain why I wasn't giving accurate

17  answers.

18  Q.  You agree that you did not give accurate answers to OPS,

19  did you?

20  A.  To an unauthorized investigation on their part, yes.

21  Q.  You were not truthful with them, were you?

22  A.  Not entirely.  Some of the answers I'm sure were truthful.

23  Q.  You have never reported this really to anyone, have you,

24  apart from the members of the grand jury?

25  A.  Correct.

** TRANSCRIPT EXCERPT **

1  correct?

2  A.  Yes.

3  Q.  With respect to the following conversation, did you begin

4  to speak or did the prosecutor begin to ask you questions about

5  cases that you were involved in?

6  A.  Yes.

7  Q.  Now when you walked into the grand jury that afternoon,

8  sir, you knew about the case of People versus Alphonso Pinex.

9  Correct?

10 A.  Yes.

11 Q.  And you knew, did you not, Mr. McDermott, that back in 1986

12 you testified in that particular case, is that correct?

13 A.  I don't recall testifying, but I did testify.

14 Q.  Okay.  There was testimony that you were called as a

15 witness by the State's Attorney in that case, correct?

16 A.  There is a motion to suppress the evidence, yes.

17 Q.  Motion to suppress the statement or other evidence,

18 correct?

19 A.  Yes, sir.

20 Q.  And in that proceeding that was before Judge Karnezis, was

21 it not?

22 A.  I don't recall what judge.

23 Q.  In any event, in that proceeding you were sworn to tell the

24 truth, correct?

25 A.  Yes.

** TRANSCRIPT EXCERPT **

1    Q.   And during the course of your testimony in that case, you

2    were asked questions concerning whether or not you had struck

3    Mr. Pinex during the course of time that you spent with him in

4    an interrogation room, correct?

5    A.   Yes.

6    Q.   And without going into the specific questions and answers,

7    would I be correct in assuming that you were asked questions

8    about you physically abusing Mr. Pinex, correct?

9    A.   Yes.

10   Q.   And in response to those questions you indicated in your

11   testimony back in 1986 that you had not struck Mr. Pinex,

12   correct?

13   A.   They were claiming there was abuse done during the

14   interrogation, and I answered honestly that there was not.

15   Q.   Well, you had a conversation with Mr. Pinex in 1985,

16   correct, after his arrest?

17   A.   Yes.

18   Q.   In an interrogation room in Area 2, correct?

19   A.   Yes.

20   Q.   And during the course of the conversation before you spoke

21   to him, you gave him his rights, correct?

22   A.   Yes.

23   Q.   And you had an opportunity to speak with him.  Am I correct

24   that that initial conversation would have been alone?

25   A.   No.

McDermott - cross by Beuke                    105

1   Q.   Was anyone with you?

2   A.   My partner.

3   Q.   Is that Mr. Maslanka?

4   A.   Yes, sir.

5   Q.   Okay.  And during the course of that con- --- initial

6   conversation with Mr. Pinex, did you and your partner speak

7   with Pinex about your investigation or developments in the

8   investigation that you had?

9   A.   Yes.  And we played audiotapes of the co-offenders

10  implicating him.

11  Q.   Well, during -- at some point during that conversation,

12  sir, you and Mr. Pinex got into a confrontation, did you not?

13  A.   No.

14  Q.   Did you ever strike Mr. Pinex during the course of that

15  interview?

16  A.   No.

17  Q.   Did you ever indicate in your testimony in front of that

18  judge that you struck Mr. Pinex during the course of that

19  interview?

20  A.   No.

21  Q.   And you were asked questions about that in your grand jury

22  appearance, were you not?

23  A.   Yes.

24  Q.   In September of 2004, correct?

25  A.   Yes.

** TRANSCRIPT EXCERPT **

McDermott - cross by Beuke                    106

1   Q.  Okay.

2            I'm sorry, 2008.  Is that correct?

3   A.  Yes.

4   Q.  And specifically were you asked questions by an assistant

5   United States Attorney named Mr. Cramer?

6   A.  Yes.

7   Q.  And during the course of that testimony in front of the

8   September 2008 grand jury, you indicated, did you not, under

9   oath that in that interview room there was some sort of a

10  confrontation with Mr. Pinex, correct?

11  A.  I had a confrontation with him prior to the interview.

12  Q.  Okay.  the confrontation, that's what I'd like to ask you

13  questions about with Mr. Pinex.

14           That was in an interview room, is that correct?

15  A.  I believe so.

16  Q.  Okay.  And that confrontation with Mr. Pinex, am I correct,

17  that it was just you and Mr. Pinex in the room, correct?

18  A.  Yes.

19  Q.  And during the course of the conversation that you had with

20  Mr. Pinex, it was at -- after he was admonished of his rights

21  or during the initial meeting?

22  A.  No, it was when he first got there, and it was just a

23  procedure to go through to search him.  And we were going to

24  come back later and conduct the interview with the Miranda

25  warnings and present him with the evidence.

** TRANSCRIPT EXCERPT **

1  Q.  I'm --

2  A.  Buts this is --

3  Q.  -- talking about this first --

4  A.  That's --

5  Q.  -- conversation with Mr. Pinex.

6          Something happened during the course of that

7  conversation, did it not, Mr. McDermott?

8  A.  There was not a conversation.  He was escorted into area by

9  two other officers from a different area who made the arrest.

10  He was put into the room.  I went into the room just to get

11  things organized and pat him down or whatever because he was

12  just arrested for murder.

13          My partner, I don't know where he went, I believe he

14  went to get the audio tapes that we were going to play for

15  him.  This guy wasn't -- there was no conversation.  He wasn't

16  listening to my instructions.  He's jumping out of his chair

17  and squaring off on me like he was going to fight me, and I

18  knocked him back down in the chair.

19  Q.  Well, when you say you knocked him back down in the chair,

20  did you strike him in the chest area or the torso?

21  A.  I testified that I believed it was an open hand that

22  knocked this guy back down.  He is a -- I had gun on my side.

23  He killed a state witness.  He's a gang member.  And he's

24  jumping out of the chair.  I'm telling him to sit down.

25          So, yeah, I knocked him back down.  I didn't think of

** TRANSCRIPT EXCERPT **

1   -- anything of it.  It wasn't abuse.  It had nothing to do with

2   the interview.

3   Q.  Okay.  Well, in any event, what happened during the course

4   of that interview, you testified in the grand jury that your

5   partner was not in the room, correct?

6   A.  That's correct.

7   Q.  He was not present when you struck Mr. Pinex in that manner

8   in the chest, correct?

9   A.  That's correct.

10  Q.  And you were asked questions by Mr. Cramer, did Mr. Pinex

11  ever say anything to your partner concerning the fact that you

12  had struck him in the chest, and you indicated that he hadn't,

13  correct, in the grand jury?

14  A.  Probably said I didn't know.

15  Q.  Okay.  And he indicated -- or you were asked questions by

16  Mr. Cramer as to whether or not you ever told your partner that

17  you struck Mr. Pinex in the chest, correct?

18  A.  Again I said I probably -- I didn't know.

19  Q.  Okay.  With respect to that motion to suppress back in

20  1986, sir, you were aware of the fact, just so it is clear for

21  the ladies and gentlemen of the jury, prior to testifying on

22  that motion, it would be customary, would it not, that you

23  would speak with the prosecutors concerning the nature or the

24  allegations in the motion?  Is that a fair statement?

25  A.  It depends on the State's Attorney.  Sometimes -- they make

1  suppression -- they make allegations on every case that you go

2  on.

3  Q.  Well --

4  A.  So sometimes it is like automatic, and sometimes the

5  State's Attorneys brief you and sometimes they don't.

6  Q.  Okay.  With respect to this being a murder case, in fact

7  the murder of a state witness, was this a case that you spent

8  some time with the prosecutors preparing your testimony for the

9  motion to suppress, if you recall?

10  A.  I don't remember any of it, no.

11  Q.  Okay.  With respect to -- you were aware of the fact, were

12  you not, that Mr. Pinex testified in that motion also, correct?

13  A.  I wasn't there for that.  I don't know if it was part of

14  the motion where --

15  Q.  Okay.

16  A.  -- the defense attorney presents an allegation.

17  Q.  Okay.  Were you aware of the fact that Mr. Pinex during the

18  course of that motion testified that he was struck by you and

19  your partner Mr. Maslanka?

20  A.  He made a couple allegations.  First, when it first

21  started, he just made an allegation against my partner.  And

22  then days later he included me.  And I don't know what he said

23  at the motion to suppress.

24  Q.  Okay.  But you were aware of the fact, were you not, that

25  he -- his allegations were that he was beaten by both you and

McDermott – cross by Beuke                    110

1   your partner, fair to say?

2   A.  That's correct.  And we took photographs of him that

3   night.

4   Q.  Okay.  But when you were on the witness stand during the

5   course of that motion, you never indicated or testified in

6   response to any of the questions either by the prosecutor or by

7   the lawyer for Mr. Pinex that you had struck him during some

8   encounter prior to the interrogation in the chest, correct?

9   A.  I don't remember testifying, so I can't really adequately

10  answer that other than I didn't think it was anything -- much

11  of anything.  It is definitely not abuse.

12  Q.  Well, I understand.  But in September of 2008 you indicated

13  in response to Mr. Cramer's question that you were not truthful

14  in that -- during the course of your testimony in that

15  hearing.  Fair to say?

16  A.  Prior to those questions, what Mr. Cramer was saying, I

17  said I felt I was truthful as far as the motions to suppress.

18  And that this -- all the questioning was revolving around when

19  we advised him of his Miranda warnings and we were conducting

20  an interview.  And it flowed from there.

21           Now maybe I misunderstood the question.  I can't tell

22  you what my mind was thinking because I don't remember

23  testifying.

24  Q.  Okay.  Well --

25  A.  He pointed out that it appeared I made a false statement

** TRANSCRIPT EXCERPT **

McDermott - cross by Beuke                          111

1  regarding did I ever put my hands on him, and I admit that is

2  not a true statement.  Whether or not I misunderstood --

3  Q.  Now Mr. Cramer --

4         THE COURT:  Wait, wait, wait.

5  BY MR. BEUKE:

6  Q.  Mr. Cramer actually directed you to a portion of the

7  transcript, did he not?

8  A.  Yeah, one portion, and I kept on trying to refer him to the

9  prior portions that had all flowed from when you and Detective

10 Maslanka went into the room, did he hit him, did I hit him,

11 blah, blah, blah.  And those were a denial, and those were

12 honest answers.

13 Q.  Well, at some point during that question or after he

14 directed you to those series of questions and answers in your

15 testimony at the motion to suppress, he asked you this question

16 or these series of questions, and you gave these series of

17 answers.  Correct?

18        "Question:  Is that a truthful answer?

19        "Answer:  If they are referring to the conversation

20 and the statement in his confession, that would have been a

21 truthful answer because it starts out on page 15 about going

22 into a room, conducting a conversation, advising him of his

23 rights, and the questions go on from there, did you coerce the

24 confession out of him?  Did you do this and that?  And I was

25 going along with, no, no, no.  I would say I was not being

** TRANSCRIPT EXCERPT **

McDermott – cross by Beuke          112

1   truthful.

2          "Question:  Why weren't you being truthful, sir?

3          "Answer:  Because he was a murderer, and I didn't want

4   him to get off."

5          Were those your answers to those questions by the U.S.

6   Attorney back in September of 2008?  Yes or no.

7   A.  That is -- yes, and I was guessing.  I was guessing to my

8   motivation at the time --

9   Q.  Well, sir --

10  A.  -- because I don't remember testifying.

11  Q.  But with respect to your answers at the motion to suppress,

12  you knew you struck him in the chest, didn't you, when you were

13  in the grand jury in September of 2008, didn't you?

14  A.  We're tussling with peoples every week.  You don't

15  understand, this was nothing.  This is I'm trying to control a

16  person who murdered a kid, and he is jumping out of chair, and

17  I knock him back down.  Do I consider that abuse?  Absolutely

18  not.

19  Q.  My question is, sir, you never told anybody, either in

20  preparation for your testimony or in response to any questions

21  posed to you during the course of that motion that you struck

22  Mr. Pinex in the chest, did you?  Yes or no.

23  A.  Yes.

24  Q.  Well, with respect to your appearance in July of 2008,

25  Mr. Cramer went on -- or I'm sorry.  Mr. Acosta was questioning

** TRANSCRIPT EXCERPT **

McDermott - cross by Beuke                    113

1   you at that time, isn't that correct?

2   A.   Yes.

3   Q.   And Mr. Acosta, after he went -- he began to ask you

4   questions, did he not, concerning several of the cases that you

5   had been involved in in your career, correct?

6   A.   Yes.

7   Q.   Do you remember Mr. Acosta asking you about a series of

8   cases?

9            "Question:  Well, let me ask you about some names

10  first.  Andrew Maxwell.

11           "Answer:  Yes."

12           Do you recall that question?

13           MS. PERRY:  Objection, Judge.  If I may be heard at

14  sidebar on this.

15       (Sidebar proceedings had in open court outside of the

16  hearing of the jury:)

17           MS. PERRY:  Judge, I get a sense Mr. Beuke is just

18  going to start reading portions of the transcript, and that's

19  an improper procedure.

20           MR. BEUKE:  No, Judge, I am not, Judge.  I'm going to

21  be in and out in two seconds.

22           MS. PERRY:  Well, you're reading directly from the

23  transcript.  Have you asked him yet anything?

24           MR. BEUKE:  Judge, my intention was to indicate that

25  he was -- he began -- the U.S. Attorney in the grand jury began

1   to ask him about a series of cases he was involved in.  And

2   then his question was, well, why do you need immunity?  And his

3   answer is:  I witnessed an abusive act by Jon Burge.

4        Now I think immediately -- at least I think the

5   relevant portion of that answer to that question is he didn't

6   give an answer that I struck Alphonso Pinex in the chest.  And

7   when I testified at a motion to suppress, I never told anybody

8   that I struck Alphonso Pinex in the chest.  What I did was I

9   gave up Jon Burge.  That's -- that's where I'm going.  And I

10  get in and get out, Judge.

11       MS. PERRY:  But you don't need to read the page of

12  questions where he is asked about all these different people.

13       MR. BEUKE:  Well, I think --

14       MS. PERRY:  That wasn't one of them.

15       MR. BEUKE:  I think it needs to be set up, the fact

16  that the series of -- he is asked about some cases.

17       THE COURT:  Well, the proper way to do this is, I

18  guess, did you tell the grand jury such and such.  If then he

19  doesn't, you can confront -- if he denies it.  But you can't

20  just read the transcript to him.

21       MR. BEUKE:  Oh, okay.  Well, I'll -- okay.  All right,

22  judge, I think I understand.

23       (Proceedings had in open court in the presence and hearing

24  of the jury:)

25  BY MR. BEUKE:

McDermott - cross by Beuke                115

1   Q.  Mr. McDermott, with respect to your appearance that morning

2   or afternoon, you were asked by the prosecutor about some of

3   the cases that you had investigated during the course of your

4   career, correct?

5   A.  Yes.

6   Q.  And at some point you indicated you remembered a few of

7   them, you didn't remember a few of them.  Correct?

8   A.  Yes.

9   Q.  And just so it is clear, you had not been told prior to

10  walking in there about any of the cases that they wanted to

11  speak to you about, correct?

12  A.  Correct.

13  Q.  Okay.  And after a series of questions and answers between

14  you and the prosecutor, is it correct that you and Mr. Acosta,

15  at that point he asked you, well, tell the ladies and gentlemen

16  why you think you need immunity, correct?

17          Do you remember that question being asked of you?

18  A.  Yes.

19  Q.  Okay.  And you told Mr. Acosta in response to that

20  question, because I witnessed an abusive act by Jon Burge.

21  Correct.

22  A.  Yes.

23  Q.  You didn't tell the ladies and gentlemen of the grand jury

24  that I committed perjury in my testimony on the People versus

25  Alphonso Pinex case, did you?

** TRANSCRIPT EXCERPT **

1  A.  And I don't believe I did.

2  Q.  Okay.  Well, you didn't tell the ladies and gentlemen of

3  the grand jury that you or your partner were involved in

4  striking Alphonso Pinex in the chest, did you?

5  A.  My partner never laid a hand on him.

6  Q.  Okay.  Well, with respect to you, you didn't tell the

7  ladies and gentlemen that you laid a hand on him, did you?

8  A.  If they asked me specifically, I guess I would have told

9  them that.

10  Q.  Well, he asked you specifically in September, didn't he?

11  A.  Yeah.  But if they asked me specifically if I had of, I

12  would had told them.

13  Q.  Did he ask you specifically in July?

14  A.  No, I don't think they asked about that case.

15  Q.  When he asked you what you thought you needed immunity for,

16  you told him, I witnessed an abusive act by Jon Burge.

17  Correct?

18  A.  And not knowing Jon Burge's intentions, I saw something

19  that was Inappropriate --

20  Q.  That's not question, sir.

21  A.  Well --

22  Q.  Did you tell him, I witnessed an abusive act by Jon Burge?

23  Yes or no.

24  A.  I did say yes.

25  Q.  Okay.  And with respect to that testimony, just so it is